**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP; GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC.; GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC.,<br><br>     *Plaintiffs,*<br><br>v.<br><br>STATE OF GEORGIA; BRIAN KEMP, in his official capacity as the Governor of the State of Georgia; BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia,<br><br>     *Defendants.* | Case No. _____<br><br>**Requesting a three-judge panel pursuant to 28 U.S.C. § 2284** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**<u>INTRODUCTION</u>**

In the wake of the growth of communities of color in Georgia, which was reflected in the 2020 elections and the January 2021 Senate runoffs, the State of Georgia has drawn its Congressional and State legislative maps in violation of the U.S. Constitution and the Voting Rights Act. Reverting to the strategies of the Jim Crow era, Georgia has employed the two classic tactics of gerrymandering to tilt the

1

balance of electoral power to the White majority: "cracking" (diluting the voting power of voters of color across many districts) and "packing" (concentrating the voting power of voters of color in one district to reduce and dilute their voting power in other districts). These redistricting techniques undermine the voting rights of Georgia's Black, Hispanic/Latino ("Latinx") and Asian American Pacific Islander ("AAPI") citizens, and deny them an equal opportunity to elect candidates of their choice.

Plaintiffs GEORGIA STATE CONFERENCE OF THE NAACP; GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC.; and GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC., file this Complaint for Declaratory and Injunctive Relief against Defendants STATE OF GEORGIA; BRIAN KEMP; and BRAD RAFFENSPERGER, and allege as follows:

## **BACKGROUND**

1.      According to the 2020 census, Georgia was among the top five States gaining population in the past decade, with the State adding 1,024,255 residents since 2010—a 10.6% increase. *See* U.S. Census Bureau, *Georgia: 2020 Census*, August 24, 2021, available at: https://www.census.gov/library/stories/state-by-state/georgia-population-change-between-census-decade.html.

2.      Communities of color in the state account for nearly all of Georgia's

2

reported population growth since 2010. This is so despite the well-documented undercounting of racial and ethnic minorities in the 2020 Census. The State's Black population increased by 12.5%, Latinx population increased by 31.6% and AAPI population increased by 52.3%. By contrast, Georgia's White population decreased by 4%.

3.     In short, the reality is that Georgia's population is becoming more racially and ethnically diverse. With full knowledge of the State's fast changing demographics, the party controlling the Georgia General Assembly ("Controlling Party") created redistricting maps for Georgia's House, Senate, and Congressional districts which are based upon the unconstitutional and unlawful use of race. Governor Brian Kemp endorsed these unconstitutional and unlawful maps by enacting them into law.

4.     Racial considerations by the Controlling Party and its chosen map drawers predominated in crucial districting decisions, diluting the voting rights of Black, Latinx, and AAPI voters. Moreover, the Controlling Party ignored the growth of communities of color by failing and refusing to create additional majority-minority and minority opportunity districts in the House, Senate, and Congressional maps.

5.     Had the chosen map drawers and the Georgia General Assembly drawn

districts that accurately reflect Georgia's increasingly diverse population without the improper consideration of race, opportunities for people of color to elect candidates of their choice would have necessarily increased. Instead, the Controlling Party deliberately targeted Black, Latinx, and AAPI Georgians and moved them into and out of districts to deny them equal opportunities to elect candidates of their choice, splitting communities of interest, and ensuring safe districts where White voters can elect their candidates of choice.

6.     The Controlling Party in the General Assembly and their map drawers made districting decisions in which race predominated the process.

7.     These maps ensure that White voters and the party favored by those voters will maintain control of the Georgia General Assembly and Georgia's Congressional delegation for the foreseeable future, despite their dwindling population, denying voters of color an opportunity to elect candidates of their choice.

8.     To accomplish this, the map drawers, chosen by the Controlling Party, used similar tactics on all three maps. First, they unconstitutionally manipulated populations based on race in many districts, moving populations of color in and out of key districts. Second, they unlawfully diluted the voting strength of Black, Latinx and AAPI voters in many districts. And, finally, they abdicated their legal responsibility to create appropriate majority-minority districts, including coalition

4

districts where necessary to give voters of color an opportunity to elect candidates of their choice.

9.      These unconstitutional and illegal redistricting tactics are nothing new in Georgia. As a result, federal courts have repeatedly invalidated Georgia State House, State Senate, and Congressional districts that disadvantaged Black people and other people of color by impermissibly drawing district lines based on race.

10.     It is well-documented that voting is racially polarized in Georgia and Senator John Kennedy, Chair of the Senate Redistricting and Reapportionment Committee, admitted that this is the case during a redistricting hearing on the Controlling Party's State Senate plan.

11.     In fact, Georgia legislators are aware of the degree of racial polarization and have crafted redistricting plans which packed or cracked communities of color into and out of districts to dilute their voting strength in order to prevent them from having a meaningful opportunity to elect candidates of their choice.

12.     Georgia's Black, Latinx, and AAPI voters often vote cohesively in the State to elect candidates of choice and White voters favor different candidates in federal and State elections. In most instances where people of color comprise the majority of the electorate, their preferred candidates win. When White voters comprise a substantial majority of voters, the preferred candidates of voters of color

5

usually lose.

13.     The elected officials who cast the votes to enact the three maps are generally preferred by White voters and not by voters of color – they acted in their own self-interest and that of White voters, and against the voters of color. Indeed, the maps manipulate populations of Black, Latinx, and AAPI person in and out of districts to make otherwise competitive districts safe for White voters and their preferred candidates, which is decidedly unconstitutional. Manipulating populations by race and diluting the votes of persons of color with the goal of maintaining political power is no more lawful when Republicans do it in Georgia today than it was when Dixiecrats did it in Georgia decades ago.

14.     Instead of allowing the incumbents the opportunity to appeal to their districts' increasingly diverse electorate, the Controlling Party in the General Assembly created these new redistricting maps to make districts safer for the Controlling Party's incumbents and candidates, while diluting the voting strength of Georgia's increasingly diverse electorate, with racial considerations used as the means for achieving this partisan end.

15.     To accomplish its goal, the Controlling Party operated with surgical precision to crack and pack districts with higher percentages of Black, Latinx, and AAPI voters, while moving the lines to increase the number of White voters in many

6

districts.

16.    Because Georgia maintains voter registration by race but not by party, the proponents of these maps necessarily used race when redrawing the boundary lines of the districts, including by racial gerrymandering, diluting the voting power of racial and ethnic minorities, and failing to create majority-minority districts.

17.    Moreover, the legislature and map drawers' actions were intentional, occurring in an atmosphere that was racially charged. These three plans were enacted following a regular legislative period that was undeniably hostile to Black, Latinx, and AAPI people.

18.    Just this year, the Georgia General Assembly enacted SB 202, a law that eliminated or changed longstanding voting options in the State that were particularly used in areas with high populations of people of color and resulted in high voter turnout and voters of color electing their candidates of choice.

19.    SB 202 shortens the time between an election where no candidate received a majority of the vote and the runoff in apparent reaction to the approximately 76,000 new voters who registered between the November 2020 general election and the January 2021 Senate runoff elections in which Reverend Raphael Warnock and Jon Ossoff were the first Black and Jewish Senators elected in Georgia. *See* Mark Niesse, *76K new Georgia voters registered before US Senate*

*runoffs,* Atlanta Journal-Constitution, December 17, 2020, available at: https://www.ajc.com/politics/75k-new-georgia-voters-registered-before-us-senate-runoffs/H3CXAFIKFVCKHJNW5MBFZKQDZU/.

20.   SB 202 also changed the deadline by which voters are required to request absentee ballots from the Friday before an election to 11 days before an election and also requires voters to provide a Georgia driver's license number, State ID card number, or copy of another form of acceptable ID with their absentee ballot applications.

21.   According to a November 26, 2021 article in the Atlanta Journal-Constitution, about 52% of the absentee ballot applications submitted by voters for November 2021 general elections were rejected due to voters making the request after the new deadline established by SB 202 and about 15% were rejected due to the new ID requirements mandated by SB 202.  The report also found that about 4% of absentee ballots applications for the November 2021 elections were rejected – a three percentage point increase over the 1% rejection rate in the November 2020 general election before these changes were enacted. The report further noted that few voters whose absentee ballots applications were rejected cast ballots in person on election day. *See* Mark Niesse, *Georgia voting law drives rejections of absentee requests made too late,* AJC (November 26, 2021)

https://www.ajc.com/politics/georgia-voting-law-drives-rejections-of-absentee-requests-made-too-late/HEZUYZA3RZBEVKZSDLEOBXLQ3E/.

22.    SB 202 also provides a clear path for the intimidation of voters by allowing unlimited challenges by partisan organizations and their advocates on an expedited hearing schedule, which gives voters only three days' notice of a hearing by mail.

23.    SB 202 also criminalizes efforts by nonpartisan volunteers to provide water, food, and PPE, even as wait times for voting are notoriously long in communities of color, among other voting changes.

24.    The three Georgia redistricting bills were rushed through in a secretive and dubious process that gave little notice about the maps to the public or even members of the General Assembly who were not in the Controlling Party. Controlling Party members refused to answer questions about why districts were drawn as they were and what information was conveyed to them by their map drawers and consultants.

25.    While paying lip-service to the Voting Rights Act, Controlling Party members refused to explain how these maps were drawn in alleged compliance with the Voting Rights Act and did not provide any of the data produced from a racially polarized voting study they claim to have obtained from a consultant.

26.     The Controlling Party's map drawers (1) strategically removed Black, Latinx, and AAPI voters from existing and performing majority-minority districts and dispersed them into White majority districts in rural and/or suburban areas where they will no longer have the ability to elect the candidates of their choice, and (2) packed Black voters and other voters of color into districts with high minority populations. The Controlling Party's legislators could have had only one motive for passing such facially unconstitutional plans: the desire to limit the voting strength of voters of color statewide.

27.     There are one or more alternative maps for each body that would fix the statutory and constitutional defects.

28.     As alleged in detail below, Plaintiffs respectfully seek a declaratory judgment that the redistricting plans for the Georgia Senate (SB 1 EX/AP), Georgia House of Representatives (HB 1EX LC 47 1163S/AP), and Congress (SB 2 EX/AP) are racial gerrymanders in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution; that these redistricting plans dilute the voting strength of voters of color and deny them the opportunity to elect preferred candidates of their choice in violation of Section 2 of the Voting Rights Act of 1965; and that these redistricting plans were drawn by legislators and were allowed to become law by Governor Kemp's failure to veto them for the express purpose of impermissibly

discriminating against voters of color in violation of the Fourteenth Amendment to the United States Constitution and the intent prong of Section 2 of the Voting Rights Act.

29.     Plaintiffs seek a permanent injunction that prohibits Defendants from calling, holding, supervising, or certifying any election under these plans and further requests the creation of revised redistricting plans that do not infringe upon the constitutional rights of Georgians of color by diluting their voting strength.

30.     Finally, Plaintiffs also seek an order requiring Georgia to preclear voting changes during the following ten-year period pursuant to 52 U.S.C. § 10302.

