**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP; GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC.; GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC. | ) ) ) ) ) |
| *Plaintiffs*, | ) ) Case No. 21-civ-5338 |
| v. | ) ) **Requesting a three-judge** |
| | ) **panel pursuant to 28** |
| STATE OF GEORGIA; BRIAN KEMP, in his official capacity as the Governor of the State of Georgia; BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia, | ) **U.S.C. § 2284** ) ) ) ) ) |
| *Defendants.* | ) ) ) |
| _____ | ) |

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF**

**<u>INTRODUCTION</u>**

In the wake of the growth of communities of color in Georgia, which was

reflected in the 2020 elections and the January 2021 Senate runoffs, the State of

Georgia has drawn its Congressional and State legislative maps in violation of the

U.S. Constitution and the Voting Rights Act. Reverting to the strategies of the Jim

Crow era, Georgia has employed the two classic tactics of gerrymandering to tilt the balance of electoral power to the White majority: "cracking" (diluting the voting power of voters of color across many districts) and "packing" (concentrating the voting power of voters of color in one district to reduce and dilute their voting power in other districts). These redistricting techniques undermine the voting rights of Georgia's Black, Hispanic/Latino ("Latinx") and Asian American Pacific Islander ("AAPI") citizens and deny them an equal opportunity to elect candidates of their choice.

Plaintiffs GEORGIA STATE CONFERENCE OF THE NAACP; GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC.; and GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC., file this Amended Complaint for Declaratory and Injunctive Relief against Defendants STATE OF GEORGIA; BRIAN KEMP; and BRAD RAFFENSPERGER, and allege as follows:

## BACKGROUND

1.    According to the 2020 census, Georgia was among the top five States gaining population in the past decade, with the State adding 1,024,255 residents since 2010—a 10.6% increase. *See* U.S. Census Bureau, *Georgia: 2020 Census*, August 24, 2021, available at: https://www.census.gov/library/stories/state-by-state/georgia-population-change-between-census-decade.html.

2.     Communities of color in the state account for nearly all of Georgia's reported population growth since 2010. This is so despite the well-documented undercounting of racial and ethnic minorities in the 2020 Census. The State's Black population increased by 12.5%, Latinx population increased by 31.6% and AAPI population increased by 52.3%. By contrast, Georgia's White population decreased by 4%.

3.     In short, the reality is that Georgia's population is becoming more racially and ethnically diverse. With full knowledge of the State's fast changing demographics, the party controlling the Georgia General Assembly ("Controlling Party") created redistricting maps for Georgia's House, Senate, and Congressional districts which are based upon the unconstitutional and unlawful use of race. Governor Brian Kemp endorsed these unconstitutional and unlawful maps by enacting them into law.

4.     Racial considerations by the Controlling Party and its chosen map drawers predominated in crucial districting decisions, diluting the voting rights of Black, Latinx, and AAPI voters. Moreover, the Controlling Party ignored the growth of communities of color by failing and refusing to create additional majority-minority and minority opportunity districts in the House, Senate, and Congressional maps.

3

5.      Had the chosen map drawers and the Georgia General Assembly drawn districts that accurately reflect Georgia's increasingly diverse population without the improper consideration of race, opportunities for people of color to elect candidates of their choice would have necessarily increased. Instead, the Controlling Party deliberately targeted Black, Latinx, and AAPI Georgians and moved them into and out of districts to deny them equal opportunities to elect candidates of their choice, splitting communities of interest, and ensuring safe districts where White voters can elect their candidates of choice.

6.      The Controlling Party in the General Assembly and their map drawers made districting decisions in which race predominated the process.

7.      These maps ensure that White voters and the party favored by those voters will maintain control of the Georgia General Assembly and Georgia's Congressional delegation for the foreseeable future, despite their dwindling population, denying voters of color an opportunity to elect candidates of their choice.

8.      To accomplish this, the map drawers, chosen by the Controlling Party, used similar tactics on all three maps. First, they unconstitutionally manipulated populations based on race in many districts, moving populations of color in and out of key districts. Second, they unlawfully diluted the voting strength of Black, Latinx and AAPI voters in many districts. And, finally, they abdicated their legal

responsibility to create appropriate majority-minority districts, including coalition districts where necessary to give voters of color an opportunity to elect candidates of their choice.

9.      These unconstitutional and illegal redistricting tactics are nothing new in Georgia. As a result, federal courts have repeatedly invalidated Georgia State House, State Senate, and Congressional districts that disadvantaged Black people and other people of color by impermissibly drawing district lines based on race.

10.      It is well-documented that voting is racially polarized in Georgia and Senator John Kennedy, Chair of the Senate Redistricting and Reapportionment Committee, admitted that this is the case during a redistricting hearing on the Controlling Party's State Senate plan.

11.      In fact, Georgia legislators are aware of the degree of racial polarization and have crafted redistricting plans which pack or crack communities of color into and out of districts to dilute their voting strength in order to prevent them from having a meaningful opportunity to elect candidates of their choice.

12.      Georgia's Black, Latinx, and AAPI voters often vote cohesively in the State to elect candidates of choice and White voters favor different candidates in federal and State elections. In most instances where people of color comprise the majority of the electorate, their preferred candidates win. When White voters

5

comprise a substantial majority of voters, the preferred candidates of voters of color usually lose.

13.   The elected officials who cast the votes to enact the three maps are generally preferred by White voters and not by voters of color – they acted in their own self-interest and that of White voters, and against the voters of color. Indeed, the maps manipulate populations of Black, Latinx, and AAPI person in and out of districts to make otherwise competitive districts safe for White voters and their preferred candidates, which is decidedly unconstitutional. Manipulating populations by race and diluting the votes of persons of color with the goal of maintaining political power is no more lawful when Republicans do it in Georgia today than it was when Dixiecrats did it in Georgia decades ago.

14.   Instead of allowing the incumbents the opportunity to appeal to their districts' increasingly diverse electorate, the Controlling Party in the General Assembly created these new redistricting maps to make districts safer for the Controlling Party's incumbents and candidates, while diluting the voting strength of Georgia's increasingly diverse electorate, with racial considerations used as the means for achieving this partisan end.

15.   To accomplish its goal, the Controlling Party operated with surgical precision to crack and pack districts with higher percentages of Black, Latinx, and

AAPI voters, while moving the lines to increase the number of White voters in many districts.

16.    Because Georgia maintains voter registration by race but not by party, the proponents of these maps necessarily used race when redrawing the boundary lines of the districts, including by racial gerrymandering, diluting the voting power of racial and ethnic minorities, and failing to create majority-minority districts.

17.    Moreover, the legislature and map drawers' actions were intentional, occurring in an atmosphere that was racially charged. These three plans were enacted following a regular legislative period that was undeniably hostile to Black, Latinx, and AAPI people.

18.    Just this year, the Georgia General Assembly enacted SB 202, a law that eliminated or changed longstanding voting options in the State that were particularly used in areas with high populations of people of color and resulted in high voter turnout and voters of color electing their candidates of choice.

19.    SB 202 shortens the time between an election where no candidate received a majority of the vote and the runoff in apparent reaction to the approximately 76,000 new voters who registered between the November 2020 general election and the January 2021 Senate runoff elections in which Reverend Raphael Warnock and Jon Ossoff were the first Black and Jewish Senators elected

in Georgia. *See* Mark Niesse, *76K new Georgia voters registered before US Senate runoffs,* Atlanta Journal-Constitution, December 17, 2020, available at: https://www.ajc.com/politics/75k-new-georgia-voters-registered-before-us-senate-runoffs/H3CXAFIKFVCKHJNW5MBFZKQDZU/.

20.    SB 202 also changed the deadline by which voters are required to request absentee ballots from the Friday before an election to 11 days before an election and also requires voters to provide a Georgia driver's license number, State ID card number, or copy of another form of acceptable ID with their absentee ballot applications.

21.    According to a November 26, 2021, article in the Atlanta Journal-Constitution, about 52% of the absentee ballot applications submitted by voters for November 2021 general elections were rejected due to voters making the request after the new deadline established by SB 202 and about 15% were rejected due to the new ID requirements mandated by SB 202.  The report also found that about 4% of absentee ballots applications for the November 2021 elections were rejected – a three percentage point increase over the 1% rejection rate in the November 2020 general election before these changes were enacted. The report further noted that few voters whose absentee ballots applications were rejected cast ballots in person on election day. *See* Mark Niesse, *Georgia voting law drives rejections of absentee*

*requests made too late*, AJC (November 26, 2021) https://www.ajc.com/politics/georgia-voting-law-drives-rejections-of-absentee-requests-made-too-late/HEZUYZA3RZBEVKZSDLEOBXLQ3E/.

22.    SB 202 also provides a clear path for the intimidation of voters by allowing unlimited challenges by partisan organizations and their advocates on an expedited hearing schedule, which gives voters only three days' notice of a hearing by mail.

23.    SB 202 also criminalizes efforts by nonpartisan volunteers to provide water, food, and PPE, even as wait times for voting are notoriously long in communities of color, among other voting changes.

24.    The three Georgia redistricting bills were rushed through in a secretive and dubious process that gave little notice about the maps to the public or even members of the General Assembly who were not in the Controlling Party. Controlling Party members refused to answer questions about why districts were drawn as they were and what information was conveyed to them by their map drawers and consultants.

25.    While paying lip-service to the Voting Rights Act, Controlling Party members refused to explain how these maps were drawn in alleged compliance with the Voting Rights Act and did not provide any of the data produced from a racially

polarized voting study they claim to have obtained from a consultant.

26.     The Controlling Party's map drawers (1) strategically removed Black, Latinx, and AAPI voters from existing and performing majority-minority districts and dispersed them into White majority districts in rural and/or suburban areas where they will no longer have the ability to elect the candidates of their choice, and (2) packed Black voters and other voters of color into districts with high minority populations. The Controlling Party's legislators could have had only one motive for passing such facially unconstitutional plans: the desire to limit the voting strength of voters of color statewide.

27.     There are one or more alternative maps for each body that would remedy violations of Section 2 of the Voting Rights Act present in the redistricting plans as described in more detail below, including a congressional map in which one (1) additional majority Black congressional district is drawn in the western Atlanta suburbs; a state senate map in which four (4) additional majority Black plus two (2) multi-racial coalition state senate districts are drawn; and a state house map in which seven (7) additional majority Black and (2) multi-racial coalition state house districts are drawn.

28.     In addition, in many of the congressional and state legislative districts, race was the predominant factor in the drawing of the districts.  To that end, the

Controlling Party's map drawers intentionally manipulated populations of voters of color by various mechanisms, including the packing of them into districts where it was unnecessary in order for them to have an opportunity to elect candidates of their choice, and by cracking these populations across several districts. These map drawers also ignored or violated traditional districting principles in order to achieve their goals.

29.     As alleged in detail below, Plaintiffs respectfully seek a declaratory judgment that the redistricting plans for the Georgia Senate (SB 1 EX/AP), Georgia House of Representatives (HB 1EX LC 47 1163S/AP), and Congress (SB 2 EX/AP) are racial gerrymanders in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution; that these redistricting plans dilute the voting strength of voters of color and deny them the opportunity to elect preferred candidates of their choice in violation of Section 2 of the Voting Rights Act of 1965; that these redistricting plans were drawn by the Controlling Party's mappers and were allowed to become law for the express purpose of impermissibly discriminating against voters of color in violation of the Fourteenth Amendment to the United States Constitution and the intent prong of Section 2 of the Voting Rights Act.

30.     Plaintiffs seek a permanent injunction that prohibits Defendants from calling, holding, supervising, or certifying any election under these plans and further

requests the creation of revised redistricting plans that do not infringe upon the constitutional and statutory rights of Georgians of color by diluting their voting strength.

31.    Finally, Plaintiffs also seek an order requiring Georgia to preclear voting changes during the following ten-year period pursuant to 52 U.S.C. § 10302.

## REQUEST FOR THREE-JUDGE PANEL

32.    Because this action challenges the constitutionality of the apportionment of a statewide legislative body, as well as the apportionment of a State's Congressional delegation, Plaintiffs request the convening of a three-judge panel pursuant to 28 U.S.C. § 2284.

## PARTIES

33.    Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP (Georgia NAACP) is a non-partisan, interracial, nonprofit membership organization that was founded in 1941. Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African Americans. It is headquartered in Atlanta and currently has approximately 10,000 members.

34.    The Georgia NAACP works to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote

voter registration, voter education, get out the vote efforts, election protection, and census participation.

35.    The Georgia NAACP brings this action on behalf of itself and its individual members, including the thousands of Georgia NAACP members who are registered voters residing in Georgia House, State Senate, and Congressional districts where their voting power will be reduced under the new plans.

36.    The Georgia NAACP has branches in counties across the State of Georgia that are involved in voter registration, voter assistance, voter education, election protection, grassroots mobilization, and get out the vote efforts, including Sunday early voting events, such as "Souls to the Polls."

37.    The Georgia NAACP has sought to prevent efforts to suppress or disenfranchise African American voters and has been involved in voting rights litigation in Georgia to vindicate their rights.

38.    The Georgia NAACP engages in voter outreach efforts, including voter education on voting in-person during early voting, voting by mail, and voting in person on election day.

39.    The Georgia NAACP has conducted text and phone banking programs and reached out to voters throughout Georgia to encourage voter participation and to educate the public about the voting process, including about voting by mail.