## **REQUEST FOR THREE-JUDGE PANEL**

31.     Because this action challenges the constitutionality of the apportionment of a statewide legislative body, as well as the apportionment of a State's Congressional delegation, Plaintiffs request the convening of a three-judge panel pursuant to 28 U.S.C. § 2284.

## **PARTIES**

32.     Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP (Georgia NAACP) is a non-partisan, interracial, nonprofit membership organization that was founded in 1941. Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and

economic rights of all persons, in particular African Americans. It is headquartered in Atlanta and currently has approximately 10,000 members.

33.     The Georgia NAACP works to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, get out the vote efforts, election protection, and census participation.

34.     The Georgia NAACP brings this action on behalf of itself and its individual members, including the thousands of Georgia NAACP members who are registered voters residing in Georgia House, State Senate, and Congressional districts where their voting power will be reduced under the new plans.

35.     The Georgia NAACP has branches in counties across the State of Georgia that are involved in voter registration, voter assistance, voter education, election protection, grassroots mobilization, and get out the vote efforts, including Sunday early voting events, such as "Souls to the Polls."

36.     The Georgia NAACP has sought to prevent efforts to suppress or disenfranchise African American voters and has been involved in voting rights litigation in Georgia to vindicate their rights.

37.     The Georgia NAACP engages in voter outreach efforts, including voter education on voting in-person during early voting, voting by mail, and voting in person on election day.

38.     The Georgia NAACP has conducted text and phone banking programs and reached out to voters throughout Georgia to encourage voter participation and to educate the public about the voting process, including about voting by mail.

39.     The Georgia NAACP and its members have a history of advocating for fair redistricting, including a history of advocating for majority-minority coalition districts in Georgia with Black, Latinx, and AAPI voters and litigating claims challenging State legislative, county and school district plans in Georgia as well as other voting rights litigation in the State.

40.     This redistricting cycle, the Georgia NAACP provided oral and written testimony to the House and Senate redistricting committees and submitted proposed Georgia Unity Maps, along with co-Plaintiffs, the Georgia Coalition for the People's Agenda, Inc. and GALEO Latino Community Development Fund, Inc., via the committees' public comment portal and advocated for the adoption of fair maps that adhere to the requirements of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

41.     The Georgia NAACP has had to commit significant time and resources,

and will have to continue to commit significant time and resources to combatting the effects of these new maps on communities of color throughout the State now that they have been enacted. Funds and volunteers normally directed towards programs that the Georgia NAACP implements, such as voter education efforts and voter registration drives, have had to be and will continue to have to be redirected and diverted towards efforts to combat the effects of these unconstitutional new maps on its constituents. By diverting time and resources to these priorities, Georgia NAACP will be unable to commit to other programs that are core to its mission.

42. Plaintiff THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC. ("GCPA") is a Georgia nonprofit corporation with its principal place of business located in Atlanta, Georgia. The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members.

43. In addition to its main office in Atlanta, the GCPA has field offices in Athens, Albany, Augusta, Macon, Savannah, and LaGrange, Georgia where it is able to provide outreach and support to voters and prospective voters of color and underserved communities outside of the Metro Atlanta area.

44. The GCPA brings this action on behalf of its itself and its individual members who are registered voters residing in Georgia House, State Senate, and Congressional districts where their voting power will be reduced under the new

plans.

45.    The GCPA encourages voter registration and participation, particularly among Black and other underrepresented communities of color in Georgia. The GCPA's support of voting rights is central to its mission. The organization has committed, and continues to commit, time and resources to protecting voting rights through advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, get out the vote efforts, election protection, census participation and litigation.

46.    The GCPA conducts voter registration drives, voter ID assistance, "Souls to the Polls" get out the vote events during Sunday early voting and other get out the vote efforts in Georgia that seek to encourage voter participation among Black and Brown voters and voters in historically underserved communities of color. The GCPA in coalition with other civic engagement organizations in Georgia also participates in voter education and voter empowerment programs.

47.    GCPA's voter education and empowerment programs have included, but are not limited to, educating prospective voters about how to register to vote and to confirm their registration status; educating voters about the options to vote in-person during advanced voting, in-person on Election Day, and by mail via absentee ballot; providing information to voters about accessing absentee ballot drop boxes to cast their

15

absentee ballots safely and securely, and helping voters to understand the new voting system implemented for the first-time during the 2020 election cycle statewide.

48.     The GCPA has also distributed civic education materials to voters and prospective voters; arranged for rides to the polls for voters; and supported the Georgia Election Protection field program in order to assist voters on the ground near polling sites.

49.     The GCPA also participates in media interviews, sponsors Public Service Announcements (PSAs), places billboard ads, conducts phone banking, and engages in text message campaigns to educate voters and to encourage participation.

50.     During this redistricting cycle, the GCPA provided oral testimony to the House and Senate redistricting committees and submitted proposed Georgia Unity Maps, along with co-Plaintiffs, the Georgia NAACP and GALEO Latino Community Development Fund, Inc., via the committees' public comment portal and advocated for the adoption of fair maps that adhere to the requirements of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

51.     The GCPA has had to commit significant time and resources, and will have to continue to commit significant time and resources to combatting the effects of these new maps on communities of color throughout the state now that they have been enacted. Funds and volunteers normally directed towards programs that the

GCPA implements, such as voter empowerment efforts and voter registration drives, have had to be and will continue to have to be redirected and diverted towards efforts to combat the effects of these new maps on its constituents. By diverting time and resources to these priorities, GCPA will be unable to commit to other programs that are core to its mission.

52.    Plaintiff GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC. ("GALEO") is a non-partisan, nonprofit corporation. GALEO is one of the oldest, largest, and most significant organizations promoting and protecting the civil rights of Georgia's Latinx community. GALEO has approximately 165 members across Georgia.

53.    GALEO's headquarters is in Norcross, which is in Gwinnett County, and a substantial amount of GALEO's civic engagement, voter registration and get-out-the-vote work takes place in Gwinnett County and other Metro Atlanta counties, areas in which the Controlling Party targeted people of color in its redistricting maps.

54.    GALEO's work includes organizing voter education, civic engagement, voter empowerment and get out the vote events and conducting voter registration drives. After Gwinnett County became a covered jurisdiction for Spanish under Section 203 in December 2016, GALEO has worked also with the

Gwinnett County Board of Registrations and Elections in an effort to bring its procedures and election materials into compliance with the law's requirements.

55.    During the 2020 election cycle, GALEO also worked to address challenges facing Gwinnett County's limited-English-proficiency Spanish speaking voters as a result of the impact of the COVID-19 pandemic.

56.    GALEO sent bilingual mailers to Latinx Gwinnett County voters with information about the presidential primary as well as additional mailers after the primary was postponed due to COVID-19.

57.    In this redistricting cycle, GALEO provided oral testimony to the House and Senate redistricting committees and submitted proposed Georgia Unity Maps, along with co-Plaintiffs, the Georgia NAACP and GCPA via the committees' public comment portal and advocated for the adoption of fair maps that that adhere to the requirements of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

58.    GALEO has had to commit significant time and resources, and will continue to have to commit significant time and resources to combatting the effects of these new maps on communities of color throughout the State now that they have been enacted. Funds and volunteers normally directed towards programs that the GALEO implements, such as voter empowerment efforts and voter registration

drives, have had to be and will continue to have to be redirected and diverted towards efforts to combat the effects of these new maps on its constituents. By diverting time and resources to these priorities, GALEO will be unable to commit to other programs that are core to its mission.

59.     Defendant STATE OF GEORGIA is a sovereign State of the United States of America.

60.     Defendant BRIAN KEMP is the Governor of Georgia and is the chief executive officer of the State of Georgia. Governor Kemp is sued in his official capacity.

61.     Defendant BRAD RAFFENSPERGER is the Secretary of State of Georgia, the State's chief election officer and is responsible for administering and implementing Georgia's election laws and regulations. Secretary Raffensperger is sued in his official capacity.

## **STATEMENT OF FACTS**

62.     The Georgia House of Representatives is comprised of 180 members. Each representative is elected from a single-member district. Georgia State legislative and Congressional elections are partisan.  Primary and general elections feature a majority vote requirement.  If no candidate receives a majority of the votes cast, a runoff election is held between the top two candidates.

19

63.     The majority vote requirement and runoffs make it more difficult for Latinx, Black, and AAPI voters to elect candidates of choice because they individually comprise a minority of the electorate and voting patterns in Georgia State legislative and Congressional election contests are racially polarized.

64.     These polarized voting patterns are highly correlated with support for Georgia's two major political parties. Georgia's Latinx, Black, and AAPI voters strongly favor candidates from the Democratic Party, while the State's White voters overwhelmingly favor candidates from the Republican Party.

65.     Racial, ethnic and language minorities historically have been and continue to be underrepresented in the Georgia General Assembly, particularly with respect to Georgia's Latinx and AAPI communities.  According to the 2020 Census, Georgia's total population is comprised of 51.9% of individuals identifying as White alone; 31% as Black alone; 10.5% as Hispanic or Latino; and 4.5% as Asian alone. *See* United States Census Bureau, Georgia: 2020 Census (August 25, 2021), https://www.census.gov/library/stories/state-by-state/georgia-population-change-between-census-decade.html.

66.     By contrast, according to a December 2020 report by the National Conference of State Legislatures, 71% of the Georgia General Assembly's legislators were White, and only 1% were Latinx or AAPI. *See* National Conference

of State Legislatures, *State Legislator Demographics* (December 1, 2020), https://www.ncsl.org/research/about-state-legislatures/state-legislator-demographics.aspx (note that this study was not updated to reflect the demographics of newly elected candidates who took their seats after the November 2020 general election).

## I. History of Discrimination in Georgia Relevant to Redistricting

67. There is a long and well-documented history of voting discrimination against voters of color in Georgia. Indeed, Courts repeatedly have acknowledged Georgia's extensive history of discrimination in this area. *See Fair Fight Action, Inc. v. Brad Raffensperger*, Order, 1:18-cv-05391-SCJ, Document 636 at 41 (11/15/21) (taking judicial notice of Georgia's "long sad history of racist policies in a number of areas including voting"); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020) ("Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy."); *Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1314-16 (N.D. Ga. 2013) (citing *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560–61, 1571 (S.D. Ga. 1994) (Georgia's "segregation practice and laws at all levels has been rehashed so

21

many times that the Court can all but take judicial notice thereof"), *vacated and remanded on other grounds*, 775 F.3d 1336 (11th Cir. 2015); and *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("we have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases").

68.    The history of voting discrimination against voters of color in Georgia is further detailed in various expert reports filed in federal voting rights litigation in Georgia and was also documented by Laughlin McDonald, et al., in *Quiet Revolution In The South: The Impact of the Voting Rights Act 1965-1990*, pp. 67-102 (Chandler Davidson & Bernard Grofman eds., 1994).