40.    The Georgia NAACP and its members have a history of advocating for fair redistricting, including a history of advocating for majority-minority coalition districts in Georgia with Black, Latinx, and AAPI voters and litigating claims challenging State legislative, county and school district plans in Georgia as well as other voting rights litigation in the State.

41.    This redistricting cycle, the Georgia NAACP provided oral and written testimony to the House and Senate redistricting committees and submitted proposed Georgia Unity Maps, along with co-Plaintiffs, the Georgia Coalition for the People's Agenda, Inc. and GALEO Latino Community Development Fund, Inc., via the committees' public comment portal and advocated for the adoption of fair maps that adhere to the requirements of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

42.    The Georgia NAACP has had to commit significant time and resources, and will have to continue to commit significant time and resources to combatting the effects of these new maps on communities of color throughout the State now that they have been enacted. Funds and volunteers normally directed towards programs that the Georgia NAACP implements, such as voter education efforts and voter registration drives, have had to be and will continue to have to be redirected and diverted towards efforts to combat the effects of these unconstitutional new maps on

14

its constituents. By diverting time and resources to these priorities, Georgia NAACP will be unable to commit to other programs that are core to its mission.

43.    Plaintiff THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC. ("GCPA") is a Georgia nonprofit corporation with its principal place of business located in Atlanta, Georgia. The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members.

44.    In addition to its main office in Atlanta, the GCPA has field offices in Athens, Albany, Augusta, Macon, Savannah, and LaGrange, Georgia where it is able to provide outreach and support to voters and prospective voters of color and underserved communities outside of the Metro Atlanta area.

45.    The GCPA brings this action on behalf of its itself and its individual members who are registered voters residing in Georgia House, State Senate, and Congressional districts where their voting power will be reduced under the new plans.

46.    The GCPA encourages voter registration and participation, particularly among Black and other underrepresented communities of color in Georgia. The GCPA's support of voting rights is central to its mission. The organization has committed, and continues to commit, time and resources to protecting voting rights through advocacy, legislation, communication, and outreach, including work to

promote voter registration, voter education, get out the vote efforts, election protection, census participation and litigation.

47.    The GCPA conducts voter registration drives, voter ID assistance, "Souls to the Polls" get out the vote events during Sunday early voting and other get out the vote efforts in Georgia that seek to encourage voter participation among Black and Brown voters and voters in historically underserved communities of color. The GCPA in coalition with other civic engagement organizations in Georgia also participates in voter education and voter empowerment programs.

48.    GCPA's voter education and empowerment programs have included, but are not limited to, educating prospective voters about how to register to vote and to confirm their registration status; educating voters about the options to vote in-person during advanced voting, in-person on Election Day, and by mail via absentee ballot; providing information to voters about accessing absentee ballot drop boxes to cast their absentee ballots safely and securely, and helping voters to understand the new voting system implemented for the first-time during the 2020 election cycle statewide.

49.    The GCPA has also distributed civic education materials to voters and prospective voters; arranged for rides to the polls for voters; and supported the Georgia Election Protection field program in order to assist voters on the ground near polling sites.

50.    The GCPA also participates in media interviews, sponsors Public Service

Announcements (PSAs), places billboard ads, conducts phone banking, and engages in text message campaigns to educate voters and to encourage participation.

51.    During this redistricting cycle, the GCPA provided oral testimony to the House and Senate redistricting committees and submitted proposed Georgia Unity Maps, along with co-Plaintiffs, the Georgia NAACP and GALEO Latino Community Development Fund, Inc., via the committees' public comment portal and advocated for the adoption of fair maps that adhere to the requirements of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

52.    The GCPA has had to commit significant time and resources, and will have to continue to commit significant time and resources to combatting the effects of these new maps on communities of color throughout the state now that they have been enacted. Funds and volunteers normally directed towards programs that the GCPA implements, such as voter empowerment efforts and voter registration drives, have had to be and will continue to have to be redirected and diverted towards efforts to combat the effects of these new maps on its constituents. By diverting time and resources to these priorities, GCPA will be unable to commit to other programs that are core to its mission.

53.     Plaintiff GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC. ("GALEO") is a non-partisan, nonprofit corporation. GALEO is one of the oldest, largest, and most significant organizations promoting and protecting the civil rights of Georgia's Latinx community. GALEO has approximately 165 members across Georgia.

54.     GALEO's headquarters is in Norcross, which is in Gwinnett County, and a substantial amount of GALEO's civic engagement, voter registration and get-out-the-vote work takes place in Gwinnett County and other Metro Atlanta counties, areas in which the Controlling Party targeted people of color in its redistricting maps.

55.     GALEO's work includes organizing voter education, civic engagement, voter empowerment and get out the vote events and conducting voter registration drives. After Gwinnett County became a covered jurisdiction for Spanish under Section 203 in December 2016, GALEO has worked also with the Gwinnett County Board of Registrations and Elections in an effort to bring its procedures and election materials into compliance with the law's requirements.

56.     During the 2020 election cycle, GALEO also worked to address challenges facing Gwinnett County's limited-English-proficiency Spanish speaking voters as a result of the impact of the COVID-19 pandemic.

18

57.    GALEO sent bilingual mailers to Latinx Gwinnett County voters with information about the presidential primary as well as additional mailers after the primary was postponed due to COVID-19.

58.    In this redistricting cycle, GALEO provided oral testimony to the House and Senate redistricting committees and submitted proposed Georgia Unity Maps, along with co-Plaintiffs, the Georgia NAACP and GCPA via the committees' public comment portal and advocated for the adoption of fair maps that that adhere to the requirements of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

59.    GALEO has had to commit significant time and resources, and will continue to have to commit significant time and resources to combatting the effects of these new maps on communities of color throughout the State now that they have been enacted. Funds and volunteers normally directed towards programs that the GALEO implements, such as voter empowerment efforts and voter registration drives, have had to be and will continue to have to be redirected and diverted towards efforts to combat the effects of these new maps on its constituents. By diverting time and resources to these priorities, GALEO will be unable to commit to other programs that are core to its mission.

60.    Defendant STATE OF GEORGIA is a sovereign State of the United

States of America.

61.     Defendant BRIAN KEMP is the Governor of Georgia and is the chief executive officer of the State of Georgia. Governor Kemp is sued in his official capacity.

62.     Defendant BRAD RAFFENSPERGER is the Secretary of State of Georgia, the State's chief election officer and is responsible for administering and implementing Georgia's election laws and regulations. Secretary Raffensperger is sued in his official capacity.

## LEGAL STANDARDS

63.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

64.     Section 2 of the Voting Rights Act prohibits the dilution of minority voting strength. The dilution of minority voting strength may be caused by, among

other things, the dispersal of the minority population into districts where they constitute an ineffective minority—known as "cracking"—and the concentration of minority voters into districts where they constitute an excessive majority—known as "packing." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

65.    When in the Under *Gingles* standard, plaintiffs who are challenging a redistricting plan violates dilutes the voting strength of people of color under Section 2 of the Voting Rights Act must first demonstrate that three preconditions are met:

      a.  that the racial minority group or groups are sufficiently large and geographically compact to constitute a majority in a single-member district;

      b.  the minority group is politically cohesive; and

      c.  the white majority votes as a bloc such that it will usually defeat the minority group's preferred candidate.

66.    In addition to the *Gingles* preconditions, vote-dilution claims under Section 2 are subject to "[a] totality of circumstances" analysis, which is guided by non-exhaustive factors set forth in Senate Report that accompanied the 1982 amendment to the Voting Rights Act.

67.    These Senate factors include, but are not limited to: (1) the extent of any history of official discrimination that touched the right of the members of the

minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting is racially polarized; (3) the extent to which the State has voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) whether the members of the minority group have been denied access to a candidate slating process, if any; (5) the extent to which members of the minority group in the State bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

68.     Courts have also considered additional factors, including whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and whether the policy underlying the State's use of the challenged standard, practice or procedure is tenuous.

69.     The Equal Protection Clause forbids racial gerrymandering, that is, intentionally assigning citizens to a district on the basis of race without sufficient justification. *Shaw v. Reno*, 509 U.S. 630, 641 (1993).  The plaintiff must prove that

race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. A conflict between the enacted plan and traditional redistricting criteria is not essential to establish racial predominance, but may be persuasive circumstantial evidence. *VBethune-Hill v. Va. State Bd. of* Elections, <u>137 S. Ct. 788, 799</u> *2017). If racial considerations predominate over others, then the redistricting decision will be subject to strict scrutiny and the burden will shift to the State to prove that its redistricting decisions served a compelling interest and was narrowly tailored to that end. *Cooper v. Harris,* <u>136 S. Ct. 2512</u> (2017).

70.     Intentional discrimination is proved by reference to factors set forth in *Village of Arlington Heights v. Metropolitan Dev. Corp.*, <u>429 U.S. 252</u> (1977), including whether the impact of the official action bears more heavily on one race than another; the specific sequence of events leading up to the challenged decision, including whether there are departures from the normal procedural sequence or substantive departures; and the legislative or administrative history. A plaintiff does not have to prove that the challenged action rested solely on racially discriminatory purposes.  <u>429 U.S. at 265-267</u>.

## STATEMENT OF FACTS

71.     The Georgia House of Representatives is comprised of 180 members.

Each representative is elected from a single-member district. Georgia State legislative and Congressional elections are partisan. Primary and general elections feature a majority vote requirement. If no candidate receives a majority of the votes cast, a runoff election is held between the top two candidates.

72. The majority vote requirement and runoffs make it more difficult for Latinx, Black, and AAPI voters to elect candidates of choice because they individually comprise a minority of the electorate and voting patterns in Georgia State legislative and Congressional election contests are racially polarized.

73. These polarized voting patterns are highly correlated with support for Georgia's two major political parties. Georgia's Latinx, Black, and AAPI voters strongly favor candidates from the Democratic Party, while the State's White voters overwhelmingly favor candidates from the Republican Party.

74. Racial, ethnic and language minorities historically have been and continue to be underrepresented in the Georgia General Assembly, particularly with respect to Georgia's Latinx and AAPI communities. According to the 2020 Census, Georgia's total population is comprised of 51.9% of individuals identifying as White alone; 31% as Black alone; 10.5% as Hispanic or Latino; and 4.5% as Asian alone. *See* United States Census Bureau, Georgia: 2020 Census (August 25, 2021), https://www.census.gov/library/stories/state-by-state/georgia-population-change-

24

between-census-decade.html.

75.     By contrast, according to a December 2020 report by the National

Conference of State Legislatures, 71% of the Georgia General Assembly's

legislators were White, and only 1% were Latinx or AAPI.  *See* National Conference

of State Legislatures, *State Legislator Demographics* (December 1, 2020),

https://www.ncsl.org/research/about-state-legislatures/state-legislator-

demographics.aspx (note that this study was not updated to reflect the demographics

of newly elected candidates who took their seats after the November 2020 general

election).

## I.     History of Discrimination in Georgia Relevant to Redistricting

76.     There is a long and well-documented history of voting discrimination

against voters of color in Georgia.  Indeed, Courts repeatedly have acknowledged

Georgia's extensive history of discrimination in this area.  *See Fair Fight Action,*

*Inc. v. Brad Raffensperger*, Order, 1:18-cv-05391-SCJ, Document 636 at 41

(11/15/21) (taking judicial notice of Georgia's "long sad history of racist policies in

a number of areas including voting"); *Wright v. Sumter Cnty. Bd. of Elections &*

*Registration*, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282

(11th Cir. 2020) ("Georgia has a history chocked full of racial discrimination at all

levels. This discrimination was ratified into state constitutions, enacted into state

statutes, and promulgated in state policy."); *Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1314-16 (N.D. Ga. 2013) (citing *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560–61, 1571 (S.D. Ga. 1994) (Georgia's "segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof"), *vacated and remanded on other grounds*, 775 F.3d 1336 (11th Cir. 2015); and *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("we have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases").

77. The history of voting discrimination against voters of color in Georgia is further detailed in various expert reports filed in federal voting rights litigation in Georgia and was also documented by Laughlin McDonald, et al., in *Quiet Revolution In The South: The Impact of the Voting Rights Act 1965-1990*, pp. 67-102 (Chandler Davidson & Bernard Grofman eds., 1994).

78. The historical background of redistricting by the Georgia Legislature includes numerous federal court orders revising Georgia's redistricting plans to cure violations of the federal Voting Rights Act or the Constitution. *See*, *e.g.*, *Georgia v. United States*, 411 U.S. 526 (1973) (finding a violation of Section 5 of the Voting Rights Act); *Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982), *aff'd mem.*, 459

U.S. 1116 (1983) (finding discriminatory purpose); *Miller v. Johnson*, 515 U.S. 900, 917 (1995) (finding racial gerrymandering); *Abrams v. Johnson*, 521 U.S. 74, 107 (1997) (same); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356 (N.D. Ga.), aff'd, 542 U.S. 947 (2004) (finding that the redistricting plan violated one person, one vote principle); *Georgia v. Ashcroft*, 539 U.S. 461, 486 (2003) (noting that redistricting plan made it more difficult for minority voters to elect a candidate of their choice).

79.     The socioeconomic realities of Georgia have placed a greater burden on minority residents to effectively participate in the electoral process.  The effects of Georgia's long history of discrimination against Black residents remains present.  Black Georgians have poverty rates more than double those of White residents.  There are also substantial disparities between Black and White Georgians in access to health care and health outcomes, in involuntary residential mobility, and in employment.  And Black Georgians face unequal access to education and discrimination in housing and lending.  Due to these and related factors, Black Georgians participate in elections at lower rates than White residents.  For example, even after an historic increase in Black voter registration in the 2020 election, the levels of Black electoral participation still remain lower than for White residents.