69.    The historical background of redistricting by the Georgia Legislature includes numerous federal court orders revising Georgia's redistricting plans to cure violations of the federal Voting Rights Act or the Constitution. *See*, *e.g.*, *Georgia v. United States*, 411 U.S. 526 (1973) (finding a violation of Section 5 of the Voting Rights Act); *Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982), *aff'd mem.*, 459 U.S. 1116 (1983) (finding discriminatory purpose); *Miller v. Johnson*, 515 U.S. 900, 917 (1995) (finding racial gerrymandering); *Abrams v. Johnson*, 521 U.S. 74, 107 (1997) (same); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356 (N.D. Ga.), aff'd, 542 U.S. 947 (2004) (finding that the redistricting plan violated one person, one vote

principle); *Georgia v. Ashcroft*, 539 U.S. 461, 486 (2003) (noting that redistricting plan made it more difficult for minority voters to elect a candidate of their choice).

## II.    Racial and Ethnic Demographics of Voting in Georgia

70.    The Secretary of State of Georgia maintains detailed records as to the racial demographics of voters because Georgia's voter registration forms ask applicants to identify their race or ethnicity to comply with the Voting Rights Act. *See* Georgia Voter Registration Form, https://sos.ga.gov/admin/files/GA_VR_APP_2019.pdf.  The form also does not ask voters to identify their political party preference.  As a result, the Controlling Party legislators and its elected officials are well aware of the implications of making decisions as to voting on racial and ethnic minorities.

71.    In every presidential election since 2004, the share of registered voters who are White has decreased in Georgia from 68% in 2004, to 63% in 2008, to 59% in 2012, to 56% in 2016, to 53% in 2020.  During that same period, the cumulative share of registered Black, Latinx, and AAPI voters and other voters of color has increased.

72.    The percentage of the vote that the Republican Presidential candidate has received in Georgia has decreased in every election since 2004 with the exception of 2012.

73.     The 2018 statewide election in Georgia demonstrated how fragile the Republican party's hold on the State was. While Republican candidates won the races for Governor, Lieutenant Governor, Secretary of State, and Attorney General, all of the winners received less than 52% of the vote and the Secretary of State election went to a run-off.

74.     In 2020, a Democratic presidential candidate won Georgia's electoral college votes for the first time in Georgia since 1992, and two senatorial races were sent to run-offs, with both Democratic candidates winning in January 2021. This was the first time a Democrat had won a United States Senate race in Georgia since 2000.

75.     Between 2016 and 2020, the share of registered voters who are White decreased from 56% to 53% and the percentage of voters who turned out who were White decreased from 61% to 58%. These percentages stayed the same for the January 2021 run-off elections.  The 3% drop was determinative in who won the 2020 and 2021 elections.

76.     Election analysis demonstrates that Black, Latinx, and AAPI voters of color overwhelmingly provide strong support to Democratic candidates. Members of the Georgia General Assembly are aware of this fact.

77.     In fact, during the 2021 regular legislative session, the Controlling Party in the Georgia General Assembly passed SB 202, an omnibus voter

suppression bill, which took aim at the voting methods increasingly being used by voters of color—including absentee and mail-in voting, early voting, out of precinct voting, and the use of ballot drop boxes. The Controlling Party did so in an effort to stem the tide of Black, Latinx, and AAPI voters electing candidates of choice in statewide and local elections. Passage of SB 202 was largely premised upon a false narrative of alleged voter fraud in majority-Black Fulton County following President Joe Biden's win in Georgia.

78.    Apparently unsatisfied that making it harder for Black voters and other voters of color to cast ballots in Georgia's elections would guarantee their electoral success notwithstanding their dwindling share of the vote, the Controlling Party rammed through State legislative and Congressional redistricting maps to racially gerrymander districts which dilute the voting strength of Black, Latinx, and AAPI voters to deny them an equal opportunity to elect candidates of choice.

79.    Manipulating voting districts in an effort to retain its dwindling vote share is nothing new for the Controlling Party.

III.    **Demographic Changes in Georgia between 2010 and 2020**

80.    There have been pronounced demographic shifts in Georgia since the 2010 Census. In fact, the 2020 Census found that the percentage of people of color residing in Georgia grew dramatically since 2010, with Black residents growing by

12.5%, Latinx by 31.6%, AAPI residents by 52.3%, while the White population of Georgia decreased by 4%.

81.    Moreover, while the percentage of Georgia's White voters has steadily decreased since 2004, the percentage of the voters of color has steadily increased. From 2004 to 2020, registered voters of color increased in Georgia from 29.8% to 38.3%. White voter registration decreased from 68.7% in 2006, to 52.7% in 2020. In the 2021 Georgia senate runoff election, 228,000 new voters cast ballots who did not participate in the November 2020 general election. These voters tended to be more racially diverse and younger than in past elections.

82.    Of Georgia's 250 existing Congressional and statewide legislative districts prior to the enactment of the new redistricting maps, 74 State House, 20 State Senate and 5 Congressional districts had a voting age population of people of color of more than 50%.

83.    Packing minority voters into as few districts as possible—while maximizing the number of districts where White voters comprise 55% or more of the electorate—has long been a strategy to maintain political dominance for White voters in Georgia. This strategy is present in the new redistricting plans passed by the General Assembly and which were signed into law by Governor Kemp.

IV.    **The Georgia 2021 Redistricting Process and Proceedings**

A. **Town Halls Convened by the Joint House and Senate Committees on Redistricting and the Public Comment Portal**

84.    The Georgia General Assembly's Joint House and Senate Redistricting Committee held a series of Town Halls in various locations around the State where they solicited public comment about the redistricting process prior to the introduction of any redistricting plans by the General Assembly and before the 2020 Census data were published.

85.    As a result, the public was unable to comment on any maps or plans proposed by legislators, nor did they have the 2020 Census data yet to inform map drawing considerations.

86.    Instead, a considerable focus of the oral public comment at the Town Halls, as well as in hundreds of public comments submitted to the committees via a public portal on the General Assembly's website (including by Plaintiffs), was on demands for a transparent, fair and equitable process, rather than a focus upon specific mapping proposals by the legislature or Census results.

87.    During these Town Halls, legislators did not respond to numerous questions posed to them by the public (including by Plaintiffs) about how the redistricting process would be conducted; when and how redistricting plans and background about the plans would be shared with the public; and whether the

legislature would consider maps, data and alternatives plans submitted by the public. The legislators also did not respond to written public comments submitted to the committees' public comment portal.

88.    While there were many members of the public who expressed concerns about the fact the Town Halls did not provide accommodations for persons with limited English proficiency, who were vision or hearing impaired, or were otherwise physically disabled, no action was taken by the Joint Committee Chairs, Representative Bonnie Rich and Senator John Kennedy, to make the Town Halls accessible for Georgians who needed such accommodations. Once the special redistricting session began on November 3, 2021, the Chairs of the Committees also failed to make such accommodations available for Georgians who needed them.

89.    The pleas for transparency and a fair and equitable process made by members of the public at the Town Halls and on the public comment portal were virtually ignored by the Controlling Party.

90.    Instead, the Controlling Party rammed through all three maps during the special session, providing little to no information about the rationale for drawing the districts and refusing to share information with the public about the role consultants played in the drawing of the Controlling Party's maps, what voter data the map-makers relied on to draw the maps (and in particular, whether that included

race-based data), and what advice they were given by the consultants about how the maps should be drawn and why.

91.     When members of the public complained about the lack of transparency in the process during committee hearings and the absence of any real opportunity to examine and analyze the proposed maps before and after the commencement of the special session on November 3, 2021, these complaints were frequently met with Controlling Party legislators pointing to the Town Halls as evidence that the process was transparent – even though they all took place before a single map was proposed by legislators, none of the legislators responded in substance to any of the comments or questions made by the public during the Town Halls or on the public portal, and Georgia's final Census data was not released until after the final Town Hall was held on August 11, 2021.

**B. Events Prior to the Commencement of the Special Session on November 3, 2021**

92.     On September 23, 2021, Governor Kemp signed a proclamation ordering the commencement of a special session of the Georgia General Assembly on November 3, 2021 for the purpose of drawing new redistricting maps for Georgia's House, Senate and Congressional districts, among other things.  *See* https://gov.georgia.gov/executive-action/proclamations.

93.     On September 27, 2021, before the special session began, the General

Assembly's Legislative and Congressional Reapportionment Office posted a proposed Congressional redistricting plan submitted by Senator John Kennedy, Chair of the Georgia Senate Redistricting Committee, on its website: https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/cong-s18-p1-packet.pdf?sfvrsn=dd7b16e7_2. This plan included total population and voting age population data for the racial and ethnic composition of each proposed district.

94.     The Reapportionment Office is a joint office of the Georgia House and Senate responsible for providing the General Assembly with redistricting services. According to the General Assembly's website, the "office uses data provided to the State of Georgia by the U.S. Census Bureau for the purpose of redistricting.  In addition to providing the technical assistance to redistrict, the website states that the office provides an array of maps and up to date data reports which include information on demographics, precincts, and local redistricting." *See* GEORGIA GENERAL ASSEMBLY: LEGISLATIVE AND CONGRESSIONAL REAPPORTIONMENT OFFICE (2021), https://www.legis.ga.gov/joint-office/reapportionment.

95.     While the Reapportionment Office is supposed to be nonpartisan and open to all members of the General Assembly from any party, and its employees are paid by the taxpayers of Georgia, the House and Senate redistricting committees

passed guidelines ("committee guidelines") for the 2021 redistricting special session

which provided, among other things, that:

> [R]edistricting plans and other records related to the provision of [Reapportionment Office] staff services to individual members of the General Assembly will not be subject to public disclosure. Only the author of a particular map may waive the confidentiality of his or her own work product. This confidentiality provision will not apply with respect to records related to the provision of staff services to any committee or subcommittee as a whole or to any records which are or have been previously disclosed by or pursuant to the direction of an individual member of the General Assembly.

*See* Georgia Senate redistricting committee's guidelines, https://www.legis.ga.gov/

api/document/docs/default-source/reapportionment-document-library/2021-senate-

redistricting-committee-guidelines.pdf?sfvrsn=a9bbb991_2;    House redistricting

committee's guidelines here: https://www.legis.ga.gov/api/document/docs/default-

source/reapportionment-document-library/2021-senate-redistricting-committee-

guidelines.pdf?sfvrsn=a9bbb991_2.

96.    Additionally, communications between legislators and Reapportionment Office staff and the nature of the services provided by the Reapportionment Office to legislators are exempt from Georgia's Open Records Act, meaning that the public has no access to this information absent obtaining it in discovery during litigation.

97.    Thus, the Reapportionment Office and Controlling Party members

engaged in a secretive process which excluded the public and minority party members, preventing them from obtaining critical information about how and why the redistricting plans were drawn the way they were. In particular, the public and minority party members were denied information regarding whether the Reapportionment Office and the Controlling Party's members relied on race as a predominant factor to draw the maps, whether the Reapportionment Office and Controlling Party members complied with the VRA to draw the maps, and whether the Reapportionment Office and the Controlling Party intentionally drew the maps to discriminate against Georgians on the basis of race or ethnicity.