80.     The Latinx community in Georgia faces similar socioeconomic burdens that limit their ability to effectively participate in the electoral process.  Poverty rates

for Latinx Georgians are almost double the rates for White Georgians. Latinx Georgians also are less likely to graduate from high school or receive a graduate degree than White Georgians. And Latinx Georgians have lower median income than their White counterparts, and also are more likely to lack health insurance than their White counterparts. In addition, access to in-language voter assistance in Georgia is significantly limited. For example, the Georgia Secretary of State does not include bilingual information on its website, including no bilingual or multilingual voter registration information, absentee ballots or other election-related materials. This substantially hampers the ability for Latinx Georgians who lack English proficiency to participate in the electoral process. For all these and related reasons, Latinx Georgians participate in elections at lower rates than White residents.

81.    And the AAPI community faces socioeconomic burdens that limit their ability to effectively participate in the electoral process as well. About 10% of AAPI Georgians lack health insurance, and about 10% live in poverty. The AAPI population also faced extreme violence in March 2021, when a gunman murdered 6 people in Atlanta, including 6 AAPI women. Also, similar to the Latinx population in Georgia, the AAPI population that lacks English proficiency is substantially hampered from participating in the electoral process due to the Georgia Secretary of

State's failure to include bilingual information on its website, and other barriers to in-language access.  For all of these and related reasons, AAPI Georgians participate in elections at lower rates than White residents.

## II.   Racial and Ethnic Demographics of Voting in Georgia

82.   The Secretary of State of Georgia maintains detailed records as to the racial demographics of voters because Georgia's voter registration forms ask applicants to identify their race or ethnicity to comply with the Voting Rights Act. *See* Georgia Voter Registration Form, https://sos.ga.gov/admin/files/GA_VR_APP_2019.pdf.  The form also does not ask voters to identify their political party preference.  As a result, the Controlling Party legislators and its elected officials are well aware of the implications of making decisions as to voting on racial and ethnic minorities.

83.   In every presidential election since 2004, the share of registered voters who are White has decreased in Georgia from 68% in 2004, to 63% in 2008, to 59% in 2012, to 56% in 2016, to 53% in 2020.  During that same period, the cumulative share of registered Black, Latinx, and AAPI voters and other voters of color has increased.

84.   The percentage of the vote that the Republican Presidential candidate has received in Georgia has decreased in every election since 2004 with the

29

exception of 2012.

85.     The 2018 statewide election in Georgia demonstrated how fragile the Republican party's hold on the State was. While Republican candidates won the races for Governor, Lieutenant Governor, Secretary of State, and Attorney General, all of the winners received less than 52% of the vote and the Secretary of State election went to a run-off.

86.     In 2020, a Democratic presidential candidate won Georgia's electoral college votes for the first time in Georgia since 1992, and two senatorial races were sent to run-offs, with both Democratic candidates winning in January 2021. This was the first time a Democrat had won a United States Senate race in Georgia since 2000.

87.     Between 2016 and 2020, the share of registered voters who are White decreased from 56% to 53% and the percentage of voters who turned out who were White decreased from 61% to 58%. These percentages stayed the same for the January 2021 run-off elections.  The 3% drop was determinative in who won the 2020 and 2021 elections.

88.     Election analysis demonstrates that Black, Latinx, and AAPI voters of color overwhelmingly provide strong support to Democratic candidates. Members of the Georgia General Assembly are aware of this fact.

89.     In fact, during the 2021 regular legislative session, the Controlling

Party in the Georgia General Assembly passed SB 202, an omnibus voter suppression bill, which took aim at the voting methods increasingly being used by voters of color—including absentee and mail-in voting, early voting, out of precinct voting, and the use of ballot drop boxes. The Controlling Party did so in an effort to stem the tide of Black, Latinx, and AAPI voters electing candidates of choice in statewide and local elections. Passage of SB 202 was largely premised upon a false narrative of alleged voter fraud in majority-Black Fulton County following President Joe Biden's win in Georgia.

90.     Apparently unsatisfied that making it harder for Black voters and other voters of color to cast ballots in Georgia's elections would guarantee their electoral success notwithstanding their dwindling share of the vote, the Controlling Party rammed through State legislative and Congressional redistricting maps to racially gerrymander districts which dilute the voting strength of Black, Latinx, and AAPI voters to deny them an equal opportunity to elect candidates of choice.

91.     Manipulating voting districts in an effort to retain its dwindling vote share is nothing new for the Controlling Party.

## III.     Demographic Changes in Georgia between 2010 and 2020

92.     There have been pronounced demographic shifts in Georgia since the 2010 Census. In fact, the 2020 Census found that the percentage of people of color

residing in Georgia grew dramatically since 2010, with Black residents growing by 12.5%, Latinx by 31.6%, AAPI residents by 52.3%, while the White population of Georgia decreased by 4%.

93.    Moreover, while the percentage of Georgia's White voters has steadily decreased since 2004, the percentage of the voters of color has steadily increased. From 2004 to 2020, registered voters of color increased in Georgia from 29.8% to 38.3%. White voter registration decreased from 68.7% in 2006, to 52.7% in 2020. In the 2021 Georgia senate runoff election, 228,000 new voters cast ballots who did not participate in the November 2020 general election. These voters tended to be more racially diverse and younger than in past elections.

94.    Of Georgia's 250 Congressional and statewide legislative districts prior to the enactment of the new redistricting maps, 74 State House, 20 State Senate and 5 Congressional districts had a voting age population of people of color of more than 50%.

95.    Packing minority voters into as few districts as possible—while maximizing the number of districts where White voters comprise 55% or more of the electorate—has long been a strategy to maintain political dominance for White voters in Georgia. This strategy is present in the new redistricting plans passed by the General Assembly and which were signed into law by Governor Kemp.

**IV.   The Georgia 2021 Redistricting Process and Proceedings**

   **A. Town Halls Convened by the Joint House and Senate Committees
   on Redistricting and the Public Comment Portal**

96.    The Georgia General Assembly's Joint House and Senate Redistricting Committee held a series of Town Halls in various locations around the State where they solicited public comment about the redistricting process prior to the introduction of any redistricting plans by the General Assembly and before the 2020 Census data were published.

97.    As a result, the public was unable to comment on any maps or plans proposed by legislators, nor did they have the 2020 Census data yet to inform map drawing considerations.

98.    Instead, a considerable focus of the oral public comment at the Town Halls, as well as in hundreds of public comments submitted to the committees via a public portal on the General Assembly's website (including by Plaintiffs), was on demands for a transparent, fair and equitable process, rather than a focus upon specific mapping proposals by the legislature or Census results.

99.    During these Town Halls, legislators did not respond to numerous questions posed to them by the public (including by Plaintiffs) about how the redistricting process would be conducted; when and how redistricting plans and background about the plans would be shared with the public; and whether the

legislature would consider maps, data and alternatives plans submitted by the public. The legislators also did not respond to written public comments submitted to the committees' public comment portal.

100.   While there were many members of the public who expressed concerns about the fact the Town Halls did not provide accommodations for persons with limited English proficiency, who were vision or hearing impaired, or were otherwise physically disabled, no action was taken by the Joint Committee Chairs, Representative Bonnie Rich and Senator John Kennedy, to make the Town Halls accessible for Georgians who needed such accommodations. Once the special redistricting session began on November 3, 2021, the Chairs of the Committees also failed to make such accommodations available for Georgians who needed them.

101.   The pleas for transparency and a fair and equitable process made by members of the public at the Town Halls and on the public comment portal were virtually ignored by the Controlling Party.

102.   Instead, the Controlling Party rammed through all three maps during the special session, providing little to no information about the rationale for drawing the districts and refusing to share information with the public about the role consultants played in the drawing of the Controlling Party's maps, what voter data the map-makers relied on to draw the maps (and in particular, whether that included

race-based data), and what advice they were given by the consultants about how the maps should be drawn and why.

103.   When members of the public complained about the lack of transparency in the process during committee hearings and the absence of any real opportunity to examine and analyze the proposed maps before and after the commencement of the special session on November 3, 2021, these complaints were frequently met with Controlling Party legislators pointing to the Town Halls as evidence that the process was transparent – even though they all took place before a single map was proposed by legislators, none of the legislators responded in substance to any of the comments or questions made by the public during the Town Halls or on the public portal, and Georgia's final Census data was not released until after the final Town Hall was held on August 11, 2021.

## B. Events Prior to the Commencement of the Special Session on November 3, 2021

104.   On September 23, 2021, Governor Kemp signed a proclamation ordering the commencement of a special session of the Georgia General Assembly on November 3, 2021, for the purpose of drawing new redistricting maps for Georgia's House, Senate and Congressional districts, among other things.   *See* https://gov.georgia.gov/executive-action/proclamations.

105.   On September 27, 2021, before the special session began, the General

Assembly's Legislative and Congressional Reapportionment Office posted a proposed Congressional redistricting plan submitted by Senator John Kennedy, Chair of the Georgia Senate Redistricting Committee, on its website: https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/cong-s18-p1-packet.pdf?sfvrsn=dd7b16e7_2. This plan included total population and voting age population data for the racial and ethnic composition of each proposed district.

106.   The Reapportionment Office is a joint office of the Georgia House and Senate responsible for providing the General Assembly with redistricting services. According to the General Assembly's website, the "office uses data provided to the State of Georgia by the U.S. Census Bureau for the purpose of redistricting.  In addition to providing the technical assistance to redistrict, the website states that the office provides an array of maps and up to date data reports which include information on demographics, precincts, and local redistricting." *See* GEORGIA GENERAL ASSEMBLY: LEGISLATIVE AND CONGRESSIONAL REAPPORTIONMENT OFFICE (2021), https://www.legis.ga.gov/joint-office/reapportionment.

107.   While the Reapportionment Office is supposed to be nonpartisan and open to all members of the General Assembly from any party, and its employees are paid by the taxpayers of Georgia, the House and Senate redistricting committees

36

passed guidelines ("Committee Guidelines") for the 2021 redistricting special session which provided, among other things, that:

> [R]edistricting plans and other records related to the provision of [Reapportionment Office] staff services to individual members of the General Assembly will not be subject to public disclosure. Only the author of a particular map may waive the confidentiality of his or her own work product. This confidentiality provision will not apply with respect to records related to the provision of staff services to any committee or subcommittee as a whole or to any records which are or have been previously disclosed by or pursuant to the direction of an individual member of the General Assembly.

*See* Georgia Senate redistricting committee's guidelines, https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/2021-senate-redistricting-committee-guidelines.pdf?sfvrsn=a9bbb991_2;   House redistricting committee's guidelines here: https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/2021-senate-redistricting-committee-guidelines.pdf?sfvrsn=a9bbb991_2.

108. Additionally, communications between legislators and Reapportionment Office staff and the nature of the services provided by the Reapportionment Office to legislators are exempt from Georgia's Open Records Act, meaning that the public has no access to this information absent obtaining it in discovery during litigation.

109. Thus, the Reapportionment Office and Controlling Party members

engaged in a secretive process which excluded the public and minority party members, preventing them from obtaining critical information about how and why the redistricting plans were drawn the way they were. In particular, the public and minority party members were denied information regarding whether the Reapportionment Office and the Controlling Party's members relied on race as a predominant factor to draw the maps, whether the Reapportionment Office and Controlling Party members complied with the VRA to draw the maps, and whether the Reapportionment Office and the Controlling Party intentionally drew the maps to discriminate against Georgians on the basis of race or ethnicity.

110. Aside from the map, data, and shapefiles posted on the Reapportionment Office website, the initial version of the Congressional district plan sponsored by Senator Kennedy was not accompanied by information explaining any rationale about how or why the plan was drawn as it was. No legislative hearings were ever held on this Congressional plan.

111. On October 21, 2021, the Reapportionment Office posted a Congressional district plan submitted by the Georgia House and Senate Democratic Caucuses identified as HB 5EX.

112. On October 28, 2021, the Reapportionment Office posted a State Senate

plan submitted by the Georgia Democratic Senate Caucus identified as SB 4EX.

113.   On October 29, 2021, the Reapportionment Office posted a State House plan submitted by the Georgia House Democratic Caucus identified as HB 4EX.

114.   On November 2, 2021, the day before the special session was scheduled to begin on November 3, 2021, the Reapportionment Office posted a House district plan identified as HB 1EX submitted by the House committee's Controlling Party's Chair and a Senate district plan identified as SB 1EX submitted by the Senate committee's Controlling Party's Chair.

### C. The Georgia Senate Redistricting Plan and Proceedings

115.   The 2021 Georgia redistricting process was designed by the Controlling Party to be anything but transparent. Line drawing was done by design in secret by Controlling Party's members with the assistance of the supposedly non-partisan Reapportionment Office; multiple committee meeting agendas were issued with the only information provided as, "TBD," i.e., "To be Determined;" redistricting plans and substitute bills were sometimes disclosed within hours of their introduction or even after committee meetings discussing them had already begun.

116.   The lack of transparency and the intentionally rushed process virtually guaranteed that the Controlling Party's redistricting plans would not be reflective of the interests and concerns of Georgia's voters—particularly those of Georgia's fast-

growing communities of color demanding that the plans comply with the Voting Rights Act, United States Constitution and respect their communities of interest, during the redistricting proceedings.