98.    Aside from the map, data, and shapefiles posted on the Reapportionment Office website, the initial version of the Congressional district plan sponsored by Senator Kennedy was not accompanied by information explaining any rationale about how or why the plan was drawn as it was. No legislative hearings were ever held on this Congressional plan.

99.    On October 21, 2021, the Reapportionment Office posted a Congressional district plan submitted by the Georgia House and Senate Democratic Caucuses identified as HB 5EX.

100.    On October 28, 2021, the Reapportionment Office posted a State Senate

plan submitted by the Georgia Democratic Senate Caucus identified as SB 4EX.

101.   On October 29, 2021, the Reapportionment Office posted a State House plan submitted by the Georgia House Democratic Caucus identified as HB 4EX.

102.   On November 2, 2021, the day before the special session was scheduled to begin on November 3, 2021, the Reapportionment Office posted a House district plan identified as HB 1EX submitted by the House committee's Controlling Party's Chair and a Senate district plan identified as SB 1EX submitted by the Senate committee's Controlling Party's Chair.

### C. The Georgia Senate Redistricting Plan and Proceedings

103.   The 2021 Georgia redistricting process was designed by the Controlling Party to be anything but transparent. Line drawing was done by design in secret by Controlling Party's members with the assistance of the supposedly non-partisan Reapportionment Office; multiple committee meeting agendas were issued with the only information provided as, "TBD," i.e., "To be Determined;" redistricting plans and substitute bills were sometimes disclosed within hours of their introduction or even after committee meetings discussing them had already begun.

104.   The lack of transparency and the intentionally rushed process virtually guaranteed that the Controlling Party's redistricting plans would not be reflective of the interests and concerns of Georgia's voters—particularly those of Georgia's fast-

33

growing communities of color demanding that the plans comply with the Voting Rights Act, United States Constitution and respect their communities of interest, during the redistricting proceedings.

105.   On November 2, 2021, the Senate Reapportionment and Redistricting Committee Chair, Senator John Kennedy, issued a notice that the committee would meet on November 3, 2021 at 1:00 p.m.  The agenda for the meeting stated it was "TBD." A skeletal bill, SB 1EX LC 47 1159, was also submitted to the Senate Hopper on November 2, 2011 which contained no specific information about the Controlling Party's Senate redistricting plan.

106.   The November 3, 2021 Senate committee meeting was relatively short and generally included a brief discussion of the aforementioned Senate redistricting committee guidelines by Chair Kennedy, the committee's process going forward, and an announcement that there would be another meeting the following day on November 4, 2021 where public comment would be allowed.

107.   Chairman Kennedy also indicated that he expected to pass a Senate districting redistricting plan out of committee as early as on November 5, 2021 – just two days after the start of the special session and before any substantive discussion of the bills by the committee.

108.   On November 4, 2021, Chairman Kennedy introduced a Senate substitute bill, SB 1EX LC 47 1165S, also known as, "User: S018 Plan Name: Senate-prop1-2021   Plan   Type:   Senate."   It   is   available   at: https://www.legis.ga.gov/api/legislation/document/2021EX/202757.   This   Senate plan included total population and voting age population data regarding of the racial and ethnic composition of each proposed district, but no other information was made available concerning how or why the plan was drawn as it was.

109.   Chairman Kennedy also announced that he planned to permit the minority leader, Senator Gloria Butler, to introduce the Democratic Caucus' Senate plan (SB 4EX LC 47 1154), but leader Butler objected because the minority party had not been informed that the Chair planned to take up the Democratic caucus' bill at this meeting.  As a result, the hearing on the minority party's map was deferred to the following day's meeting on November 5, 2021.

110.   The Senate Reapportionment and Redistricting Committee met next on November 5, 2021. The Agenda included a reference to public comment and that the committee would be conducting a hearing on SB 4 (Sen. Butler) and consideration of SB 1 (Sen. Kennedy). (These bills were introduced as SB 4EX LC 1154 and SB 1EX 1165S, respectively).

111.   During this hearing, Chairman Kennedy stated that the 2021

35

redistricting committee guidelines included prioritizing keeping counties whole, yet the Senate plan splits 29 of Georgia's 159 counties, including counties where communities of color account for the significant growth in population reported in the 2020 Census.

112.   The committee considered the Controlling Party's Senate Plan, SB 1EX 1165S, as well as the minority party's plan, SB 4EX LC 47 1154. Public comment on the bills was received, with the majority of the public comments opposed to the passage of the Controlling Party's plan.

113.   Members of the public and the minority party objected to the Controlling Party's lack of transparency and the rushed process which failed to give the public any reasonable opportunity to analyze the bill. Members of the public also objected to the plan because of racially gerrymandered districts and minority vote dilution present in the Controlling Party's plan.

114.   Nevertheless, the Controlling Party's Senate plan was voted out of committee at this meeting after only three days of hearings.

115.   This plan was passed by the General Assembly on November 15, 2021 following a Senate floor vote along party lines of 34-21 on November 9, 2021 and a House floor vote along party lines of 96-70 on November 15, 2021.

116.   Governor Kemp signed the Senate plan, which is a racial gerrymander

and violates Section 2 of the Voting Rights Act, into law.

### D. The Georgia House Redistricting Plan and Proceedings

117.   On Friday, November 5, 2021, Representative Bonnie Rich, the Chair of the House Legislative and Congressional Reapportionment Committee, convened the first meeting of the committee to discuss HB 1EX, the Controlling Party's House redistricting bill, and HB 4EX, the Democratic Caucus' House redistricting bill.  The agenda provided no information about whether the committee would entertain public comment. During this meeting, the Chair and members of the committee generally discussed the committee's redistricting guidelines and the process for the hearings on the proposed House plans.

118.   On the following Monday, November 8, 2021, the Reapportionment Office posted a substitute House district plan, HB 1EX LC 47 1163S, submitted by Chair Rich, replacing the previous skeletal redistricting bill proposed by the Controlling Party. This bill was subsequently introduced the same day at the House committee meeting convened by Chair Rich, giving the public and minority party lawmakers little time to review changes made to the Controlling Party's House redistricting bill. The substitute bill was also not mentioned in the agenda circulated prior to the meeting.

119.   On the following day, November 9, 2021, Chair Rich convened another

hearing on HB 1EX LC 47 1163S and received public comment, most of which was negative, with members of the public complaining about the lack of transparency and the failure of the Controlling Party to provide the public with information about the rationale for the way districts were drawn in the plan. Members of the public, as well as minority members of the committee, also provided negative comments about the racial gerrymanders and minority vote dilution present in the plan.

120.   Nevertheless, the Controlling Party's House substitute redistricting bill was voted out of committee on November 9, 2021, after only three days of public hearings, and was later passed by a House floor vote along party lines of 99-79 the following day on November 10, 2021. It was subsequently passed by a Senate floor vote two days later on November 12, 2021, on a vote of 32-21 along party lines.

121. Governor Kemp chose not to veto the Controlling Party's unconstitutional and unlawful House redistricting plan and allowed it to become law.

### E. The Georgia Congressional Redistricting Plan and Proceedings

122.   A skeletal Congressional redistricting bill was filed as SB 2EX LC 47 1158 in the Senate Hopper on November 2, 2021 and was read and referred to the Senate Reapportionment and Redistricting Committee on November 3, 2021. This bill contained no details about the map or plan and did not reference the Congressional plan posted by the Reapportionment Office that had been submitted

by Chairman Kennedy on September 27, 2021.

123.   On November 17, 2021, just hours before the Senate Reapportionment and Redistricting Committee was scheduled to convene that day, the Reapportionment Office posted a Congressional district plan jointly sponsored by the House and Senate Controlling Party's redistricting committee chairs, giving neither the public nor the minority party's legislators any reasonable opportunity to review or analyze the plan before the hearing began. *See* https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/congress-prop1-2021-packet.pdf?sfvrsn=104b7388_2. This plan was introduced in the Georgia Senate and considered by the House redistricting committee as SB 2EX LC 47 1166S and in ("Joint Congressional Plan"). This plan included data on the race and ethnicity of the total population and voting age population (VAP) in each proposed district.

124.   Hearings on the joint Congressional plan began on November 17, 2021 in both the Senate and House redistricting committees.

125.   The very next day, on November 18, 2021, the Senate Reapportionment and Redistricting Committee voted the joint Congressional plan out of committee and it was passed on the Senate floor the following day, November 19, 2021, by a vote of 32-21, along party lines—only two days after the plan was first made

available to the public and the hearings on the bill were commenced in the Senate redistricting committee.

126.   The House committee also held a hearing on November 18, 2021 on the joint Congressional plan, SB 2EX LC 47 1166S, and on the Democratic Caucus' Congressional plan, HB 5EX LC 47 1149. The House committee scheduled another hearing on the joint Congressional plan on Saturday, November 20, 2021 at 9:00 a.m. where the Congressional plan was passed out of committee.

127.   A House floor vote was held on Monday, November 22, 2021 and SB 2 EX LC 47 1166S was passed by a vote of 96-68 along party lines. A copy of the final bill as passed by the Georgia General Assembly is entitled "SB 2EX/AP and is available on the Georgia General Assembly's website at: https://www.legis.ga.gov/api/legislation/document/2021EX/203133.

128.   The joint Congressional plan is a racial gerrymander and violates Section 2 of the Voting Rights Act because race predominated in the drawing of the plan and the plan dilutes the voting strength of voters of color.

129. Nevertheless, Governor Kemp signed the Controlling Party's unconstitutional and unlawful Joint Congressional district plan and as well as the

Controlling Party's House and Senate plans into law.

## V.    Analyses of the Enacted Redistricting Plans

### A. The Joint Controlling Party Congressional Plan

130.   The Controlling Party and its map drawers could have drawn two additional Congressional districts to give people of color a meaningful opportunity to elect candidates of their choice by unpacking at least one Congressional district in Metro Atlanta and another in southeastern Georgia, but chose not to.

131.   Instead, they chose to racially gerrymander Congressional districts and dilute the voting strength of voters of color. Some of the most egregious instances of racial gerrymanders and minority vote dilution in the new Congressional plan (SB 2 EX/AP) are present in the Metro Atlanta area, particularly in Congressional

Districts 3, 4, 6, 7, 9, 10, 11 and 13, where communities of color are cracked or packed to dilute their voting strength.

132.   Key demographic changes in the new Congressional districts are reflected in Tables 1-4, which are attached and incorporated by reference to Appendix 1.

133.   The Controlling Party and its map drawers chose to egregiously increase the packing of people of color in CD-13 to dilute their voting strength and to deny them an equal opportunity to participate in the political process.

134.   The total population of people of color in CD-13 in the new plan is a whopping 83.65%, with 64.26% of the packed district comprised of persons identifying as Black alone in the 2020 Census. This is an overall increase in the total population of people of color in the already overpacked CD-13 of 4.41 percentage points. The people of color VAP in the new CD-13 plan is 81.18%, an increase of 4.76 percentage points, and the Black VAP is 63.75%, an increase of 4.03 percentage points. The percentage of registered voters of color in the new CD-13 plan is 79.32%, an increase of 4.98 percentage points, and the Black registered voter percentage is 70.75%, an increase of 4.66 percentage points.