117.   On November 2, 2021, the Senate Reapportionment and Redistricting Committee Chair, Senator John Kennedy, issued a notice that the committee would meet on November 3, 2021, at 1:00 p.m.  The agenda for the meeting stated it was "TBD." A skeletal bill, SB 1EX LC 47 1159, was also submitted to the Senate Hopper on November 2, 2011, which contained no specific information about the Controlling Party's Senate redistricting plan.

118.   The November 3, 2021, Senate committee meeting was relatively short and generally included a brief discussion of the aforementioned Senate redistricting committee guidelines by Chair Kennedy, the committee's process going forward, and an announcement that there would be another meeting the following day on November 4, 2021, where public comment would be allowed.

119.   Chairman Kennedy also indicated that he expected to pass a Senate districting redistricting plan out of committee as early as on November 5, 2021 – just two days after the start of the special session and before any substantive discussion of the bills by the committee.

120.  On November 4, 2021, Chairman Kennedy introduced a Senate substitute bill, SB 1EX LC 47 1165S, also known as, "User: S018 Plan Name: Senate-prop1-2021 Plan Type: Senate." It is available at: https://www.legis.ga.gov/api/legislation/document/2021EX/202757. This Senate plan included total population and voting age population data regarding of the racial and ethnic composition of each proposed district, but no other information was made available concerning how or why the plan was drawn as it was.

121.  Chairman Kennedy also announced that he planned to permit the minority leader, Senator Gloria Butler, to introduce the Democratic Caucus' Senate plan (SB 4EX LC 47 1154), but leader Butler objected because the minority party had not been informed that the Chair planned to take up the Democratic caucus' bill at this meeting. As a result, the hearing on the minority party's map was deferred to the following day's meeting on November 5, 2021.

122.  The Senate Reapportionment and Redistricting Committee met next on November 5, 2021. The Agenda included a reference to public comment and that the committee would be conducting a hearing on SB 4 (Sen. Butler) and consideration of SB 1 (Sen. Kennedy). (These bills were introduced as SB 4EX LC 1154 and SB 1EX 1165S, respectively).

123.  During this hearing, Chairman Kennedy stated that the 2021 Committee

Guidelines included prioritizing keeping counties whole, yet the Senate plan splits 29 of Georgia's 159 counties, including counties where communities of color account for the significant growth in population reported in the 2020 Census.

124. The committee considered the Controlling Party's Senate Plan, SB 1EX 1165S, as well as the minority party's plan, SB 4EX LC 47 1154. Public comment on the bills was received, with the majority of the public comments opposed to the passage of the Controlling Party's plan.

125. Members of the public and the minority party objected to the Controlling Party's lack of transparency and the rushed process which failed to give the public any reasonable opportunity to analyze the bill. Members of the public also objected to the plan because of racially gerrymandered districts and minority vote dilution present in the Controlling Party's plan.

126. Nevertheless, the Controlling Party's Senate plan was voted out of committee at this meeting after only three days of hearings.

127. This plan was passed by the General Assembly on November 15, 2021, following a Senate floor vote along party lines of 34-21 on November 9, 2021, and a House floor vote along party lines of 96-70 on November 15, 2021.

128. Governor Kemp signed the Senate plan, which is a racial gerrymander

42

and violates Section 2 of the Voting Rights Act, into law.

**D. The Georgia House Redistricting Plan and Proceedings**

129.   On Friday, November 5, 2021, Representative Bonnie Rich, the Chair of the House Legislative and Congressional Reapportionment Committee, convened the first meeting of the committee to discuss HB 1EX, the Controlling Party's House redistricting bill, and HB 4EX, the Democratic Caucus' House redistricting bill.  The agenda provided no information about whether the committee would entertain public comment. During this meeting, the Chair and members of the committee generally discussed the committee's redistricting guidelines and the process for the hearings on the proposed House plans.

130.   On the following Monday, November 8, 2021, the Reapportionment Office posted a substitute House district plan, HB 1EX LC 47 1163S, submitted by Chair Rich, replacing the previous skeletal redistricting bill proposed by the Controlling Party. This bill was subsequently introduced the same day at the House committee meeting convened by Chair Rich, giving the public and minority party lawmakers little time to review changes made to the Controlling Party's House redistricting bill. The substitute bill was also not mentioned in the agenda circulated prior to the meeting.

131.   On the following day, November 9, 2021, Chair Rich convened another

43

hearing on HB 1EX LC 47 1163S and received public comment, most of which was negative, with members of the public complaining about the lack of transparency and the failure of the Controlling Party to provide the public with information about the rationale for the way districts were drawn in the plan. Members of the public, as well as minority members of the committee, also provided negative comments about the racial gerrymanders and minority vote dilution present in the plan.

132.   Nevertheless, the Controlling Party's House substitute redistricting bill was voted out of committee on November 9, 2021, after only three days of public hearings, and was later passed by a House floor vote along party lines of 99-79 the following day on November 10, 2021. It was subsequently passed by a Senate floor vote two days later on November 12, 2021, on a vote of 32-21 along party lines.

133.   Governor Kemp chose not to veto the Controlling Party's unconstitutional and unlawful House redistricting plan and allowed it to become law.

### E.  The Georgia Congressional Redistricting Plan and Proceedings

134.   A skeletal Congressional redistricting bill was filed as SB 2EX LC 47 1158 in the Senate Hopper on November 2, 2021, and was read and referred to the Senate Reapportionment and Redistricting Committee on November 3, 2021. This bill contained no details about the map or plan and did not reference the Congressional plan posted by the Reapportionment Office that had been submitted

by Chairman Kennedy on September 27, 2021.

135.   On November 17, 2021, just hours before the Senate Reapportionment and Redistricting Committee was scheduled to convene that day, the Reapportionment Office posted a Congressional district plan jointly sponsored by the House and Senate Controlling Party's redistricting committee chairs, giving neither the public nor the minority party's legislators any reasonable opportunity to review or analyze the plan before the hearing began. *See* https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/congress-prop1-2021-packet.pdf?sfvrsn=104b7388_2. This plan was introduced in the Georgia Senate and considered by the House redistricting committee as SB 2EX LC 47 1166S and in ("Joint Congressional Plan"). This plan included data on the race and ethnicity of the total population and voting age population (VAP) in each proposed district.

136.   Hearings on the joint Congressional plan began on November 17, 2021, in both the Senate and House redistricting committees.

137.   The very next day, on November 18, 2021, the Senate Reapportionment and Redistricting Committee voted the joint Congressional plan out of committee and it was passed on the Senate floor the following day, November 19, 2021, by a vote of 32-21, along party lines—only two days after the plan was first made

available to the public and the hearings on the bill were commenced in the Senate redistricting committee.

138.   The House committee also held a hearing on November 18, 2021, on the joint Congressional plan, SB 2EX LC 47 1166S, and on the Democratic Caucus' Congressional plan, HB 5EX LC 47 1149. The House committee scheduled another hearing on the joint Congressional plan on Saturday, November 20, 2021, at 9:00 a.m. where the Congressional plan was passed out of committee.

139.   A House floor vote was held on Monday, November 22, 2021, and SB 2 EX LC 47 1166S was passed by a vote of 96-68 along party lines. A copy of the final bill as passed by the Georgia General Assembly is entitled "SB 2EX/AP and is available on the Georgia General Assembly's website at: https://www.legis.ga.gov/api/legislation/document/2021EX/203133.

140.   The joint Congressional plan is a racial gerrymander and violates Section 2 of the Voting Rights Act because race predominated in the drawing of the plan and the plan dilutes the voting strength of voters of color.

141.   Nevertheless, Governor Kemp signed the Controlling Party's unconstitutional and unlawful Joint Congressional district plan and as well as the

Controlling Party's House and Senate plans into law.

## V.    The Congressional Map

### A. The Metro Atlanta Congressional Plan (SB 2 EX/AP) (Allegations supporting constitutional and Section 2 of VRA claims)

142.    The Controlling Party and their map drawers created a textbook example of how redistricting lines can be manipulated to dilute the voting strength of people of color by refusing to draw a majority-Black Congressional district and using gerrymandering of adjacent districts to maintain a White majority advantage in an area of Georgia in which the population of people of color has exploded since the 2010 Census.

143.    The growth in the State's population of Black, Latinx and AAPI residents has in large part taken place in the Atlanta Metro area.

144.    The percentage of total population that are people of color in the Atlanta metropolitan ("Atlanta Metro") area grew dramatically since the last Census, from 49.22% in 2010 to 56.29% in 2020, a net increase of just over 7 percentage points.

145.    In the same period, the percentage of population that is White in the Atlanta Metro area decreased from 50.78% in 2010 to 43.71% in 2020, a net drop of just over 7 percentage points.

146.    Similar changes are seen in the percentage of the voting age population in the Metro Atlanta with an approximately 7.4 percentage point increase in the

voting age population of voters of color from 2010 to 2020. The opposite was true for White voters, where the percentage of the White voting age population decreased by about 7.4 percentage points from 53.72% in 2010 and 46.34% in 2020.

147.   And in this area of Georgia, voting is racially polarized, with Black voters cohesively for candidates of their choice, and the White majority generally voting as a bloc for different candidates so as to prevent the election of the candidates of choice of Black voters. Thus, unless Black voters comprise a majority of a district or close to it, the White majority votes as a bloc for its preferred candidates, usually preventing the election of Black preferred candidates.

148.   Before the enactment of SB 2 EX/AP in 2021, the existing 2011 14-seat Congressional plan, had four (4) seats that were majority-Black by total population based upon the 2020 Census: CD-2, CD-4, CD-5, and CD-13. Three (3) of those seats were in the Metro Atlanta area: CD-4, CD-5 and CD-13. One (1) Metro Atlanta seat, CD-7, was a majority coalition district based upon the population of people of color collectively (61.95%) and voting age population (58.84%); but was not a majority coalition district by CVAP (45.13%) or registered voters (48.75%), but getting closer to a majority coalition district on those metrics as well.

149.   Due to the population changes in this area of the State where racially polarized voting is present, the Controlling Party and its map drawers could have

and should have drawn at least one new compact majority-Black Congressional district in the western Atlanta Metro area to comply with the Section 2 Voting Rights Act. This would have increased the total number of majority-Black Congressional districts in the Metro Atlanta area from 3 to 4 and given Black voters and other voters of color an opportunity to elect candidates of their choice.

150.    Instead, the Controlling Party and their map drawers intentionally chose to systematically racially gerrymander Atlanta Metro Congressional districts to avoid drawing the new majority-Black Congressional district and to dilute the voting strength of Black, Latinx and AAPI voters in this region. This not only violated Section 2 of the Voting Rights Act, but also violated the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

151.    Some of the most egregious instances of racial gerrymanders and minority vote dilution in the new Congressional plan (SB 2 EX/AP) are present in the Metro Atlanta area districts, particularly in Congressional Districts 3, 4, 6, 7, 9, 10, 11 13, and 14 where communities of color were cracked or packed to dilute their voting strength.

152.    CD-6 in the new plan is a prime example where the Controlling Party and its map drawers manipulated the district lines to dilute the voting strength of people of color and where race predominated over traditional districting principles.

49

153.   Until recently, CD-6 had elected candidates preferred by the White majority.  However, in 2018, the growing Black population helped elect CD-6's first Black female Congresswoman, Lucy McBath, as their candidate of choice.

154.   CD-6 was only 657 persons away from the ideal district size of 765,736 for equal apportionment based upon the 2020 Census. Nevertheless, the Controlling Party and its map drawers retained only 404,452 people from the prior plan or about 52.8% of the former plan's population in the new CD-6 plan.

155.   This group is 61.5% White by population, 63.9% White by VAP and 61.7% White by voter registration.  About 361,351 people, or approximately 47.2% of CD-6's population, was swapped out of the district by the Controlling Party's mappers.

156.   Of that population—which was removed from Cobb, Fulton, and DeKalb County portions of the district—184,254 or 51% of the population were people of color. 134,972 of 279,240 or 49% of the removed population were people of color by VAP, and 82,606 of 222,271 or 37.2% were registered voters of color.

157.   Of the added population—which was drawn from Forsyth, Dawson, Cherokee, Gwinnett, and Cobb Counties—121,810 of 360,684 or 33.8% of the population were people of color; 79,828 of 264,430 or 30% were people of color by VAP; and, 50,808 of 240,187 or 21.15% were registered voters of color.

50

158.   The new CD-6 plan drastically changed the geography of the district as well as its demographics. The net result was that the new CD-6 plan had 62,482 fewer persons of color than under the previous plan and 61,670 more White persons.

159.   The percentage of White registered voters in CD-6 under the new plan increased from 58.39% to 65.60%, while the percentage of registered voters who are people of color decreased from 32.19% to 25.38%, a loss of 6.81 percentage points. The White voting age population of the district also increased from 58.13% to 66.63%, while the voting age population of people of color decreased from 41.88% to 33.37%, a loss of 8.51 percentage points. The total White population of the district also increased – growing from 55.58% to 63.70%, while the total population of people of color decreased from 44.42% to 36.30%, under the new plan, a loss of 8.12 percentage points.

160.   Under every metric, the changes made by the Controlling Party and its map drawers to CD-6 made it a safe district for White voters by diluting the voting strength of persons of color in order to prevent them and cross-over voters from having a meaningful opportunity to elect candidates of choice.