135.   The Controlling Party and its map drawers offered no evidence during the hearings on the Congressional plan demonstrating that the packing of CD-13 to

such an extraordinary degree was necessary to provide voters of color or Black voters an equal opportunity to elect candidates of their choice or was required to comply with traditional districting principles or for any other legitimate reason.

136.   Although the Controlling Party and its map drawers could have unpacked CD-13 to relieve the overpacking in order to facilitate the creation of another majority-minority Congressional district in the Metro Atlanta area, they chose not to do so and, instead, created a Congressional plan which dilutes the voting strength of people of color and Black voters in CD-13 and denies voters of color and Black voters an equal opportunity to participate in the political process.

137.   CD-6 in the new plan is another example where the Controlling Party and its map drawers manipulated the district lines to dilute the voting strength of people of color and where race predominated over traditional districting principles.

138.   CD-6 was only 657 persons away from the ideal district size of 765,736 for equal apportionment based upon the 2020 Census. Nevertheless, the Controlling Party and its map drawers retained 404,452 people from the prior plan or about 52.8% of the former plan's population in the new CD-6 plan.

139.   This group is 61.5% White by population, 63.9% White by VAP and 61.7% White by voter registration.  About 361,351 people, or approximately 47.2%

of CD-6's population, was swapped out of the district by the Controlling Party's mappers.

140.   Of that population—which was removed from Cobb, Fulton, and DeKalb County portions of the district—184,254 or 51% of the population were people of color. 134,972 of 279,240 or 49% of the removed population were people of color by VAP, and 82,606 of 222,271 or 37.2% were registered voters of color.

141.   Of the added population—which was drawn from Forsyth, Dawson, Cherokee, Gwinnett, and Cobb Counties—121,810 of 360,684 or 33.8% of the population were people of color; 79,828 of 264,430 or 30% were people of color by VAP; and, 50,808 of 240,187 or 21.15% were registered voters of color.

142.    The new CD-6 plan drastically changed the geography of the district as well as its demographics. The net result was that the new CD-6 plan had 62,482 fewer persons of color than under the previous plan and 61,670 more White persons.

143.   The percentage of White registered voters in CD-6 under the new plan increased from 58.39% to 65.60%, while the percentage of registered voters who are people of color decreased from 32.19% to 25.38%, a loss of 6.81 percentage points. The White voting age population of the district also increased from 58.13% to 66.63%, while the voting age population of people of color decreased from 41.88% to 33.37%, a loss of 8.51 percentage points. The total White population of the district

also increased – growing from 55.58% to 63.70%, while the total population of people of color decreased from 44.42% to 36.30%, under the new plan, a loss of 8.12%.

144.   Under every metric, the changes made by the Controlling Party and its map drawers to CD-6 made it a safe district for White voters by diluting the voting strength of persons of color in order to prevent them and cross-over voters from having a meaningful opportunity to elect candidates of choice.

145.   Since CD-6 was only 657 persons away from ideal population size for apportionment, there was no legitimate reason for the Controlling Party and its map drawers to surgically remove 62,482 people of color from CD-6 and replace them with 61,670 more White people except to dilute the voting strength of voters of color who had helped elect CD-6's first Black female Congresswoman, Lucy McBath, as their candidate of choice in the 2018 mid-term election.

146.   The Controlling Party and its map drawers sorted voters by race into and out of CD-6 to dilute the voting strength of voters of color and to deny voters of color an equal opportunity to participate in the political process in CD-6.

147.   The new Congressional plan also continues to pack people of color in CD-4, which was already a majority-minority district in the previous Congressional

plan.

148.   In the new CD-4 plan, people of color comprise 74.18% of the total population in the new plan, with 52.19% of the population identifying Black alone in the 2020 Census. This represents a small reduction of the packing of this district, but is still well above the percentage of population necessary for voters of color to have a meaningful opportunity to elect candidates of their choice. As a result, the new plan dilutes the voting strength of people of color in the Atlanta area by packing them into CD-4.

149.   Although the Controlling Party and its map drawers could have created another majority-minority Congressional district in the Metro Atlanta by unpacking CD-13 and CD-4 and by moving voters of color from other adjacent districts to give the growing population of people of color a meaningful opportunity to elect candidates of choice, they chose not to do so and did not provide any rationale for continuing to overpack CD-4 during the legislative hearings on the new Congressional plan.

150.   Voters of color in Henry, Fayette, and Newton counties also remain cracked between the packed CD-13 and the majority-White CD-3 and CD-10, diluting their voting strength.  The plan also cracks communities of color in Douglas County, which was not split in the 2011-2021 plan. The new plan moves a total of

42,970 people into the majority-White CD-3. 19,532 or 45.5% of the persons moved into CD-3 are people of color.

151.   Approximately 283,464 people, 85% of whom were in CD-7 in Gwinnett County in the prior plan, and approximately 54% of whom are people of color, were moved to the majority-White CD-9. Had these voters of color been retained in CD-7, they could have been used to facilitate the drawing of a new fifth majority-minority Congressional district in the Metro Atlanta area, giving these voters of color a meaningful opportunity to elect candidates of choice.

152.   The new Congressional plan also dilutes the voting strength of voters of color in Cobb County, including those residing in the majority-minority cities of Marietta, Smyrna, Powder Springs, Austell, and in areas adjacent to I-75.

153.   The center of Cobb County and numerous cities along I-75 are paired with majority-White Cherokee, Bartow, and Pickens counties to make CD-11, a

majority-White district, which preserves the cracking of growing communities of color in these areas in the previous map, diluting their voting strength.

154.   In the southern part of Cobb County, voters of color continue to be packed into CD-13 at unnecessarily high levels—far above what is needed for them to have a meaningful opportunity to elect candidates of their choice.

155.   In the new Congressional plan, the Controlling Party and its map drawers moved 77,813 people out of Cobb County to majority-White CD-14. This included persons residing in southwestern Cobb County in the majority-minority cities of Powder Springs and Austell - the majority of whom are people of color,

156.   60,003 or 77% of the persons moved into CD-14 were previously in majority-Black CD-13, the rest were from majority-White CD-11. The majority of the persons moved into CD-14 from CD-13 and CD-11 were people of color.

157.   44,429 or 74% of the 60,003 people moved into CD-14 from CD-13 were people of color by total population; 70% of persons of voting age (VAP) who were moved were people of color; 63.6% of citizens of voting age (CVAP) who were moved were people of color, and 68.3% of registered voters who were moved were

people of color. 31,611 or 52.7% of the persons from CD-13 who were moved into CD-14 are Black and 51% of those persons were of voting age.

158.   17,810 persons moved into majority-White CD-14 from majority-White CD-11 were 34% people of color by total population and 30.5% by voting age population.

159.   Rather than diluting the voting strength of voters of color who were moved into CD-14 from majority-Black CD-13, the Controlling Party's lawmakers and map drawers should have drawn population from adjacent areas of CD-9 and/or additional population from CD-11 to equalize the population of CD-14.

160.   Instead, the Controlling Party's lawmakers ignored pleas from community members of color affected by this change during legislative committee hearings who expressed concerns the change would dilute their voting strength and move them into a district with which they have little or no shared common interests.

161.   In southwest Georgia, CD-2 was a majority-Black district in the 2012 Congressional plan based upon 2020 Census results, but was not retained as a majority-Black district in the new plan.

162.   The district was malapportioned and needed to add 92,108 people to be approximately equal in population to the other Congressional districts.

163.   While some of that malapportionment was cured with the addition of portions of the racially diverse city of Warner Robins, the Controlling Party and its mappers increased the White population of this formerly majority-Black district by retaining majority-White Lee, Grady, Seminole, and Miller counties in the district, adding majority-White Thomas County, and by removing Crisp County, a majority-minority county, in the new CD-2 plan.

164.   The end result was that the new plan increased the non-Hispanic White total population from 38.63% to 39.94%, an increase of 1.32 percentage points, while reducing the total Black-alone population to from 50.89% to 49.03%, a decrease of 1.86 percentage points. The new plan also increased the non-Hispanic White VAP from 41.35% to 42.73%, an increase of 1.38 percentage points, while reducing the Black alone VAP from 49.47% to 47.62%, a decrease of 1.68 percentage points.  The plan also reduced the Black alone population of registered voters from 53.69% to 51.53%, and increased the population of non-Hispanic White population from 39.40% to 40.89%, a gain of 1.58 percentage points in the new plan.

165.   No evidence was offered by the Controlling Party or its map drawers at legislative hearings showing why the movement of White population into and people

of color out of this longstanding majority-Black district was necessary to achieve any legitimate, much less any compelling, state interest.

166.   CD-2 could be restored to a majority-Black district by removing White population in the district from Lee and Thomas counties and from areas near the Florida border; and by moving people of color from adjacent counties, such as Crisp, Macon-Bibb, Muscogee, Houston, Twiggs and Baldwin, into CD-2. However, the Controlling Party chose not to do this.

167.   CD-12 is located in southeastern Georgia. Based upon 2020 Census data, CD-12 was underpopulated by 25,512 persons with a deviation of 3.42% from the ideal district population size for equal apportionment of 765,136 persons.

168.   The Controlling Party and its map drawers could have drawn CD-12 as a majority-minority coalition district by increasing the percentage of voting age people of color in the district to give them a meaningful opportunity to elect candidates of choice, but they chose not to draw the district as a majority-minority coalition district.

169.   As a result, the district was drawn as a majority-White district, with a non-Hispanic White total population of 52.13% and a people of color total population of 47.87%, representing a small increase of .78 percentage points from the previous plan based upon the 2020 Census.  The non-Hispanic White voting age

population is 54.65% and the people of color voting age population is 45.35%, representing a small increase of .89 percentage points in the people of color voting age population. The non-Hispanic White registered voter total is 52.75% and the people of color voter registration total is 42.90%, reflecting a small increase of the people of color registration of 1.25 points.

170.   The Controlling Party and its map drawers could have drawn CD-12 as a majority-minority coalition district by drawing in populations of people of color in from areas in adjacent congressional districts CD-1, CD-8 and CD-10, including Savannah in Chatham County, Hancock County, and Taliaferro in CD-10 and/or from Baldwin County in CD-8, and drawing out majority-White counties southwest of Augusta, such as Laurens, Treutlen, Emanuel, Candler, Evens, Tattnall, Toombs, Montgomery, Wheeler, Johnson, Bulloch, and/or portions of Effingham or Columbia Counties. They chose not to do so in order maintain this district as majority-White and to deny people of color a meaningful opportunity to elect candidates of their choice.

171.   Additionally, the Controlling Party and its map drawers divided majority-Black counties east of Macon between the Eighth, Ninth, and Tenth Congressional districts, diluting the voting strength of people of color residing in these counties. The plan also represents a departure from one of the Controlling

Party's redistricting guidelines to avoid splitting counties. Instead of splitting these counties among three congressional districts, the Controlling Party and its map drawers could have allowed these communities sharing common demographics, economic and other interests to be drawn into CD-12 instead, where they could have been part of a majority-minority congressional district with an opportunity to elect candidates of their choice.