161.   Because CD-6 was only 657 persons away from ideal population size for apportionment, there was no legitimate or compelling reason for the Controlling Party and its map drawers to surgically remove 62,482 people of color from CD-6

and replace them with 61,670 more White people except to dilute the voting strength of voters of color.

162.   The Controlling Party and its map drawers sorted voters by race into and out of CD-6 to dilute the voting strength of voters of color and to deny voters of color an equal opportunity to participate in the political process in CD-6.

163.   CD-13 is another example of the Controlling Party and their map drawers' choosing to increase the packing of people of color in CD-13 to dilute their voting strength and to deny them an equal opportunity to participate in the political process, despite the fact that CD-13 was an already packed district and population could have been shifted out of CD-13 to create the new majority-Black district in the Metro Atlanta area.

164.   The total population of people of color in CD-13 in the new plan is a whopping 83.65%, with 64.26% of the packed district comprised of persons identifying as Black alone in the 2020 Census. This is an overall increase in the total population of people of color in the already overpacked CD-13 of 4.41 percentage points. The people of color VAP in the new CD-13 plan is 81.18%, an increase of 4.76 percentage points, and the Black VAP is 63.75%, an increase of 4.03 percentage points. The percentage of registered voters of color in the new CD-13 plan is 79.32%, an increase of 4.98 percentage points, and the Black registered voter percentage is

70.75%, an increase of 4.66 percentage points.

165.   The Controlling Party and its map drawers offered no evidence during the hearings on the Congressional plan demonstrating that the packing of CD-13 to such an extraordinary degree was necessary to provide voters of color or Black voters an equal opportunity to elect candidates of their choice or was required to comply with Section 2, traditional districting principles or for any other legitimate reason.

166.   Although the Controlling Party and its map drawers could have unpacked CD-13 to relieve the overpacking in order to facilitate the creation of the new majority-minority Congressional district in the Metro Atlanta area, they chose not to do so and, instead, created a Congressional plan which dilutes the voting strength of people of color and Black voters in CD-13 and denies voters of color and Black voters an equal opportunity to participate in the political process.

167.   The new Congressional plan also continues to pack people of color in CD-4, which was already a majority-minority district in the previous Congressional plan.

168.   In the new CD-4 plan, people of color comprise 74.18% of the total population in the new plan, with 52.19% of the population identifying Black alone in the 2020 Census. This represents a small reduction of the packing of this district,

but is still well above the percentage of population necessary for voters of color to have a meaningful opportunity to elect candidates of their choice. As a result, the new plan dilutes the voting strength of people of color in the Atlanta area by continuing to pack them into CD-4 without a legitimate or compelling reason.

169.   Although the Controlling Party and its map drawers could have created another majority-minority Congressional district in the Metro Atlanta by unpacking CD-13 and CD-4 and by moving voters of color from other adjacent districts to give the growing population of people of color a meaningful opportunity to elect candidates of choice, they chose not to do so and did not provide any rationale for continuing to overpack CD-4 during the legislative hearings on the new Congressional plan.

170.   Voters of color in Henry, Fayette, and Newton counties also remain cracked between the packed CD-13 and the majority-White CD-3 and CD-10, diluting their voting strength.  The plan also cracks communities of color in Douglas County, which was not split in the 2011 plan. The new plan moves a total of 42,970 people into the majority-White CD-3. 19,532 or 45.5% of the persons moved into CD-3 are people of color.

171.   Approximately 283,464 people, 85% of whom were in CD-7 in Gwinnett County in the prior plan, and approximately 54% of whom are people of

color, were moved to the majority-White CD-9. Had these voters of color been retained in CD-7, they could have been used to facilitate the drawing of the new fourth majority-Black Congressional district in the Metro Atlanta area, giving these voters of color a meaningful opportunity to elect candidates of choice.

172.   The new Congressional plan also dilutes the voting strength of voters of color in Cobb County, including those residing in the majority-minority cities of Marietta, Smyrna, Powder Springs, Austell, and in areas adjacent to I-75.

173.   The center of Cobb County and numerous cities along I-75 are paired with majority-White Cherokee, Bartow, and Pickens counties to make CD-11, a majority-White district, which preserves the cracking of growing communities of color in these areas in the previous map, diluting their voting strength.

174.   In the southern part of Cobb County, voters of color continue to be packed into CD-13 at unnecessarily high levels—far above what is needed for them to have a meaningful opportunity to elect candidates of their choice.

175.   In the new Congressional plan, the Controlling Party and its map drawers moved 77,813 people out of Cobb County to majority-White CD-14. This included persons residing in southwestern Cobb County in the majority-minority cities of Powder Springs and Austell - the majority of whom are people of color,

176.   60,003 or 77% of the persons moved into CD-14 were previously in

majority-Black CD-13, the rest were from majority-White CD-11. The majority of the persons moved into CD-14 from CD-13 and CD-11 were people of color.

177.   44,429 or 74% of the 60,003 people moved into CD-14 from CD-13 were people of color by total population; 70% of persons of voting age (VAP) who were moved were people of color; 63.6% of citizens of voting age (CVAP) who were moved were people of color, and 68.3% of registered voters who were moved were people of color. 31,611 or 52.7% of the persons from CD-13 who were moved into CD-14 are Black and 51% of those persons were of voting age.

178.   17,810 persons moved into majority-White CD-14 from majority-White CD-11 were 34% people of color by total population and 30.5% by voting age population.

179.   Rather than diluting the voting strength of voters of color who were moved into CD-14 from packed majority-Black CD-13, the Controlling Party's lawmakers and map drawers should have drawn population from adjacent areas of CD-9 and/or additional population from CD-11 to equalize the population of CD-14 and used the over-packed population of CD-13 to create the new majority-Black Congressional seat in the western Atlanta Metro Area.

180.   Instead, the Controlling Party's lawmakers ignored pleas from community members of color affected by these changes during legislative committee

hearings who expressed concerns the changes would dilute their voting strength and move them into a district with which they have little or no shared common interests.

181.  There was no reason to draw the map in this way other than to dilute the voting strength of voters of color in one of the fastest growing regions for Black communities in the United States in violation of Section 2 of the Voting Rights Act and the U.S. Constitution without a compelling justification.

182.  These changes are textbook examples of cracking and packing, and they were made with the objective to create a Congressional map that has at least one-less majority-Black Congressional district than should be present.

183.  Accordingly, race predominated in the Controlling Party's decision not to create a new majority-Black Congressional district in the Metro Atlanta area and in cracking and packing the adjacent Metro Atlanta Congressional districts to dilute the voting strength of Black voters and other voters of color in order to avoid drawing the new majority-Black Congressional district. Traditional districting principles, including drawing compact districts, keeping communities of interest intact, and avoiding cross county splits were all subordinated to the predominance of racial considerations in the drawing of the 2021 Congressional plan.

## VI.    The State Senate Map

### A. Central Georgia Senate Districts (Allegations supporting constitutional and Section 2 of VRA claims)

184.   The Black population in Georgia has grown in the last decade, while the White population has fallen.  These trends are across the State, including in central Georgia, where counties such as Newton, Rockdale, Henry, Spalding are located.

185.   However, the Controlling Party and its map drawers drew Senate districts in central Georgia that have the effect of diluting the political power of Black Georgians in violation of Section 2 of the Voting Rights Act.  The State Senate districts in central Georgia were also drawn with the intent to dilute the political power of Black Georgians and constitute racial gerrymanders.

186.   Specifically, SD-10 and SD-43 were packed with Black voters.  Both districts have a Black voting population that is greater than 60%.  And this packing was accomplished by creating districts that do not comport with traditional districting principles, have irregular shapes, pull in Black populations from disparate communities without a compelling justification, and dilute the voting strength of Black voters.

187.   In addition, SD-17 and SD-25 were drawn to crack populations of Black voters to dilute Black voting strength, with neither district having a Black

voting population over 33%. Due to racially polarized voting, Black voters are usually unable to elect candidates of choice in these cracked districts because the White majority tends to vote as a bloc to prevent Black voters from electing candidates of their choice.

188.   Only Senate District 10 and SD-43 give voters of color a meaningful opportunity to elect a candidate of choice. Senate Districts 17 and 25 crack the population of people of color to prevent them from having a meaningful opportunity to elect candidates of choice.

189.   In the new Senate plan, the Controlling Party and its map drawers reduced the voting age population of people of color in the new SD-17 plan from 50.93% to 40.58%, a 10.35% drop. This plan was drawn after Phyllis Hatcher, a Black Democrat, was in a competitive election against a White Republican candidate, Brian Strickland, and lost by a margin of approximately 5 percentage points in 2018.  The Controlling Party's map drawers also reduced the population of registered voters of color in the new plan from 48.73% to 37.88%, a 10.86 percentage point drop. The Black voter registration population was also reduced from 42.23% to 31.84%, a drop of 10.39 percentage points in the new plan.  Race

predominated over traditional districting principles in the drawing of SD-17 by the Controlling Party and its map drawers in the new Senate plan.

190.   In SD-25, the percentage of the population of people of color was increased slightly from 37.24% in the old plan to 42.55% in the new plan, but the increase is not likely enough to give people of color a meaningful opportunity to elect candidates of their choice in the new SD-25 plan.

191.   The Controlling Party and its map drawers could have alleviated the overpacking of SD-10 and the cracking of people of color in SD-17 and SD-25 by increasing the percentage of people of color in SD-17 and SD-25, but chose not to, diluting the voting strength of people of color in the new plan.

Without violating—and indeed, while better preserving—traditional redistricting principles, Black voters should be moved out of SD-10 and SD-43 and moved into SD-17 and SD-25 to provide the Black voters in central Georgia an opportunity to elect candidates of their choice.

### B. Senate Districts in and around the Area of Clayton, Spalding & Fayette Counties (Allegations supporting constitutional and Section 2 of VRA claims)

192.   Clayton, Spalding, and Fayette counties are part of the Atlanta Metro area and have seen material population growth since the 2010 Census.  In all three counties as well—and also in surrounding counties—the population growth can be

attributed primarily to the increase in Black population whose voters vote cohesively.

193.    Accordingly, this region of the State can support the drawing of at least three compact majority-Black State Senate districts where Black voters, who vote cohesively, have the opportunity to elect candidates of their choice.

194.    However, the Controlling Party and its map drawers drew the lines in and around this region—specifically, the lines for SD-44, SD-34, SD-16, and SD-18, to ensure that this region would have only two districts where Black voters can elect candidates of their choice.

195.    Specifically, SD-34 and SD-44 are substantially packed, with both having a Black voting population of over 65%.  But the Controlling Party's map drawers drew SD-16 and SD-18 to severely crack populations of Black voters, with both districts containing a Black voter population of less than 30%.

196.    These line drawing decisions were made intentionally and surgically to diminish Black voting strength.  For example, SD-16 was drawn to intentionally not reach into Clayton County and SD-18 was drawn to reach far down into Crawford and Peach counties, so as to push SD-16 down and away from the highly dense Black populations in and around Clayton, Fayette, and Spalding counties and towards counties with higher populations of White residents where racially polarized voting

61

usually prevents Black voters who vote cohesively from being able to elect candidates of choice due to White bloc voting.

197.   These choices have caused the Black voters to have one less district where they have an opportunity to elect candidates of their choice.  And these decisions were made intentionally by the Controlling Party and its map drawers.

### C. Senate Districts in the Area of Fulton & Douglas Counties (Allegations supporting Section 2 of VRA claims)

198.   Senate District 35 is located solely in Fulton and Douglas counties. Dense Black communities are located in these counties. Approximately 90% of Atlanta sits in Fulton County, while Douglas County to the west has witnessed an almost 10% increase in its Black population since the 2010 Census.

199.   Prior to the 2021 redistricting of Senate District 35, the district had a 68.3% Black voting age population.

200.   Given this fact, it is no surprise that SD-35 is a majority-Black district with a Black voting age population of almost 70%.

201.   However, this level of packing is not necessary for Black voters to elect candidates of their choice.  In fact, if such packing did not take place, then at least one additional compact majority-Black senate district could be drawn in the area of Fulton and Douglas counties that provides Black voters in this region with an opportunity to elect candidates of their choice.

202. The drawing of another majority-Black senate district in this area is possible by reducing the packing of SD-35 and drawing in additional Black voting age population from Senate districts to the immediate west of SD-35, which include SD-30, SD-31, and SD-28.

203. None of these districts have even a 20% Black voter population, and each of these districts could reach further into Douglas and Fulton counties without violating traditional redistricting principles. In fact, the compositions of at least SD-28 and SD-30 would better protect traditional redistricting principles if these changes were made given that the map drawn by the Controlling Party and its mappers was not compact.

### D. Senate Districts in Cobb County Area (Allegations supporting constitutional and Section 2 of VRA claims)

204. Cobb County is one of the largest counties in the Atlanta Metro area, with over 760,000 total residents after the most recent Census. The county is majority people of color. The largest city in Cobb County, Marietta, has a population of people of color that nearly reaches 60%. The Cobb County population of people of color is primarily comprised of large percentages of Black and Latinx residents.

205. Also, Cobb County is surrounded by other counties with large populations of people of color, such as Fulton and Douglas counties.

63

206.   Both historically and in the most recent Georgia elections, the large and growing populations of Black and Latinx voters in Cobb County usually vote cohesively, individually and collectively as a group, voting for the same candidates. The White majority votes cohesively as a bloc for different candidates and, due to racially polarized voting, White bloc voting usually prevents voters of color from electing candidates of their choice.