B. **State Senate Plan (SB 1EX/AP)**

172.    Based upon the 2020 Census results, Georgia's Controlling Party and its map drawers could have drawn 31 of 56 Georgia's State Senate districts as majority-minority districts based upon total population; 29 of the 56 State Senate districts as majority-minority districts based upon voting-age (VAP) population; 26 of the 56 State senate districts as majority-minority districts based upon citizen voting-age (CVAP) population; and 27 of the 56 State senate districts as majority-minority districts based upon the number of registered voters of color to give voters of color meaningful opportunities to elect candidates of choice. *See* GeorgiaUnityMaps.org.   However, they chose not to and instead drew only 20 majority-minority districts. 19 are majority-minority based upon registered voters of color (RV); and 18 are majority-minority based on 2019 CVAP.

173.   Key demographic changes in the new Senate district plan are reflected in Tables 5-8 which are attached to Appendix 1 and incorporated by reference.

174.   The average percentage of Black, Latinx, and AAPI (alone) population in the 20 majority-minority VAP districts in the Senate's plan is 72.05%, while the average White percentage of the population in the 34 districts that are majority-White is 64.40%. This discrepancy in the percentage of the population in the majority-minority and majority-White districts is an indication that the map drawers packed the majority-minority districts and cracked populations of voters of color across majority-White districts to dilute their voting strength.

175.   The Senate districts with the highest percentage of people of color are SD-34-36; 38-44; and SD 55. All are in the Metro Atlanta area. The Controlling Party and its map drawers made no effort to correct the extreme packing of minority population in these districts and the resulting dilution of the voting strength of voters of color.

176.   Henry County, with a growing population of people of color, is split into three Senate Districts (SD-10, 17 and 25), deviating from the Senate redistricting committee's guideline to keep counties whole.

177.   Only Senate District 10, which has a packed population of people of color of 82.29%, gives voters of color a meaningful opportunity to elect a candidate

54

of choice. Senate Districts 17 and 25 crack the population of people of color to prevent them from having a meaningful opportunity to elect candidates of choice.

178.   In the new Senate plan, the Controlling Party and its map drawers reduced the voting age population of people of color in the new SD-17 plan from 50.93% to 40.58%, a 10.35% drop. This plan was drawn after Phyllis Hatcher, a Black Democrat, was in a competitive election against a White Republican candidate, Brian Strickland, and lost by a margin of approximately 5 percentage points in 2018. The Controlling Party's map drawers also reduced the population of registered voters of color in the new plan from 48.73% to 37.88%, a 10.86 percentage point drop. The Black voter registration population was also reduced from 42.23% to 31.84%, a drop of 10.39 percentage points in the new plan. Race predominated over traditional districting principles in the drawing of SD-17 by the Controlling Party and its map drawers in the new Senate plan.

179.   In SD-25, the percentage of the population of people of color was increased slightly from 37.24% in the old plan to 42.55% in the new plan, but the increase is not likely enough to give people of color a meaningful opportunity to elect candidates of their choice in the new SD-25 plan.

180.   The Controlling Party and its map drawers could have alleviated the overpacking of SD-10 and the cracking of people of color in SD-17 and SD-25 by

increasing the percentage of people of color in SD-17 and SD-25, but chose not to, diluting the voting strength of people of color in the new plan.

181.   The cracking of the minority population is worse in Cobb County as compared to the south Atlanta suburbs. For example, Marietta is split into four Senate districts. Only District 33, which is majority people of color by total population (74%), VAP of people of color (69.75%), and registered voters of color (65.05%) in the new plan, gives voters of color a meaningful opportunity to elect a candidate of choice. Senate Districts 6, 32, and 37 in the new plan are all majority-White.

182.   The packing of SD-33 should have been alleviated by increasing the VAP people of color in SD-6, 32 or 37 under the new plan to give people of color in those districts a meaningful opportunity to elect candidates of choice, but the Controlling Party and its map drawers chose not to remedy the packing and cracking of people of color in these districts.

183.   Douglas County is split into three Senate districts – Districts 28, 30, 35. Only SD-35, which is majority people of color by total population (83.54%), people of color VAP (81.18%), and people of color voter registration (79.99%), provides voters of color with an equal opportunity to a candidate of choice. SD-28 and SD 30 are majority-White districts by total White population (67.06% and 66.97%,

respectively), White VAP (69.44% and 69.41%, respectively), and White voter registration (68.41% and 69%, respectively).

184. The packing of SD-35 should have been alleviated by increasing the VAP people of color in SD-28 and SD-30 under the new plan to give people of color in those districts a meaningful opportunity to elect candidates of choice, but the Controlling Party and its map drawers chose not to remedy the packing and cracking of people of color in these districts. The plan is also a departure from one of the Controlling Party's redistricting guidelines to avoid splitting counties.

185. The new plan for Senate District 56 in Cobb County substantially reduced the percentage of the voting age population of people of color by 14.56 percentage points - even though the district was already a majority-White district. Under the new plan, SD-56 is overpacked majority-White by a total population (73.90%); majority-White by VAP (76.17%); and majority-White by voter registration (70.86%).

186. Some of diverse areas removed from SD-56 in the redistricting plan were moved into the new SD-14, but SD-14 was not drawn by the Controlling Party and its map drawers as a majority people of color coalition district, even though it could have been so drawn. Instead, SD-14 was drawn as a majority-White district,

diluting the voting strength of the existing and added populations of people of color moved into SD-14 from SD-56.

187.   The new SD-56 and SD-14 are racial gerrymanders because voters were moved out and within SD -56 and SD-14 on account of race and the sorting of voters on account of race does not meet strict scrutiny.

188.   Additionally, race predominated in the redistricting decisions over traditional redistricting principles and other legitimate redistricting concerns.

189.   During the legislative hearings on the new Senate plan, the Controlling Party provided no evidence justifying why the voting age population of people of color had to be surgically removed from SD-56 - an already a packed majority-White district - and moved into SD-14.

190.   While SD-14 was reapportioned and White population was moved into SD-56, to make it an overpacked majority-White district, SD-14 could have been drawn by the Controlling Party and its map drawers as a majority-minority coalition district, but they chose not to do so. This is another example where the Controlling Party and its map drawers manipulated the district lines by predominating race over traditional or other redistricting principles.

191.   The prior SD-48 plan was an effective majority-minority coalition district, comprised of 64.6% people of color by 2020 population and 62% by VAP.

The district was 27.6% AAPI by total population, 28% AAPI by VAP with the multi-racial coalition in the district electing the chamber's first Asian Senator, Michelle Au, in 2020.

192.   Due to the growth of the AAPI population in the Johns Creek area covered by the prior SD-48 plan as reported in the 2020 Census, the Controlling Party and its map drawers increased the AAPI population in the new SD-48 plan. However, they decided to add the northern corner of Gwinnett County between Sugar Hill and Forsyth County to the district and removed areas from the district in Gwinnett County around Duluth with high populations of people of color.

193.   As a result, the Controlling Party and its map drawers reduced the population of people of color by 13.4 percentage points, including by reducing the Black and Latinx populations by 9.02 and 7.48 percentage points respectively in the new plan. As a result, it is unlikely that AAPI voters, in coalition with other voters of color and cross-over voters, will have a meaningful opportunity to elect candidates of choice as a majority-minority coalition district, including being able to reelect the current SD-48 Asian Senator.

194.   SD-48 could have been drawn as an AAPI coalition or opportunity district in the new plan if it had retained the majority-minority areas with high AAPI

populations in central Gwinnett County around Duluth instead of adding in the northern corner of the county to the plan.

195.   Bibb County is split into three Senate districts (SD-18, SD-25 and SD-26), with only SD-26 providing people of color with a meaningful opportunity to elect candidates of choice. SD-26 is a majority people of color district by total population (66.74%), people of color VAP (63.40%), and by registered voters of color (63.23%).   In addition to the packing of SD-26 with people of color, the Controlling Party and its map drawers cracked communities of color in SD-18 and SD-25 to dilute their voting strength by drawing those districts as majority White by total population (58.41% and 57.45%, respectively), White VAP (60.69% and 59.94%), and White voter registration (60.33% and 57.91%, respectively).

196.   The Controlling Party and map drawers could have unpacked SD-26 and increased the population of voters of color in SD-18 and SD-25 to give those voters a meaningful opportunity to elect candidates of choice and avoid the dilution of their voting strength. They chose not to do so. The new Senate plan for SD-18, 25, and 26 represents another departure from the Controlling Party's redistricting guidelines to keep counties whole.

197.   In addition, Baldwin County, with its large total population of people of color of more than 40%, is located in Senate District 25, separated from other

counties and communities of interest in the region with similar demographics to the east and west.

198.    The new SD-26 plan by the Controlling Party and its map drawers also impacts the surrounding region by including majority-Black counties, such as Hancock and Washington, in the plan which prevent SD-23 from becoming a majority-minority district, thereby preventing people of color in SD-23 from having a meaningful opportunity to elect candidates of their choice.

199.    In yet another departure from its redistricting guidelines which sought to avoid splitting counties, the Controlling Party and its map drawers also split Chatham County among three Senate districts (Districts 01, 02, and 04), a significant change from its two-way split in the previous Senate plan.

200.    SD-02 is a packed majority people of color district in and around the City of Savannah. It is majority people of color by total population (63.60%), by people of color VAP (59.79%), and by people of color voter registration (61.11%). The total population of people of color in SD-02 is almost unchanged from the prior

Senate plan and there was no apparent attempt by the Controlling Party and its map drawers to unpack this district in the new plan.

201.   SD-01 and SD-04 were drawn as majority-White districts. SD-01 includes coastal areas south of Savannah and adjacent interior areas to the west.  SD-04 includes areas to the north and west of Savannah.

202.   The new three-way split of the Senate plan in this region is made more egregious because of the pairing of the population of people of color in Liberty County with the heavily White populated areas in Chatham and Bryan Counties in SD-01. Adding SD-04 into the cracking of Chatham County prevents the district from becoming more diverse and competitive for voters of color.

203.   A second majority-minority Senate district in this region could have been drawn to give voters of color a meaningful opportunity to elect candidates of their choice. This could have been accomplished by using minority population from Liberty County and unpacking parts of majority-minority SD-02 in Savannah.

However, the Controlling Party and its map drawers chose not to draw a second majority-minority Senate district in this region in the new plan.

C. **Georgia House Plan (HB 1EX LC 1163S/AP**)

204.    There are 78 majority-minority State House districts in the new House plan by total 2020 population; 76 by 2020 voting age population (VAP), 66 by 2021 registered voters (RV), and 64 by 2019 citizen voting age population (CVAP).

205.    Key demographic changes in the House district plan are summarized in Tables 9-12, which are attached to Appendix 1 and incorporated by reference.