207.   In 2020, there were five districts with significant pieces of Cobb: SD-38, which is a majority-Black district split between Fulton and Cobb counties (61.31% BVAP); SD-33, is a majority-people of color coalition district (with a people of color VAP of 63.65%, CVAP 55.18% and registered voters 57.97%), which is nested within Cobb County; SD-6, which is a majority-White district (White VAP of 53.74%), which includes part of Fulton and Cobb counties; SD-32, a majority-White district (White VAP of 68.88%), which includes part of Cobb and Fulton counties; and SD-37, which is a majority-White district (62.54% White VAP), which is entirely in Cobb County. There was also one senate district, SD-14, which included a smaller portion of Cobb County.

208.   The new senate map continues to cut Cobb County into six separate districts—SD-6, SD-32, SD-33, SD-37, SD-38, and SD-56—which results in the

packing of Black and Latinx voters into SD-33 and SD-38, but does not provide this coalition with another opportunity to elect candidates of their choice.

209.   These six senate districts in the new plan cut Cobb County to a greater extent than the previous senate plan.  Each district includes at least 89,000 Cobb County residents and is paired with adjacent parts of neighboring counties.

210.   This was an intentional and deliberate choice on the part of the Controlling Party and its map drawers to dilute the voting strength of Black and Latinx voters by packing them into two senate districts instead of giving them more opportunities to elect candidates of choice in at least three additional compact, majority people of color districts.

211.   By doing so, race predominated over traditional districting principles, including the Controlling Party's own redistricting guidelines which stated cross county cuts, like these in the Cobb County senate districts, should be avoided.

212.   In making these changes, the Controlling Party and its mappers also intentionally increased the percentage in SD-6 of White VAP from 53.8% in the previous plan to 57.8% to prevent people of color from having a meaningful opportunity to elect candidates of their choice in this district.

213.   Without violating traditional districting principles—and in fact, by drawing the districts to better preserve Cobb County and to better respect traditional

redistricting principles—a third majority persons of color senate district could be drawn in this region by shifting voters into SD-6 and primarily out of SD-38 and SD-33. This would reduce the number of senate districts that enter Cobb County to five instead of the six in the new plan.

214.   Alternatively, a map could be drawn to reduce the number of senate districts with portions of Cobb County to four instead of five. 765,136 people are needed for four state senate districts based on statewide figures. Cobb County's total population is 766,149 people. This is only 1,013 people, or 0.13% greater than the total population required for four seats, well within the acceptable 5% population deviation for state senate districts. Four districts could be nested within Cobb County, better satisfying traditional districting principles. The voting strength of Black voters in SD-38 will continue to make this district perform as a majority Black district – even if it no longer included precincts from Cobb County.

215.   Notably, the Controlling Party's legislative delegation passed a Cobb County Board of Commission map that includes only four single member districts and an at-large chair. That plan has two coalition districts and is entirely nested in Cobb County. There is no compelling or reason for six senate seats to enter Cobb County, except to dilute the voting strength of the burgeoning population of people of color in Cobb County and adjacent areas.

216.   As a result, the six-senate district plan drawn by the Controlling Party and its map drawers violates Section 2 of the Voting Rights Act and also constitutes an unconstitutional racial gerrymander.

### E. Senate Districts in and around Gwinnett, North Fulton & Forsyth Counties (Allegations supporting constitutional claims)

217.   In 2020, Michelle Au was elected to the Georgia State Senate to represent SD-48.  This was an historic election, as Senator Au is the first AAPI individual elected to the Georgia State Senate.

218.   Her victory was due in part to the growing diversity of Gwinnett, Fulton, and a small portion of Forsyth counties, where there is not only a growth in the population of Black communities, but also of Latinx and AAPI communities as well.

219.   In a clear effort to put a roadblock in the way of the increasingly diverse multi-racial and ethnic voting bloc in SD-48, the Controlling Party and its mappers intentionally manipulated the redistricting plan for SD-48 to dilute the voting strength of this coalition and to prevent the re-election of a candidate of their choice, such as Senate Au, in the future.

220.   In the new plan, SD-48 was drawn as a majority-White district, with a Black and Latinx voting age population at less than 10% each, an AAPI voting age

population at less than 30% and a combined CVAP percentage of people of color of only about 32%.

221.   The map drawers achieved this result by reaching out of the existing SD-48 lines into a region of Forsyth County that has a high density of White voters. These percentages virtually guarantee that the coalition of Black, Latinx and APPI voters will be unable to elect candidates of their choice in upcoming election cycles, despite the substantial surge of the population of people of color in this area.

222.   Racial   considerations   predominated   the   Controlling   Party's redistricting plan for SD-48.  It would have been very easy for the Controlling Party and its map drawers to have maintained this performing coalition opportunity district as it was, but they chose not to do that and, instead, deliberately moved White population from Forsyth County into the district to purposely dilute the voting strength of Black, Latinx and AAPI voters in the district.

223.   The Controlling Party and their mappers could have also unpacked SD-7, which has voting age population of people of color that is over 73%, and SD-5, which has a voting age population of people of color of 84.31% and a registered voting population and CVAP of people of color that is over 70%, to increase the voting strength of the burgeoning population of voters of color in this area but chose

not to that either.  In short, this was a racial gerrymander of a performing coalition opportunity district.

224.   The mappers could have a drawn a reasonably compact district with a combined majority of Black, Latinx, and Asian voters. Moreover. the Black, Latinx, and Asian voters in this region vote cohesively and usually as a bloc for the same political candidates. The White majority votes cohesively as a bloc for different candidates of choice and, due to racially polarized voting, the White majority bloc prevents candidates from being elected in the current SD-48.

### F. Senate Districts in the East Black Belt (Allegations supporting Section 2 of VRA claims)

225.   The East Black Belt has a large Black population with historical ties to the region.  The Black voters in this region vote cohesively and usually as a bloc for the same political candidates. The White majority votes cohesively as a bloc for different candidates of choice and, due to racially polarized voting, the White majority bloc prevents Black candidates from being elected.

226.   Given the demographics of this region, at least one additional compact majority-Black senate district could be drawn which provides the Black community with an opportunity to elect candidates of their choice.

227.   But this did not occur. Instead, the Controlling Party and its map drawers drew SD-23 to crack the Black voter population, by drawing the lines for

SD-23 south all the way down to the bottom of majority-White Emanuel County, where the Black voter population is not even 34%.

228.   In contrast, SD-26 was packed with a Black voting age population that is over 55%. The district achieves this result by having tendrils that reach into the center of Bibb County, while also climbing up into Hancock County to include Black voting age population to aid in the packing of this district.

Another compact majority-Black district could be drawn by moving some of the Black voting age population from packed SD-26 into the cracked SD-23 and out of the adjacent SD-22 in Richmond County into SD-23 to give Black voters an opportunity to elect candidates of their choice. Moreover, these changes would ensure that the State Senate map better preserves and respects traditional redistricting principles, including compactness, than the map that the Controlling Party and its map drawers created.

### G. State Senate Districts in Chatham County area (Allegations supporting constitutional claims)

229.   In yet another departure from its redistricting guidelines which advised that the Controlling Party and its mappers should avoid splitting counties, the Controlling Party and its map drawers also split Chatham County among three Senate districts (Districts 01, 02, and 04), a significant change from its two-way split in the previous Senate plan.

70

230.   SD-02 is a packed majority people of color district in and around the City of Savannah. It is majority people of color by total population (63.60%), by people of color VAP (59.79%), and by people of color voter registration (61.11%). The total population of people of color in SD-02 is almost unchanged from the prior Senate plan and there was no apparent attempt by the Controlling Party and its map drawers to unpack this district in the new plan.

231.   SD-01 and SD-04, on the other hand, were drawn as majority-White districts. SD-01 includes coastal areas south of Savannah and adjacent interior areas to the west.  SD-04 includes areas to the north and west of Savannah.

232.   The new three-way split of the Senate plan in this region is made more egregious because of the pairing of the population of people of color in Liberty County with the heavily White populated areas in Chatham and Bryan Counties in SD-01 in order to dilute their voting strength.

233.   By adding SD-04 into the cracking of Chatham County, the Controlling Party and its map drawers sought to prevent the district from becoming more diverse and competitive for voters of color, thereby predominating racial considerations in

the drawing of these districts without a compelling justification, such as compliance with the Voting Rights Act or traditional districting principles.

234.  In fact, SD-1, SD-2, and SD-4 the Controlling Party and its map drawers did not comply with traditional redistricting principles.  They include jagged and uneven lines and the districting plan rips apart communities of interest.

235.  All three districts enter into Chatham County.  And the diverse city of Pooler in Chatham County is brought into SD-4, which includes all of Bulloch and Candler counties, but is ripped away from other Chatham County cities that have been placed instead in SD-2.

236.  The Controlling Party's predominant purpose was to make these line-drawing decisions to preserve the White majority in SD-1.  If traditional redistricting principles were followed, then the lines would not be drawn this way.

237.  For aforementioned reasons, SD-1, SD-2, and SD-4 are unconstitutional racial gerrymanders.

## VII.  The State House Map

### A. House Districts in Douglas and Fulton Counties (Allegations supporting constitutional and Section 2 of VRA claims)

238.  Douglas County is majority-people of color, with a White population that is less than 35% of the total.  This is a dramatic change from the 2010 Census, when Douglas County was majority-White.  Much of the demographic change can

be attributed to an almost 10 percentage point increase in the Douglas County Black population.

239.   Fulton County is also majority-people of color, with a White population that is less than 40% and a Black population that is over 40% of the total.  Also, 90% of Atlanta, which has a large Black population, is located in Fulton County.

240.   Historically and also in recent elections, the Black population in and around Douglas and Fulton Counties has usually voted cohesively for the same candidates and White voters have usually voted as a bloc to prevent the election of candidates preferred by Black voters.

241.   At least one more reasonably compact House District can be drawn in and around Douglas and Fulton counties that provides the Black voters in this region an opportunity to elect the candidates of their choice.

242.   Instead, the Controlling Party and its map drawers drew the House Districts in this area of the State with the intent and effect of diluting the political power of Black voters.  HD-61 is packed with over 70% Black voters by starting in Douglas and slithering down into Fulton County.  HD-65, with a Black voting age population that reaches almost 60%, is packed by starting in Douglas County and reaching down into Fulton and Coweta counties.

243.   The packing of Black voters in HD-61 and HD-64 results in the dilution of the Black vote in HD-64. HD-64 has a Black voting population of less than 30%, and while it is located primarily in Douglas County, it reaches north into Paulding County and does not enter into Fulton County.

244.   The districts in this region could have instead been drawn to pull Black voters out of HD-61 and HD-65 and place them into HD-64.  Doing this could allow the House Districts in this region to cut across fewer counties and be drawn with greater contiguity—better preserving traditional redistricting principles than the existing House map.

### B. House Districts in South Atlanta Exurbs (Allegations supporting constitutional and Section 2 of VRA claims)

245.   House District 74, located in Clayton County, which is part of the South Atlanta Exurbs, has a Black voting age population that is under 25%.  House Districts 75-79, also located in and around Clayton County, each have a Black voter population that is greater than 64%.  HD-69 in the same region of the State also has a Black voter population that is over 60%.

246.  Black voters in and around Clayton County consistently vote cohesively for candidates of their choice and White voters usually vote as a bloc to prevent Black voters from electing candidates of their choice.

247.   HD-74   (previously HD-73) had been reliable seat for candidates preferred by the White majority. , with the White-preferred candidate winning election unanimously in 2018. But the district became more competitive in 2020, when the White-preferred candidate won reelection over a candidate preferred by voters of color by 54.12% to 44.03%.

248.   A reasonably compact district of majority Black voters could have been created in Clayton County, in the area around HD-74, by unpacking the Black voters concentrated in the surrounding areas.  Instead of creating this Black majority district in the South Atlanta Exurbs, the Controlling Party intentionally created the surrounding packed districts, thereby diluting the voting power of Black voters in HD-74.

249.   Race was the predominant motive behind the drawing of these districts. The drawing of the districts in the South Atlanta Exurbs violated traditional districting principles, in particular by drawing HD-78 as a long and skinny district that reaches at its bottom to HD-74 and at its top to HD-76, and by drawing HD-74 to avoid Black voter population from Clayton County by hooking around to include portions of less diverse areas of Spalding, Henry, and Fayette.

250.   None of the decisions by the Controlling Party and its map drawers to allow race to predominate the redistricting plans in these districts were justified by

compelling reasons, such as compliance with the Voting Rights Act.  This was an unconstitutional racial gerrymander.

### C. House Districts in Henry County (Allegations supporting constitutional and Section 2 of VRA claims)

251.   Henry County, also in the Atlanta Metro area, is a majority-minority county that has a White population at around 35% and a near-majority Black population.  This is a stark change from the 2010 Census, when Henry County contained a White majority. Black voters in Henry County consistently vote cohesively for candidates of their choice and White voters usually vote as a bloc so as to prevent Black voters from electing candidates of their choice.

252.   Because of the growth of the Black population, at least one additional reasonably compact majority-Black House district could be drawn in Henry County.

253.   Instead, the Controlling Party and its map drawers cut into Henry County with seven different House districts—HD-74, HD-78, HD-91, HD-115, HD-116, HD-117, and HD-118, cracking and packing populations of Black voters with the intent and effect of diluting the voting power of Black voters in Henry County.