206.    Georgia's Controlling Party's map drawers could have drawn 96 of 180 State House districts as majority-minority districts based upon total population; 94 of 180 State House districts as majority-minority districts based upon voting-age population people of color; 82 of 180 State House districts as majority-minority districts based upon CVAP; and 87 of 180 State House districts as majority-minority districts based upon the number of registered voters of color. Such a plan would have reflected the increasingly racially and ethnically diverse electorate in the State. The Controlling Party and its map drawers chose not to do so.

207.    The new House plan has two purported majority-Latinx districts located Dalton (HD-4) and in Gwinnett County (HD-98) based upon total Latinx populations of 50.07% and 57.42%, respectively. However, with a Latinx CVAP of

25.41% and Latinx registered voter population of 35.10% in HD-4, the new plan, does not give Latinx voters a meaningful opportunity to elect candidates of choice. Similarly, with a Latinx CVAP of 23.53% and registered voter population of 28.19%, the HD-98 plan does not provide Latinx voters with a meaningful opportunity to elect candidates of choice.

208.   Additionally, it appears that an effective Latinx and AAPI coalition district is not attainable in HD-98 based upon the new plan. The HD-98 AAPI CVAP is 23.5% and it has a 28.19% AAPI registered voter population. Thus, even combined with the district's Latinx CVAP or registered voter metrics, HD-98 was not drawn by the Controlling Party and its map drawers to provide the district's Latinx and AAPI voters a meaningful opportunity to elect candidates of their choice. In short, the Controlling Party did not draw these districts as performing majority-Latinx or majority-minority coalition districts, although they should have.

209.   The Controlling Party's map drawers could have created two additional Latinx coalition districts adjacent to HD-98, as well as a Latinx coalition district in Gainesville. HD-4 could have been drawn in Dalton to create a meaningful Latinx coalition district. Other areas with significant Latinx population could have been used to create Latinx opportunity districts, including in the areas around Clayton, Cobb, and Gwinnett counties. The Controlling Party and its map drawers

chose not to draw these additional districts in the new House plan notwithstanding the tremendous growth of the Latinx communities in this region.

210.   House Districts 55 to 63 are based in the Fulton County portion of the City of Atlanta in the new plan drawn by the Controlling Party and its mappers. All of these districts, with the sole exception of HD-57, are extremely packed with a voting age population of more than 65% people of color, with some districts (HD-61, HD-62, and HD-63) packed with more than an 80% voting age population of people of color. The Controlling Party and its map drawers could have alleviated the extreme packing of these districts by increasing the percentage of people of color population in HD-57, which is 57% majority-White.

211.   Yet, the Controlling Party and its map drawers chose not to do, diluting the voting strength of voters of color as a result of the extreme packing of people of color in HD-61, HD-62, and HD-63.

212.   The Controlling Party and its map drawers packed and cracked the voting age population of people of color among districts in south suburban areas outside of Fulton County, including in Fayette and Clayton Counties, diluting their voting strength.

213.   House Districts 68-69 in Fayette County remain packed majority-minority districts by total people of color population (68.85% and 75.90%,

respectively); people of color VAP (66.06% and 73.11%, respectively); and people of color voter registration (62.65% and 71.98%, respectively), diluting the voting strength of people of color in these districts. The new plan retains the packing of these districts at levels much higher than needed to give people of color a meaningful opportunity to elect candidates of their choice.

214.   Instead of drawing the district lines to relieve the excessive packing of these districts by increasing the population of people of color in adjacent districts, the Controlling Party and its map drawers drew the lines for adjacent House Districts 73 and 74 to increase White population by reaching out of Fayette County into predominantly White populated parts of Spalding County to the south and east and Coweta County to the west to ensure they remain majority-White districts.

215.   House Districts 75-79 in Clayton County are also extremely overly packed majority-minority districts, with people of color total populations in excess of 87%; people of color VAP in excess of 84%; and people of color voter registration in excess of 83%.

216.   Again, this severe overpacking could have been relieved if the Controlling Party's mappers moved the district lines to increase the population of

people of color in adjacent districts. Instead, they chose to dilute the voting strength of people of color in the new plan.

217.   The Controlling Party and its map drawers also allowed the cracking of the population of people of color in Rockdale County to persist in the new House plan. HD-114 (HD-112 in the former plan) was a majority-White district prior to the 2021 redistricting. The Controlling Party and its map drawers retained HD-114 as a majority-White district in the new plan, packed at levels well beyond necessary for White voters in the district to elect their candidates of choice.  In the new plan, HD-114 is majority-White by total population (66.90%), White VAP (68.84%), and White voter registration (67.41%). At the same time, the new House plan packs people of color into majority-minority districts 91-93 and 95. The total population of people of color in districts 91-93 and 95 is in excess of 79%; people of color VAP is in excess of 75.9%; and people of color voter registration is in excess of 74%.

218.   All of these metrics are well beyond what is necessary to give voters of color a meaningful opportunity to elect candidates of their choice, yet the Controlling Party chose not to relieve the packing of HD 91-93 and 95 by increasing

the population of people of color in HD-114 or in other adjacent districts, even though it could have done so.

219.   The Controlling Party and its map drawers also packed people of color into HD-113 in Newton County. HD-113 is a majority-people of color district by total population (71.18%), people of color VAP (68.20%); and people of color voter registration (69.09%). The packing of this district could have been remedied had the Controlling Party's map drawers increased the population of people of color in adjacent districts., but they chose to leave HD-113 as an over-packed majority-minority district, diluting the voting strength of HD-113's voters of color.

220.   In House District 25, a majority-White district by total population (51.99%); White VAP (56.12%) and White voter registration (56.66%), the Controlling Party and its mappers paired areas in North Fulton with south Forsyth County, both of which have large AAPI populations. However, these areas are majority-White and, as a result, the new plan dilutes the voting strength of AAPI voters. Had the Controlling Party changed the areas of Forsyth County included in the HD-25 plan, it could have made HD-25 into an AAPI opportunity coalition district but chose not to.

221.   The City of Gainesville and neighboring Latinx areas are cracked into four different House Districts (HD-28, 29, 30, and 31). This represents another

departure from the Controlling Party's redistricting guideline which counseled against splitting counties.

222. The result is every House District in this area is majority-White by CVAP and registered voters, despite the fact the Controlling Party's map drawers could have drawn a district in this region that is majority-minority by those metrics to give Latinx voters a meaningful opportunity to elect candidates of their choice.

223. House Districts 138, 151 and 154 in the prior House plan were all located in southwestern Georgia, south of Columbus. HD-138 was a majority-White district in the former plan, with a White VAP of 72.4%, people of color VAP of 27.6%, and Black VAP of 18.42% based upon the 2020 Census results.

224. Both HD-151 and HD-154 were majority-Black districts in the former House plan. HD-154 was cut and reapportioned. The result is that one majority-White district remains in the new House plan (the new HD-151) and one majority-Black district remains in the New House plan (the new HD-154), a loss of one majority-Black district. The Controlling Party and its map drawers could have

preserved both majority-Black districts (HD-151 and HD-154) by reapportioning a different district.

225.   There is no lawful reason why the Controlling Party and its mappers decided not to retain both majority-Black districts in this region but instead chose instead to dilute the voting strength of people of color.

226.   The new House districts in Athens, La Grange, and Warner Robins, all crack communities of color among multiple districts, diluting minority voting strength.

227.   Former HD-132, which was based in the city of LaGrange in Troup County, was a majority-minority district based upon 2020 total population and VAP. HD-136, its successor district, is over 60% White. LaGrange is split in the new plan between three districts. The former district instead could have been made more diverse, rather than majority-White in the new plan, by including more of Newman in Coweta county.

228.   House Districts 145 to 148 in Houston County were fully redrawn in the House plan, cracking communities of color in the majority-minority city of Warner Robins. The city of Warner Robins is larger than one State House district and is increasingly diverse. However, the new House plan splits the city between HD-145, HD-146, and HD-147, diluting the voting strength of people of color in

these districts. In fact, all three of these districts are majority-White in the new plan, with a White VAP ranging from 55.12% to 61.84% and White voter registration ranging from 54.54% to 61.29%.

229.   The Controlling Party and its map drawers could have drawn an effective majority-minority district in North/Northeast Athens/Clarke County which could have provided people of color an actual opportunity to elect candidates of their choice, with enough room for a second district to be nested inside the county. Instead, Athens-Clarke County was split between four districts, another departure from the House redistricting guideline to keep counties whole, and created a district which is not likely to be an effective majority-minority coalition district. In the new plan, HD-122 is just barely a majority-minority coalition district by total population (50.87% people of color to 49.13% White); majority-White by VAP (45.2% people of color to 54.8% White); majority-White by CVAP (43.93% people of color to 56.07% White); and just barely a majority-minority coalition district by registered voters (50.62% people of color to 44.36% White). Majority-White Districts 120, 121, and 124, all having a White VAP between 65.01% and 76.13%, and White voter registration between 64.59% and 75.55%, carve up the remainder of the county, including communities of color, to dilute the voting strength of voters of color.

230.   House Districts 126, 129, 130, and 132 in in the Augusta-Richmond area are heavily packed with people of color in the new plan, diluting the voting strength of people of color. The people of color VAP in these districts ranges from 60.03% to 66.26%, and people of color voter registration ranges between 61.65% to 68.61%. Instead of relieving this severe packing by drawing population from these districts into HD-127, the Controlling Party and its map drawers allowed HD-127 to remain a majority-White district, with a White VAP of 68.13% and White voter registration of 64.61%.

231.   House Districts 162, 163, and 165 are majority-minority districts in Savannah, with people of color VAP ranging from 58.08% to 60.82% and people of color registered voters ranging from 57.83% to 66.39%. HD-166 is a majority-White district in south Chatham County, which has a White VAP of 84.71% and a White registered voter population of 78.49%. The Controlling Party and its mappers continue to pair diverse portions of the northern areas of the county with majority-White parts of neighboring Bryan and Effingham counties to dilute the voting strength of people of color. A fourth majority-minority House district could have been drawn in this region if the northern area of Chatham County was not cracked between HD-161 and HD-164 by the Controlling Party and its map drawers in the new plan.

## COUNT I

### 42 U.S.C. § 1983
### Racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution

**(Alleged Against Defendants Governor Kemp and Secretary Raffensperger)**

232.   Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs above, as if fully set forth here.

233.   Race predominated with respect to the redistricting in the new Georgia House, Senate, and Congressional plans.

234.   Specifically, Congressional districts: CD-2, CD-3, CD-4, CD-6, CD-7, CD-8, CD-9, CD-10, CD-11, CD-12 and/or CD-13; State Senate districts:  SD-01, SD-02, SD-4, SD-05, SD-6, SD-07, SD-9, SD-10, SD-14, SD-17, SD-18, SD-23, SD-25, SD-26, SD-28, SD-30, SD-32, SD-33, SD-34, SD-35, SD-37, SD-38 to SD 44, SD-45, SD-46, SD-48, SD-55 and/or SD-56; and State House districts:  HD-4, HD-20, HD-22, HD-25, HD-28, HD-29, HD-30, HD-31, HD-44, HD-46, HD-55 to HD-63, HD-68, HD-69, HD-73, HD-74, HD-75 to HD-79; HD-91 to HD-93, HD-95, HD-98; HD-113, HD-114, HD-120, HD-121, HD-122, HD-124, HD-126, HD, 129, HD-130, HD-132, HD-134, HD-136, HD-145 to HD-148, HD-151, HD-154, HD-161, HD-164 and/or HD-166, among others, are unconstitutional racial gerrymanders. In each of these plans, the Controlling Party and its map drawers

made the conscious choice of manipulating populations by race.