254.   Specifically, HD-78 and HD-91 are packed with Black Georgians, and HD-117 is cracked of Black voters, with a Black voter population at less than 35%.

255.   Race was the predominant motive behind the drawing of these districts. HD-117 (previously HD-110) had been a reliable seat for the election of White-

preferred candidates, with one such candidate winning election with 100% of the vote in 2018. Another such candidate won election in 2020 with only 55.80% of the vote in 2020 to a candidate preferred by Black voters, and who is himself Black and who garnered 44.20% of the vote.

256.   The existing map in this region, which cuts Henry County into seven separate House Districts, does not respect traditional redistricting principles. For example, HD-117, has the appearance of two orbs that sit on top of one another, connected by a thin line in the middle.

257.   None of the decisions by the Controlling Party and its map drawers to allow race to predominate the redistricting plans in these districts were justified by compelling reasons, such as compliance with the Voting Rights Act. This was an unconstitutional racial gerrymander.

### D. House Districts in Newton and Rockdale Counties (Allegations supporting Section 2 of VRA claims)

258.   House Districts 91, 92, 93, and 95 cover all of Rockdale County. Each is packed with at least a Black voting population of at least 62%. HD- 113 covers a large portion of Newton County.  It has a Black voting age population of over 56%.

259.   The only remaining district to touch Newton County (in addition to HD-113 and HD-93) is HD-114.  HD-114 dilutes the Black vote.  It has a Black voter population of less than 24%, which is achieved by drawing the district to run far east

and cover all of majority-White Morgan County. The packing and cracking of the Black voting population in these districts were done by the Controlling Party with the intent and have the effect of diluting the voting power of Black voters.

260.   While Black voters in this region usually vote cohesively for the same candidates of choice, due to racially polarized voting, the White majority usually votes cohesively as a bloc to prevent Black voters from electing candidates of their choice.

261.   By moving voters out of the packed districts that encompass Rockdale County, the map could be redrawn to permit the Black community in this region to elect candidates of their choice in a new HD-114.  And doing so could ensure that the new districts do not break apart communities of interest in and around Rockdale, Newton and Henry counties.

### E.  House Districts in Houston, Peach, and Bibb Counties (Allegations supporting constitutional and Section 2 of VRA claims)

262.   Black voters in the Houston, Peach, and Bibb counties region vote cohesively for candidates of their choice and the White majority in this area usually votes for different candidates as a bloc, preventing Black voters from electing candidates of their choice.

263. Bibb County sits directly north of both Peach and Houston counties. Under the map drawn by the Controlling Party and its map drawers, Bibb is divided between four separate districts, HD-142, HD-143, HD-144, and HD-145. Both HD-142 and HD-143 have packed Black voting populations. House District 145, however, has a Black voting population of only 34%.

264. The Controlling Party and its map drawers could have created another reasonably compact majority Black district in and around Houston, Peach, and Bibb Instead, by packing HD-142 and HD-143, and cracking the Black voting population in HD-145, the Controlling Party and its map drawers drew districts in this area so as to dilute the voting power of Black voters.

265. The packing and cracking of the Black voting population in these districts were done by the Controlling Party with the intent and have the effect of diluting the voting power of Black voters.

266. Election contests in the area have become increasingly competitive. For example, in HD-147, the margin of victory for the White-preferred candidate over the candidate preferred by Black voters narrowed from about 8 percentage points in 2018 to about 5 percentage points in 2020.

267. Race was the predominant motive behind the drawing of these districts. The Controlling Party and its map drawers achieved this result by ignoring

traditional districting principles, drawing HD-145 to cross five county lines.  It starts at the southern end of Monroe County, covers all of Crawford and a small portion of Bibb, and includes the northern-half of Peach County and a small sliver of population at the north of Houston County.

268.   The highly irregular shape of HD-145 has also allowed the Controlling Party to crack HD-147.  This district looks like a cul de sac with HD-145 surrounding it on three sides.  And while it is surrounded by Black populations in this region of Georgia, it has under the existing map a Black voting population at less than 30%.

269.   None of the decisions by the Controlling Party and its map drawers to allow race to predominate the redistricting plans in these districts were justified by compelling reasons, such as compliance with the Voting Rights Act. This was an unconstitutional racial gerrymander.

### F.  House Districts in Baldwin County (Allegations supporting constitutional and Section 2 of VRA claims)

270.   Baldwin County shares historical and demographic ties with the East Black Belt region of Georgia.  The East Black Belt has a large Black community which has consistently voted as a cohesive bloc for candidates of their choice.

271.   To the immediate west of Baldwin County, however, there are counties in Georgia that do not share the historical and geographic ties to the East Black Belt. These counties have large White majority populations which usually vote cohesively

as a bloc for different preferred candidates than Black voters do and, as a result, White majority racial bloc voting usually prevents Black voters from electing candidates of their choice.

272.   The Controlling Party and its map drawers divided Baldwin County between HD-133 in the west and HD-128 in the east.   HD-128 is a highly competitive district for the Black community, but HD-133 provides the Black community with no opportunity to elect candidates of their choice.  The Black voting population in HD-133 is less than 36% of the total.  The drawing of these districts was done by the Controlling Party with the intent and has the effect of diluting the voting power of Black voters.

273.   An additional majority-Black district could be drawn where HD-133 is presently located.  The new district could take voters from HD-128 in Baldwin County, from portions of Hancock and Washington counties or from packed districts to the east in Augusta-Richmond County which would not weaken Black voting strength there, as HD-128 could be extended further eastward.

### G. House Districts in Dougherty County (Allegations supporting constitutional and Section 2 of VRA claims)

274.   In southwest Georgia, Dougherty County is divided between four separate districts—HD-151, HD-152, HD-153, and HD-154.  The largest city in

Dougherty county is Albany, which has a Black population that makes up nearly 75% of all residents.  All four of the districts in Dougherty County enter Albany.

275.   Black voters in this region cohesively for the same candidates.  Due to racially polarized voting, the White majority usually votes as a bloc to prevent Black voters from electing candidates of choice.

276.   At least one additional majority-Black house district in Dougherty County could be drawn to provide the Black voters with an opportunity to elect candidates of their choice.  Under the existing map, HD-153 is packed with over 66% Black voters.  And while HD-151 has a competitive Black voting population, the percentages of Black voters are diluted because the map has this district reach up all the way into less diverse areas of Chattahoochee and Marion counties.  These districts were drawn by the Controlling Party with the intent and have the effect of diluting the voting power of Black voters.

277.   By moving Black voters out of HD-153 and redistributing the voters in HD-151 and the remaining Dougherty County districts, at least one additional majority-Black district could be drawn in this region of the State.

278.   Race was the predominant motive behind the drawing of these districts. The map drawers violated traditional redistricting principles by dividing a single city into four separate House Districts. None of the decisions by the Controlling Party

82

and its map drawers to allow race to predominate the redistricting plans for the Dougherty County districts were justified by compelling reasons, such as compliance with the Voting Rights Act. This was an unconstitutional racial gerrymander.

### H. House Districts in Hall County (Allegations supporting constitutional and Section 2 of VRA claims)

279.   Hall County has gained approximately 24,000 residents since the 2010 Census, and Gainesville within Hall County has gained approximately 8,000 residents. A significant portion of the county and city's new residents are Latinx.

280.   Black and Latinx voter populations in Hall County and in Gainesville individually and collectively, usually vote cohesively for the same preferred candidates, while the White majority usually votes as a bloc for different candidates. Due to racially polarized voting, White majority bloc voting usually prevents Black and Latinx voters in this region from electing candidates of their choice.

281.   Hall County forms a major part of three State House Districts, one of which has to be anchored by Gainesville and its concentrated community of people of color. The previous State House District 29 just barely became majority non-White by VAP after the 2020 Census, but it was 62.8% White by CVAP and 57.6% White by registered voters.

282.   Changes were made by the Controlling Party's mappers to House District 29 to make it appear more diverse at first glance by general population and voting age population, but it maintains a 58.5% White CVAP percentage and 51.5% White registered voter (RV) advantage.

283.   The Controlling Party and its map drawers also intentionally cracked the Latinx and Black population in HD-30 and HD-31. The CVAP and registered voter metrics for people of color in HD-30 are 19.91% and 23.02%, respectively; and the CVAP and registered voter metrics for HD-31 are 22.29% and 22.7%, respectively.

284.   The result is that every House District in this area is majority-White by CVAP and registered voters, despite the fact the Controlling Party's map drawers could have drawn a district in this region that is a compact majority-coalition district comprised of Latinx and Black voters by registered voters or CVAP to give Latinx and Black voters a meaningful opportunity to elect candidates of their choice.

285.   While preserving traditional redistricting principles, areas with concentrations of Latinx and Black voters in HD 30 or 31 could be moved into HD-29 to draw a compact majority-Latinx and Black coalition district to give Latinx and Black voters a meaningful opportunity to elect candidates of their choice.

## I.  House Districts in Gwinnett County (Allegations supporting constitutional claims)

286.  Based on the 2020 Census, Gwinnett County is one of the most diverse counties in Georgia.  It has a White population around 30%, Black and Latinx populations around 25%, and an AAPI population that is steadily growing and already at around 15%. Even in the most distant parts of Gwinnett County, the electorate is diverse

287.  To combat the emerging diversity in the Gwinnett County House Districts and to prevent people of color from gaining voting strength that would empower them to elect candidates of their choice, the Controlling Party and its map drawers intentionally cracked the populations of people of color in northern Gwinnett County House Districts.

288.  In fact, every northern Gwinnett House District – 100, 103, 104, as well as the neighboring House Districts 111 and 30 (which grabs a single precinct) – crosses the county line in violation of the districting principles adopted by the Controlling Party, and go into the much less diverse and majority-White neighboring areas to dilute the voting strength of voters of color.

289.  The changes made by the Controlling Party and its mappers were intended to limit the emerging voting strength in Gwinnett County's communities of people of color. For example, former Gwinnett-only House District 98 was 52.5%

White by VAP and 53% White by registered voters (RV) in the prior plan. Its successor, District 100 in the 2020 House plan, which includes less diverse Hall and Forsyth County precincts, increased by almost six and one half (6.5) percentage points to 59.1% White by VAP.

290.   These demographic changes have led to increasingly competitive elections in the area.  For example, in HD-104, the margin of victory of the White-preferred candidate over the candidate preferred by voters of color narrowed from over 6 percentage points in 2018 to a little over 2 percentage points in 2020. Additionally, the more competitive losing candidate in 2020 was a Black woman.

291.   HD-104, which was 46.6% White by VAP, is now 63% White by VAP in the new plan due largely by the decision of the Controlling Party and its mappers to add less diverse Barrow County precincts in the HD-104 redistricting plan to prevent voters of color from having an opportunity to elect candidates of their choice.

292.   HD-111 is mainly a majority-White Walton County District but its arm into Gwinnett reduces and pulls out diverse precincts. The old HD-114 plan had some areas of Rockdale County that were dropped in favor of the Gwinnett County cracking of populations of voters of color.

293.   The Controlling Party and its map drawers used race as the predominate consideration without a compelling justification in cracking communities of voters of color in the new plan for HD-103, which retreats somewhat into Gwinnett County but still crosses the Hall County border.

294.   None of the decisions by the Controlling Party and its map drawers to allow race to predominate the redistricting plans for in the cracking and packing of Gwinnett County House districts were justified by compelling reasons, such as compliance with the Voting Rights Act.  Instead, race predominated in the decisions to intentionally limit the voting strength of voters in these districts and to prevent the drawing of additional compact majority-coalition districts.  This was an unconstitutional racial gerrymander.

### J.  House Districts in North Fulton County (Allegations supporting constitutional claims)

295.   The northern portion of Fulton County, outside of the Atlanta municipal lines, is represented by nine districts, HD-25 and HD-47 through HD-54.  Even though this region does not include the diverse city of Atlanta, it is still a highly diverse area of Georgia.  There is a large AAPI population in the eastern portion near Forsyth County.  And the remainder of North Fulton has large Latinx and Black populations.

296.   Given this demographic makeup, the Controlling Party and its map

drawers could have complied with traditional redistricting principles and created several districts that provide either the Black population with an opportunity to elect candidates of their choice, or coalitions of Black/Latinx and Black/Latinx/AAPI populations the opportunities to elect the candidates of their choices.

297.   But the nine districts that split apart north Fulton County do not create a single majority-Black district, and only HD-50 provides a coalition of minority voters the opportunity to elect candidates of their choice.

298.   This dilution of minority political power was accomplished by the intentional and surgical splitting of minority populations in this region of the State. The choice to split apart racial minorities in north Fulton County predominated the line-drawing choices and were specifically emphasized over compliance with traditional redistricting principles such as contiguity and preserving communities of interest.

299.   For example, HD-48 and HD-49 have jagged edges and tentacles that stretch away from the body of each district.  And HD-53 has a long and thin line that squiggles along the border of Cobb County, and which has the result of diluting the minority vote in Sandy Springs.

300.   These lines fail to comply with traditional redistricting principles, and the State lacked a compelling justification, such as compliance with the Voting

Rights Act, to draw the House map in north Fulton County in this matter. This was an unconstitutional racial gerrymander.

### K. House Districts in Savannah (Allegations supporting constitutional claims)

301. The House Districts in Savannah and its suburbs run from HD-161 through HD-166. Savannah's population increased by approximately 10% since the 2010 Census, and it is now a clear majority-people of color city. The White population is around 36%, the Black population is around 40%, and the Latinx population is around 6%. The suburbs of Savannah have a similar demographic distribution.