235.   Racial considerations were the controlling rationale by the Controlling Party and its map drawers behind these plans and traditional redistricting principles were subordinated.

236.   Because racial considerations predominated the map drawing, Defendants' justifications for the maps are subject to strict scrutiny.

237.   The redistricting plans challenged in this Complaint cannot survive strict scrutiny.

238.   By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and will continue to violate those rights absent relief granted by this Court.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT II

### 52 U.S.C. § 10301
### Vote dilution in violation of Section 2 of the Voting Rights Act

### (Alleged Against All Defendants)

239.   Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs above, as if fully set forth herein.

240.   Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any

"standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

241.   Section 2 of the Voting Rights Act prohibits the dilution of minority voting strength. The dilution of minority voting strength may be caused by, among other things, the dispersal of the minority population into districts where they constitute an ineffective minority—known as "cracking"—and the concentration of minority voters into districts where they constitute an excessive majority—known as "packing." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

242.   The Controlling Party's lawmakers and their map drawers diluted the voting strength of Black, Latinx, and AAPI voters in specific regions described in this Complaint, particularly in areas that witnessed significant growth of communities of color in the past decade, packing or cracking communities of color into districts.

243. The districts where reasonably compact majority-minority districts, either by one race/ethnicity or a combination of racial/ethnic groups of color, could have been drawn, including, but not limited to the unpacking of districts with unnecessary large populations of people of color or by correcting the cracking of communities of color which prevent them from having an equal opportunity to elect candidates of choice. These districts include, but may not be limited to: Congressional districts: CD-2, CD-4, CD-6, CD-7, CD-12, and/or CD-13; State Senate districts: SD-01, SD-02, SD-04, SD-05, SD-06, SD-10, SD-14, SD-17, SD-23, SD-25, SD-26, SD-32, SD-33, SD-34, SD-35, D-48 and/or SD-56; and State House districts: HD-4, HD-28, HD-29, HD-30, HD-31; HD-104, HD-74, HD-120, HD-121, HD-122, HD-124; HD-98; HD-136, HD-145 to HD-148, HD-151, HD-161, HD-162, HD-164 and/or HD-166.

244. In the above districts, voters of color are politically cohesive, and White voters usually vote to defeat the preferred candidates of voters of color. In short, voting is racially polarized in these districts.

245. The totality of the circumstances, including the retrogressive effect of the plans, interact with historical and socio-economic factors to deny voters of color, including Black, Latinx and AAPI voters, the opportunity to elect preferred candidates of choice in Georgia as a whole and in these districts.

246.   Georgia has a long history of official voting-related discrimination conducted by the White majority political party in power (previously Democrats, now Republicans); elections are racially polarized in Georgia; the State has used voting practices and procedures, even as recently as 2021, that tend to enhance the opportunity for discrimination against voters of color; people of color in Georgia bear the effects of discrimination in areas such as education, employment, and health and people of color participate at lower rates than White people in elections; numerous candidates who have run for political campaigns use overt and subtle racial appeals in political campaigns; and every decade, including this one, Georgia has drawn maps that have an overall retrogressive effect in that they decrease the number of majority-minority and minority opportunity districts in the State. The totality of the circumstances establishes that the manner in which said districts were drawn and passed has the effect of denying voters of color an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

247.   By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny Plaintiffs the rights guaranteed to them by Section 2 of the Voting Rights Act, and will continue to violate those rights absent relief granted by this Court.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT III

### 52 U.S.C. § 10301 and 42 U.S.C. § 1983

### Discriminatory purpose in violation of the Fourteenth Amendment to the United States Constitution and Section 2 of the Voting Rights Act

### (Alleged Against All Defendants on the Section 2 Claim; Alleged Against Defendants Governor Kemp and Secretary Raffensperger on the Fourteenth Amendment Claim)

248.   Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs above, as if fully set forth here.

249.   42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

250.   Article 1 of the Fourteenth Amendment to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

251.   Section 2 of the Voting Rights Act of 1965 prohibits the imposition of any voting standard, practice, or procedure enacted with a discriminatory purpose. 52 U.S.C. § 10301(a).

252.   The new Congressional, State House and State Senate plans (SB 2EX/AP, SB 1EX/AP, and HB 1EX LC 47 1163S/AP, respectively) were adopted, at least in part, for the purpose of disadvantaging voters of color, and in particular, Black, Latinx, and AAPI voters relative to White voters across the State.

253.   From the outset, the map drawers intended to reduce or limit the number of State House, Senate, and Congressional districts in which voters of color could elect candidates of choice, thereby weakening the voting strength of voters of color over the next decade. Examples include, but are not limited to: Congressional districts: Congressional districts: CD-2, CD-3, CD-4, CD-6, CD-7, CD-8, CD-9, CD-10, CD-11, CD-12 and/or CD-13; State Senate districts: SD-01, SD-02, SD-4, SD-05, SD-6, SD-07, SD-9, SD-10, SD-14, SD-17, SD-18, SD-23, SD-25, SD-26, SD-28, SD-30, SD-32, SD-33, SD-34, SD-35, SD-37, SD-38 to SD 44, SD-45, SD-46, SD-48, SD-55 and/or SD-56; and State House districts: HD-4, HD-20, HD-22, HD-25, HD-28, HD-29, HD-30, HD-31, HD-44, HD-46, HD-55 to HD-63, HD-68, HD-69, HD-73, HD-74, HD-75 to HD-79; HD-91 to HD-93, HD-95, HD-98; HD-113, HD-114, HD-120, HD-121, HD-122, HD-124, HD-126, HD, 129, HD-130, HD-132, HD-134, HD-136, HD-145 to HD-148, HD-151, HD-154, HD-161, HD-164 and/or HD-166, among others.

254.   Several of the indicia of discriminatory purpose are present in this case.

There is evidence of substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision, including contemporaneous statements by decision makers.

255.   Legislators provided virtually no notice of the proposed changes, sought to minimize or eliminate public comment, and expedited the legislative process in ways intended to reduce input from anyone other than its main proponents. From last-minute announcements of public hearings to the complicated procedural rules that made it more difficult for members of the public to submit alternative maps or documents to legislators, to amendments introduced and adopted without any or little public notice, to the failure of legislators to even consider plans submitted by groups representing the interests of voters of color, to legislators' awareness, based on testimony from numerous civil rights groups, including Plaintiffs' organization, about the dilutive effect of these Plans—legislators moved the goal posts to make certain districts in all three plans noncompetitive.

256.   Defendants will be unable to prove that the maps would have been enacted without the discriminatory intent described above.

257.   By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiff the rights guaranteed to

them by the Fourteenth Amendment to the U.S. Constitution and Section 2 of the Voting Rights Act, and will continue to violate those rights absent relief granted by this Court.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1)   Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

2)   Declare that, Congressional districts: CD-2, CD-3, CD-4, CD-6, CD-7, CD-8, CD-9, CD-10, CD-11, CD-12 and/or CD-13; State Senate districts:  SD-01, SD-02, SD-4, SD-05, SD-6, SD-07, SD-9, SD-10, SD-14, SD-17, SD-18, SD-23, SD-25, SD-26, SD-28, SD-30, SD-32, SD-33, SD-34, SD-35, SD-37, SD-38 to SD 44, SD-45, SD-46, SD-48, SD-55 and/or SD-56; State House districts: HD-4, HD-20, HD-22, HD-25, HD-28, HD-29, HD-30, HD-31, HD-44, HD-46, HD-55 to HD-63, HD-68, HD-69, HD-73, HD-74, HD-75 to HD-79; HD-91 to HD-93, HD-95, HD-98; HD-113, HD-114, HD-120, HD-121, HD-122, HD-124, HD-126, HD, 129, HD-130, HD-132, HD-134, HD-136, HD-145 to HD-148, HD-151, HD-154, HD-161, HD-164 and/or HD-166, among others, constitute racial gerrymanders in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution;

3)      Declare that the voting strength of voters of color were diluted with respect to Congressional districts:, CD-2, CD-4, CD-6, CD-7, CD-12, and/or CD-13; State Senate districts:  SD-01, SD-02, SD-04, SD-05, SD-06, SD-10, SD-14, SD-17, SD-23, SD-25, SD-26, SD-32, SD-33, SD-34, SD-35, D-48 and/or SD-56; and State House districts:  HD-4, HD-28, HD-29, HD-30, HD-31; HD-104, HD-74, HD-120, HD-121, HD-122, HD-124; HD-98; HD-136, HD-145 to HD-148, HD-151, HD-161, HD-162, HD-164 and/or HD-166, resulting in a denial or abridgement of the rights of Black, Latinx, and AAPI voters to vote on account of their race or color in violation of Section 2's effects test of the Voting Rights Act;

4)      Declare that the congressional, State House, and State Senate plans, in their entirety (SB 2EX/AP, SB 1EX/AP, and HB 1EX LC 47 1163S/AP, respectively), were enacted with an impermissible discriminatory purpose on the basis of race in violation of Article I of the Fourteenth Amendment to the United States Constitution and the intent prong of Section 2 of the Voting Rights Act;

5)      Issue a permanent injunction enjoining Defendants from enforcing or giving effect to the boundaries of the violative districts, including an injunction barring Defendants from conducting any elections in the violative districts;

6)      Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order valid plans for the Georgia House, Senate,

and U.S. Congress, which include majority-minority coalition districts and minority opportunity districts, that give voters of color the ability to elect candidates of choice;

7)      Make an order requiring Georgia to preclear voting changes during the following ten-year period pursuant to 52 U.S.C. § 10302.

8)      Make all further orders as are just, necessary, and proper to ensure complete relief consistent with this Court's orders; and

9)      Grant such other or further relief as the Court deems to be appropriate, including but not limited to an award of Plaintiff's attorneys' fees, expense and reasonable costs, as authorized by 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).

Dated: _____           Respectfully submitted,

By:  */s/ Kurt Kastorf*_____
**Georgia Bar No. 315315**
**KASTORF LAW LLP**
1387 Iverson St., Suite 100
Atlanta, GA 30307
(404) 900-0030
kurt@kastorflaw.com

Jon Greenbaum*
Ezra D. Rosenberg*
Julie M. Houk*
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
**LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW**
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

*Pro Hac Vice Applications To Be Filed
for Attorneys Greenbaum, Rosenberg,
Houk, and Powers*


Toni Michelle Jackson*
Astor H.L. Heaven*
Keith Harrison*
tjackson@crowell.com
aheaven@crowell.com
kharrison@crowell.com
aheaven@crowell.com
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: (202) 624-2500

*Pro Hac Vice Applications To Be Filed
for Attorneys Jackson, Heaven, and
Harrison*