302. However, the Controlling Party and its map drawers drew lines in this region to specifically protect the White voting population's political power in HD-164. This district has a White voting population that is greater than 60% because it stretches west from the Savannah suburbs out onto the far edge of Bryan County and to the border of Evans County.

303. House District 164 also has a large hole at its eastern end where HD-162 is located. While HD-162 is heavily concentrated and has a minority population at around 60%, HD-164 is not nearly as densely populated and, as stated above, has a White voting population at nearly 60%.

304. The districts in Savannah and its suburbs, and also in the surrounding

region of Southeast Georgia, were drawn with the predominant purpose of protecting the White majority's power in HD-164.  Elections in this area have become highly competitive. As recently as 2016, the White-preferred candidate ran unopposed, but in the last two elections a mere 5 percentage point has separated him from the losing candidates, in each case a Black candidate.

305.   This district does not comply with traditional redistricting principles because it crosses county lines in violation of the Controlling Party's redistricting principles in order to maintain it as a majority-White district by including less diverse parts of Chatham County, majority-White areas of suburban Bryan County and portions of the largely non-voting military base areas of Liberty County. There was no compelling justification to draw the district as majority-White, such as compliance with the Voting Rights Act.  The other districts in this area were drawn in order to facilitate this result.

306.   As a result, the districts in Savannah and its suburbs and in the wider Southeast region of Georgia are unconstitutional racial gerrymanders.  In particular, HD-164 was drawn for the predominant purpose of protecting the White majority's political power.  This was an unconstitutional racial gerrymander.

**L.    House Districts in LaGrange (Allegations supporting constitutional claims)**

307.   LaGrange, which sits in Troup County and is near the western border

of Georgia, has a majority-Black population, and has a White population that is around only 35%.

308.   HD-136 (previously HD-132) had traditionally been a competitive district. The last two elections were decided by three to four percentage points.

309.   The new maps cut-up the city across four House Districts, HD-72, HD-136, HD-137, and HD-138. Prior to the new maps, HD-136 (then HD-132) was 48.79% WVAP. The new maps increased it to 63.9% WVAP. Prior to the new maps, HD-136 was 40.89% BVAP. The new maps decreased it to 27.8% BVAP.

310.   Breaking apart the seat of Troup County into four districts violates traditional redistricting principles. And the composition of these districts is also highly irregular: HD-137 appears like a waxing crescent moon, with its northern and southern edges stretch far to the west away from its heart in Talbot County; HD-136 has a protrusion into Troup County and otherwise covers most of Meriwether County; and both HD-72 and HD-138 have protrusions that lack contiguity with the remainder of the districts as well.

311.   The result of these line-drawing decisions was to create only one majority-Black district in the LaGrange area, HD-137, while the remainder of the districts are not majority-Black and do not provide the Black community in LaGrange with a reasonable opportunity to elect candidates of their choice.

312.   The predominant purpose for drawing the lines that intersect LaGrange in this manner was to ensure that Black voters would have a reasonable opportunity to elect candidates of their choice in only HD-137, and not in the other House Districts in LaGrange, including HD-136.  The Controlling Party and its map drawers were not required to make these map drawing decisions in order to comply with the Voting Rights Act, and there is no other compelling justification for breaking apart the LaGrange Black voting community.  This was an unconstitutional racial gerrymander.

## COUNT I

### 42 U.S.C. § 1983
### Racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution

**(Alleged Against Defendants Governor Kemp and Secretary Raffensperger)**

313.  Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs above, as if fully set forth here.

314.  As detailed above in this Amended Complaint, race predominated over traditional redistricting principles and other lawful considerations with respect to the drawing of specific districts in the new Georgia House, Senate, and Congressional plans (SB 2EX/AP, SB 1EX/AP, and HB 1EX LC 47 1163S/AP) without a compelling state interest.

315.  As such, the new Georgia House, Senate and Congressional plans are racial gerrymanders because of the drawing of the districts described heretofore. In each of these plans, the Controlling Party and its map drawers made the conscious choice of manipulating and sorting populations by race in the districts described heretofore.

316. Racial considerations predominated and traditional redistricting principles were subordinated as to the drawing of the districts described heretofore.

317.  Because racial considerations predominated the map drawing of these districts, Defendants' justifications for the maps are subject to strict scrutiny.

318. The redistricting plans challenged in this Complaint cannot survive strict scrutiny.

319.  By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and will continue to violate those rights absent relief granted by this Court.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT II

### 52 U.S.C. § 10301
**Vote dilution in violation of Section 2 of the Voting Rights Act**

**(Alleged Against All Defendants)**

320.  Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs above, as if fully set forth herein.

321.  Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

322.  Section 2 of the Voting Rights Act prohibits the dilution of minority voting strength. The dilution of minority voting strength may be caused by, among other things, the dispersal of the minority population into districts where they constitute an ineffective minority—known as "cracking"—and the concentration of minority voters into districts where they constitute an excessive majority—known as "packing." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

323.  The Controlling Party's lawmakers and their map drawers diluted the voting strength of Black, Latinx, and AAPI voters in specific regions described above in this Amended Complaint, particularly in areas that witnessed significant

94

growth of communities of color in the past decade, by the packing or cracking of communities of color in the districts described heretofore.

324. The districts where reasonably compact majority-minority districts, either by one race/ethnicity or a combination of racial/ethnic groups of color, could have been drawn, including, but not limited to the unpacking of districts with unnecessary large populations of people of color or by correcting the cracking of communities of color which prevent them from having an equal opportunity to elect candidates of choice as alleged heretofore in this Amended Complaint.

325. In the districts alleged heretofore in this Amended Complaint, voters of color are politically cohesive, the White majority usually vote as a bloc to defeat the preferred candidates of voters of color. In short, voting is racially polarized in these districts.

326. The totality of the circumstances, including the retrogressive effect of the plans, interact with historical and socio-economic factors to deny voters of color, including Black, Latinx and AAPI voters, the opportunity to elect preferred candidates of choice in Georgia as a whole and in these districts.

327. Georgia has a long history of official voting-related discrimination conducted by the White majority political party in power (previously Democrats, now Republicans). Georgia's long history of official voting-related discrimination

continues to impact the Congressional, State Senate and State House districts which the Controlling Party and its map drawers drew to dilute the voting strength of voters of color in order to prevent voters of color from electing candidates of their choice and to have a meaningful ability to participate in the state's elections.

328.  Even today, official voting-related discrimination continues, including in the districts alleged in this Amended Complaint which violate Section 2 of the Voting Rights Act. Elections are racially polarized in Georgia; the State has used voting practices and procedures, even as recently as 2021, that tend to enhance the opportunity for discrimination against voters of color and the Controlling Party is continuing to advance bills during the 2022 legislative session which may inhibit or prevent people of color from being able to cast ballots that will count as votes if they are enacted.

329.  Additionally, people of color in Georgia generally, and specifically in the districts alleged heretofore in this Amended Complaint, bear the effects of discrimination in areas such as education, employment, and health and people of color participate at lower rates than White people in elections.

330.  Numerous candidates who have run for political campaigns in Georgia have used and continue to use overt and subtle racial appeals in political campaigns; and every decade, including this one, Georgia has drawn maps that have an overall

retrogressive effect in that they decrease the number of majority-minority and minority opportunity districts in the State.

331. Candidates of color rarely win elections in Georgia, and in the particular districts at issue in this case unless they constitute a majority or near majority of the voting age population.

332. The policies underlying the diluting and minimizing the voting rights of voters of color as described in this complaint are tenuous.

333. The totality of the circumstances establishes that the manner in which said districts were drawn and passed has the effect of denying voters of color an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

334. By engaging in the acts and omissions as alleged in this Amended Complaint, Defendants acted and continue to act under color of law to deny Plaintiffs the rights guaranteed to them by Section 2 of the Voting Rights Act, and will continue to violate those rights absent relief granted by this Court.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT III

### 52 U.S.C. § 10301 and 42 U.S.C. § 1983

**Discriminatory purpose in violation of the Fourteenth Amendment to the United States Constitution and Section 2 of the Voting Rights Act**

**(Alleged Against All Defendants on the Section 2 Claim; Alleged Against Defendants Governor Kemp and Secretary Raffensperger on the Fourteenth Amendment Claim)**

335.  Plaintiffs repeat and re-allege each and every allegation contained in the paragraphs above, as if fully set forth here.

336.  42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

337.  Article 1 of the Fourteenth Amendment to the United States Constitution provides:

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

338.  Section 2 of the Voting Rights Act of 1965 prohibits the imposition of any voting standard, practice, or procedure enacted with a discriminatory purpose. 52 U.S.C. § 10301(a).

339.  The new Congressional, State House and State Senate plans (SB 2EX/AP, SB 1EX/AP, and HB 1EX LC 47 1163S/AP, respectively) were adopted, at least in part, for the purpose of disadvantaging voters of color, and in particular, Black, Latinx, and AAPI voters relative to White voters across the State.

340.  From the outset, the map drawers intended to reduce or limit the number

of State House, Senate, and Congressional districts in which voters of color could elect candidates of choice, thereby weakening the voting strength of voters of color over the next decade.

341.  Several of the indicia of discriminatory purpose are present in this case. There is evidence of substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision, including contemporaneous statements by decision makers.

342.  The Controlling Party's legislators provided virtually no notice of the proposed changes, sought to minimize or eliminate public comment, and expedited the legislative process in ways intended to reduce input from anyone other than its main proponents. From last-minute announcements of public hearings to the complicated procedural rules that made it more difficult for members of the public to submit alternative maps or documents to legislators, to amendments introduced and adopted without any or little public notice, to the failure of legislators to even consider plans submitted by groups representing the interests of voters of color, to legislators' awareness, based on testimony from numerous civil rights groups, including Plaintiffs' organization, about the dilutive effect of these Plans —the Controlling Party's legislators moved the goal posts to make certain districts in all

three plans noncompetitive.

343. Defendants will be unable to prove that the maps would have been enacted without the discriminatory intent described above.

344. By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiff the rights guaranteed to them by the Fourteenth Amendment to the U.S. Constitution and Section 2 of the Voting Rights Act, and will continue to violate those rights absent relief granted by this Court.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1) Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

2) Declare that the drawing of specific districts in Congressional, State Senate and State House redistricting plans (SB 2EX/AP, SB 1EX/AP, and HB 1EX LC 47 1163S/AP, respectively) as alleged heretofore in this Amended Complaint constitute racial gerrymanders in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution;

3) Declare that the voting strength of voters of color was diluted with respect to specific districts drawn in the new Congressional, State Senate and State

House redistricting plans (SB 2EX/AP, SB 1EX/AP, and HB 1EX LC 47 1163S/AP, respectively) as alleged heretofore in this Amended Complaint, resulting in a denial or abridgement of the rights of Black, Latinx, and AAPI voters to vote on account of their race or color in violation of Section 2's effects test of the Voting Rights Act;

4)    Declare that the Congressional, State House, and State Senate plans, in their entirety (SB 2EX/AP, SB 1EX/AP, and HB 1EX LC 47 1163S/AP, respectively) as alleged heretofore in this Amended Complaint, were enacted with an impermissible discriminatory purpose on the basis of race in violation of Article I of the Fourteenth Amendment to the United States Constitution and the intent prong of Section 2 of the Voting Rights Act;

5)    Issue a permanent injunction enjoining Defendants from enforcing or giving effect to the boundaries of the violative districts, including an injunction barring Defendants from conducting any elections in the violative districts;

6)    Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order valid plans for the Georgia House, Senate, and U.S. Congress, which include majority-minority coalition districts and minority opportunity districts, that give voters of color the ability to elect candidates of choice;

7)    Make an order requiring Georgia to preclear voting changes during the

following ten-year period pursuant to <u>52 U.S.C. § 10302.</u>

      <u>8)    Make all further orders as are just, necess</u>ary, and proper to ensure complete relief consistent with this Court's orders; and

      9)    Grant such other or further relief as the Court deems to be appropriate, including but not limited to an award of Plaintiff's attorneys' fees, expenses, and reasonable costs, as authorized by <u>42 U.S.C. § 1988</u> and <u>52 U.S.C. § 10310(e)</u>.

Dated: <u>March 30, 2022</u>       Respectfully submitted,

                       By:  <u>/s/ Kurt Kastorf</u>
                       **Georgia Bar No. 315315**
                       **KASTORF LAW LLP**
                       1387 Iverson St., Suite 100
                       Atlanta, GA 30307
                       (404) 900-0030
                       kurt@kastorflaw.com

                       Jon Greenbaum*
                       Ezra D. Rosenberg*
                       Julie M. Houk*
                       jgreenbaum@lawyerscommittee.org
                       erosenberg@lawyerscommittee.org
                       jhouk@lawyerscommittee.org
                     **LAWYERS' COMMITTEE FOR**
                       **CIVIL RIGHTS UNDER LAW**
                       1500 K Street NW, Suite 900
                       Washington, D.C. 20005
                       Telephone: (202) 662-8600
                       Facsimile: (202) 783-0857

                       *Admitted *Pro Hac Vice*

102

Toni Michelle Jackson*
Astor H.L. Heaven*
Keith Harrison*
tjackson@crowell.com
aheaven@crowell.com
kharrison@crowell.com
aheaven@crowell.com
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: (202) 624-2500

*Admitted *Pro Hac Vice*