IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GEORGIA STATE CONFERENCE OF NAACP, ET AL. | ) ) ) | |
| PLAINTIFFS, | ) ) | CIVIL ACTION NO. 1:21-CV-5338- |
| V. | ) ) | ELB-SCJ-SDG |
| STATE OF GEORGIA, ET AL. | ) ) | |
| DEFENDANTS. | ) ) | |
| COMMON CAUSE, et al., | ) ) ) | |
| PLAINTIFFS, | ) ) | CIVIL ACTION FILE NO. 1:22-CV-00090- |
| V. | ) ) | ELB-SCJ-SDG |
| BRAD RAFFENSPERGER, | ) ) | |
| DEFENDANT. | ) | |

## BRIEF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

COME NOW, John Kennedy ("Senator Kennedy"), Bonnie Rich ("Representative Rich"), the "Senate Reapportionment and Redistricting Committee," the "House Reapportionment and Redistricting Committee," Gina Wright, Executive Director of the Legislative and Congressional Reapportionment Office, and the

Legislative and Congressional Reapportionment Office (collectively the "Movants") and file this, their Brief in Support of their Motion for Protective Order showing the Court as follows:

## I.    Background

This motion arises out of litigation related to legislation establishing Georgia's Congressional and State legislative maps SB1EX, HB1EX, and SB2EX (collectively, the "Redistricting Bills") which Plaintiffs allege were adopted in violation of the Voting Rights Act of 1965 and the Fourteenth Amendment to the United States Constitution. Plaintiffs seek information and documents regarding the introduction, formulation, consideration, and adoption of legislation by the Georgia General Assembly.  Such information and documents are sought from:

- John Kennedy, a duly elected member of the Georgia Senate, who served as Chair of the Senate Reapportionment and Redistricting Committee ("Senate Committee") during the 2021 Special Session of the Georgia General Assembly;

- The Senate Committee;

- Bonnie Rich, a duly elected member of the Georgia House of Representatives, who served as chair of the House Legislative and Congressional Reapportionment Committee ("House Committee") during the 2021 Special Session of the Georgia General Assembly;

2

- The House Committee;

- Gina Wright, the Executive Director of the Legislative and Congressional Reapportionment Office ("LCRO"), a joint office of the Georgia General Assembly; and

- The LCRO.

Plaintiffs issued subpoenas for the production of documents to Senator Kennedy, Representative Rich, Gina Wright, the Senate Committee c/o Senator Kennedy, the House Committee c/o Representative Houston Gaines, the House Committee's current Chair, and the LCRO c/o Gina Wright. (The "Subpoenas"). Plaintiffs also seek to depose Movants. The Subpoenas are all attached to the Motion for Protective Order and made a part thereof as Exhibits A-M.

Movants are actively in the process of producing non-objectionable documents. Currently, movants have produced 447 documents, including the relevant committee meeting agendas and minutes, maps, and more than 112 hours of video capturing the relevant Town Halls, committee meetings, and floor debates. Because Plaintiffs refuse to acknowledge the existence and efficacy of the doctrine of legislative privilege, Movants and Plaintiffs are unable to agree on the documents that should be disclosed pursuant to the Subpoenas, including the General Assembly members' and staff's email communications and text messages.

## II.    Meet and Confer and Movant's Proposed Compromise

After the August 9, 2022 telephone conference conducted by this Court, and pursuant to the Court's instructions [Doc. 81], Plaintiffs submitted to Movants their intended topics of inquiry during the proposed depositions of the Movants. (See, Exhibit M). In response thereto, and in an effort to accommodate Plaintiffs' desire to depose the Movants and to ensure that such depositions are only minimally intrusive upon the Movants' legislative privilege, Movants proposed that the areas of inquiry be limited. (See, Exhibit N). Movants' proposal was rejected by Plaintiffs. (See, Exhibit O).

Plaintiffs' rejection of the Movants' proposal, and their failure to offer any counter-proposal, demonstrates Plaintiffs' refusal to acknowledge that legislative privilege provides any protection to the Movants. Plaintiffs' position is not supported by any established legal doctrine, nor is it based on a rational interpretation of legislative privilege. In fact, Plaintiffs' position makes short shrift of the well-established doctrine of legislative privilege entirely.

In a continuing effort to achieve an appropriate balance between the Movants' duty to preserve the integrity of the legislative process from intrusion and the Plaintiffs' alleged need to seek evidence from members and staff of the General Assembly to support their claims, and despite Movants' strongly held and well-supported conviction that legislative privilege operates to shield them from giving testimony or producing documents in this action, Movants propose as follows:

4

(1)     Senator Kennedy will sit for one consolidated deposition of up to seven (7) hours on a single date in response to both the subpoena sent to him individually and the subpoena sent to the Senate Committee, which he chaired during the relevant period;

(2)      Representative Rich will sit for one consolidated deposition of up to seven (7) hours on a single date in response to both the subpoena sent to her individually and the subpoena sent to the House Committee, which she chaired during the relevant period;

(3)     Questioning during Senator Kennedy's and Representative Rich's respective depositions shall be limited to the redistricting process, bills, and maps at issue in this litigation, namely SB1EX, HB1EX, and SB2EX, including the process by which those bills were created, deliberated, and passed;

(4)     Senator Kennedy and Representative Rich will produce correspondence regarding SB1EX, HB1EX, and SB2EX and the redistricting process in general with other members of their respective redistricting committees and the LCRO. To the extent Movants have any relevant communications with Members or staff of the General Assembly who do not agree to waive their legislative privilege for such purpose, those communications will be recorded on a privilege log that will be provided to Plaintiffs;

(5)     Gina Wright will sit for one consolidated deposition of up to seven (7) hours on a single date in response to both the subpoena sent to her individually and the subpoena sent to the LCRO;

(6)    Questioning during Gina Wright's deposition shall be limited to the redistricting process, bills, and maps at issue in this litigation, namely SB1EX, HB1EX, and SB2EX, including the data consulted and generated during the creation of the bills and maps;

(7)    Gina Wright will produce correspondence regarding SB1EX, HB1EX, and SB2EX and the redistricting process in general with members of the House Committee and Senate Committee and other employees of the LCRO. To the extent Ms. Wright has any relevant communications with other Members or staff of the General Assembly who do not agree to waive their legislative privilege, those communications will be recorded on a privilege log that will be provided to Plaintiffs; and

(8)    The Movants reserve, and may assert as and when appropriate, such other objections to documents to be produced pursuant to this proposal and to questions posed during any deposition.  All objections will be resolved in the normal course.

This good-faith proposal seeks to avoid the necessity of a potentially lengthy interlocutory appeal[1] by striking a reasonable, proportionate balance between the interests of the Movants and Plaintiffs.  Movants' proposal allows Plaintiffs to inquire of the General Assembly as to the specific sequence of events leading up to the adoption of the maps, whether the General Assembly departed from its normal procedures or

_____

[1] *In Re Hubbard*, 803 F.3d 1298, 1305 (11th Cir. 2015) (third party legislators who "unsuccessfully assert[] a governmental privilege may immediately appeal a discovery order where he is not a party to the lawsuit").

substantive conclusions in adopting the maps, applicable legislative history, and contemporaneous statements made by legislators during the legislative process. *See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266-268 (1977)*. Further, this proposal, if accepted by the Court, gives Plaintiffs discovery into the legislatively privileged communications and inner workings of the Senate Committee, the House Committee, and the LCRO, which far exceeds the scope of discovery to which Plaintiffs can claim entitlement under *Village of Arlington Heights*, as discussed more fully below.

### III.    Summary of Argument

Through the Subpoenas, Plaintiffs are seeking depositions and documents, records, and communications on a wide range of subjects, including the Congressional Map, Senate Map, House Map (alternatives to those maps), factors considered in drawing the maps, money spent or received in creating the maps, Town Hall Meetings related to the maps, and activities of the Committees in creating the maps.

Not only are the Subpoenas overly broad in that they seek every communication related to the Redistricting Bills, the Subpoenas further demand the testimony and the production of documents protected from discovery by legislative privilege, a well-established safeguard against the disclosure of material implicating the legislative

process and the motivations underlying legislative decision-making.[2] This privilege acts to secure the independence of the legislative branch and as a defense against overreaching by the judicial or executive branches of government. The privilege also serves the public interest by ensuring that lawmakers may focus on their public duties rather than diverting their attention and resources to compulsory legal process.

The Subpoenas strike at the heart of the legislative privilege. The sought-after materials are an integral part of the legislative process, and but for the Movants' good faith offer to produce documents and sit for depositions (subject to minimal, common sense guidelines), would be shielded from entanglement in executive and judicial processes to preserve the separation of powers that is essential to our representative form of government.

## IV.   Argument and Citation to Authority

Federal Rule of Civil Procedure 45(d) directs a court to quash or limit a subpoena if the subpoena imposes an undue burden or requires the disclosure of privileged or other protected matter, provided that no exception or waiver applies. Fed. R. Civ. P. 45(d)(3)(A)(iii) and (iv).  Federal courts "have the authority and duty to recognize claims of privilege that are valid under federal common law." *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015).

---

[2] Some of the documents requested by the Plaintiffs are subject to both legislative privilege and attorney-client privilege, such as draft bills and communications with the Office of Legislative Counsel regarding reapportionment and redistricting.

The scope of permissible discovery from non-parties is subject to the relevancy and proportionality limitations applicable to the parties under Federal Rule 26. *See* Fed. R. Civ. P. 26(b)(1). However, "the standards for non-party discovery require a stronger showing of relevance than for party discovery." *See, e.g.*, *Pinehaven Plantation Prop. LLC v. Mountcastle Family LLC*, 2013 WL 6734117 at *2 (M.D. Ga. Dec. 19, 2013). Additionally, the parties have a heightened duty to avoid imposing undue burden or expense on non-parties. Fed. R. Civ. P. 45(d)(1); *see also Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("[C]oncern for the unwanted burden [of discovery] thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.").

## A. Legislative Privilege Bars the Discovery Sought by the Subpoenas.

### 1. The Background and Purpose of Legislative Privilege

Legislative privilege imbues legislators, the peoples' representatives, on all levels of government with two benefits meant to shield them from threat or coercion: (1) immunity from civil and criminal liability for legislative conduct (hereafter "legislative immunity"); and (2) an evidentiary "immunity" precluding legislators from being compelled to give testimony or produce documents about legislative conduct (hereafter "legislative privilege"). *See Lindley v. Life Investors Ins. Co. of Am.*, 2009 WL 2245565 at *2-6 (N.D. Okla. July 24, 2009).

9

Legislative privilege and legislative immunity exist to preserve the independence and integrity of the legislature in which they serve. *U.S. v. Brewster*, 408 U.S. 501, 507-08 (1972). "Two related rationales underlie the Speech or Debate Clause: first, the need to avoid intrusion by the Executive or Judiciary into the affairs of a coequal branch, and second, the desire to protect legislative independence." *U.S. v. Gillock*, 445 U.S. 360, 369 (1980); *see also Powell v. McCormack*, 395 U.S. 486, 503 (1969) (noting that legislative immunity "insures that legislators are free to represent the interests of their constituents without fear that they will later be called to task in the courts for that representation"). These privileges are essential to representative democracy, and their importance cannot be overstated.

Although the Speech or Debate Clause in the United States Constitution applies only to members of Congress, federal common law affords analogous protections to state legislators in cases arising under federal law. *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732-34 (1967). Thus, state legislators and legislative staff[3] can assert common law legislative privilege and immunity in cases involving federal claims arising out of or inquiring into their legislative acts. *See Tenney v. Brandhove*, 341 U.S. 367, 376 (1951); *In re Hubbard*, 803 F.3d at 1311-12; *Scott v. Taylor*, 405 F.3d 1251, 1257 (11th Cir. 2005).

---

[3] Legislative staff are entitled to legislative privilege "insofar as the conduct of the 'staff member' would be a protected legislative act if performed by the Member himself." *Gravel v. United States*, 408 U.S. 606, 618 (1972).

2.    The Subpoenas seek testimony and documents concerning legitimate legislative activity.

Under federal common law, the legislative privilege protects the actions of state legislators in the "sphere of legitimate legislative activity."[4] *In re Hubbard*, 803 F.3d at 1308. "The privilege protects the legislative process itself, and therefore covers both governors' and legislators' actions in the proposal, formulation, and passage of legislation" regardless of whether the state lawmaker is a party or nonparty to the proceeding. *In re Hubbard*, 803 F.3d at 1308-09.

While the Supreme Court has only had limited occasion to address legislative privilege for state legislators under federal common law, the Eleventh Circuit, in *In Re Hubbard*, has provided guidance for analyzing whether given actions can be characterized as legitimate legislative activity.

Legitimate legislative activity is inclusive of information reflecting the subjective motivation or intent behind a legislative enactment. The Supreme Court has long held that "it is not consonant with our scheme of government for a court to inquire into the motives of legislators." *Tenney*, 341 U.S. at 377; *see also In re Hubbard*, 803 F.3d at 1307-08. The underlying action in *In re Hubbard* involved a challenge to the

---

[4] The word "legitimate" is not synonymous with worthwhile or meritorious attempts at legislating. Rather, the term "legitimate legislative activity" encompasses all actual legislative activity regardless of whether it is objectively laudable.  See, *Tenney*, 341 U.S. at 377 ("[t]he claim of an unworthy purpose does not destroy the privilege.")

constitutionality of an Alabama law (Act 761) that prohibited state employees from making contributions to political organizations by way of payroll deductions. The plaintiffs, members of a public-sector union, alleged that Act 761 was an unconstitutional act of government retaliation in violation of the First Amendment as incorporated through the Fourteenth Amendment. In pursuit of this claim, the plaintiffs issued subpoenas to four non-party state lawmakers seeking:

> "production of six categories of documents relating to: the contents and passage of Act 761, any similar proposals to stop payroll deductions and collection of dues for employee organizations, as well as any communications regarding AEA and the other plaintiffs in the lawsuit."

*In re Hubbard*, 803 F.3d at 1303. The court characterized these subpoenas as a probe into the subjective motivations of the legislators who supported Act 761. Even though the subjective motivation of the legislators was an element of the public sector union's cause of action and the lawsuit involved fundamental First Amendment rights, such inquiry was held to be barred by the legislative privilege. *Id.* at 1310 ("The privilege applies with full force against requests for information about the motives for legislative votes and legislative enactments."). This outcome was reasoned to be in accordance with Supreme Court jurisprudence on the purpose of the Speech or Debate Clause, that of ensuring an independent legislature that need not divert time from legislative tasks to comply with discovery requests. *Id.*

    *In re Hubbard*'s holding dictates that certain subpoena requests be quashed on the grounds that they seek discovery protected by legislative privilege. Requests in each of

12

the Subpoenas expressly seek information on the motivation behind the Redistricting Bills. As to the maps, the Subpoenas seek "all documents and communications …including, but not limited to, any notes, requests, opinions, thoughts, or views about the maps…" and "all documents and communications that relate to or reflect money spent or received relating to the [maps].…" As to the Senate Committee, House Committee, and LCRO, the Subpoenas seek "all documents and communications" shared or sent between them. Furthermore, the Subpoenas seek information regarding the motivation behind the Redistricting Bills by asking for all documents and communications that related to any factor considered…including, but not limited to, the use of race, the use of political or party information, traditional redistricting principles, or "compliance with the U.S. Constitution or the Voting Rights Act of 1965." All of these requests seek to inquire into the legislative process that created the Redistricting Bills and to reveal the motivation behind their enactment.  Of course, to the extent it can even be divined during discovery, the motivation behind legislation constitutes legislative activity that is privileged. *In re Hubbard*, 803 F.3d at 1310

Further, an allegation that legislation arose out of an improper motivation is insufficient to destroy the privilege. *Tenney*, 341 U.S. at 377. Thus, Plaintiffs' assertion that the Redistricting Bills arise out of a discriminatory intent is inconsequential for the purpose of determining the applicability of the privilege. *Id.*; *see also Pulte Home Corp. v. Montgomery Cty., Maryland*, 2017 WL 2361167 at *5 (D. Md. May 31, 2017) (noting

13

that the legislative privilege would be rendered obsolete if allegations of improper motive were sufficient to overcome the privilege).

Additionally, privileged legislative activity includes the investigation and consideration of information regarding the actual or potential impact of a legislative enactment.  Such information is an integral part of the deliberative process by which legislators consider legislation. *Gravel*, 408 U.S. at 625. Without information on the impact of proposed legislation, legislators could not conduct a meaningful deliberation on that legislation. *See League of Women Voters, Inc. v. Lee*, 340 F.R.D. 446 (N.D. Fla. 2021).

In *League of Women Voters*, plaintiffs challenged Florida Senate Bill 90 ("SB 90"), alleging that the bill violated federal law, including the Voting Rights Act, the Fourteenth Amendment, and the Fifteenth Amendment. Seeking evidence of discriminatory intent, the plaintiffs sought discovery from non-party state legislators, including requests for information available to the Legislators about the potential impact of SB 90, the legislative process generally, the legislators' decision making process, the legislators' interactions with third-party groups, and the Legislators' service on various committees, including an election integrity committee.  The district court quashed the subpoena of the legislators, reasoning that the requests were inquiries into the motivation behind a state legislative enactment and such inquiry "strikes at the heart of the legislative privilege." *Id.* at 455 (quoting *In re Hubbard*, 803 F.3d at 1310.)

Like in *League of Women Voters*, the Subpoenas seek to reveal information the legislators considered regarding the potential or actual impact of the Redistricting Bills. Because this information is essential to the legislators' decision-making process, it is legitimate legislative activity covered by the legislative privilege.

It is inconsequential to this analysis that Plaintiffs assert that the legislators' decision-making itself is the basis of the Plaintiffs' claims. If legislative privilege is unavailable where the underlying claims challenge the legislature's decision-making process, there "would be few, if any, cases in which state legislators could shield their personal thought process from view." *Rodriguez v. Pataki*, 280 F.Supp.2d 89, 99 (S.D.N.Y. 2003).

Further, legislative activity can include communications between legislators and third parties. While the Eleventh Circuit has not directly addressed the application of the legislative privilege to communications between legislators and third parties, courts within this circuit have found that, in order to remain consistent with *In re Hubbard*, "activity engaged in by legislators is still protected by the legislative privilege even if there are communications with non-legislators, as long as the communications were pursuant to the proposal, formulation, and passage of legislation." *Thompson v. Merrill*, No. 2:16-cv-783-ECM, 2020 WL 2545317, at *3 (M.D. Ala. May 19, 2020); *see also Dyas v. City of Fairhope*, 2009 WL 3151879, at *8 (S.D. Ala. Sept. 24, 2009)

("[P]rivilege that prohibits a plaintiff from asking a legislator what was said in the decisive meeting but allows questions concerning any potential influences on his or her decision – such as conversations with constituents, review of documents and other information-gathering, as well as potential bias – offers a legislator no protection worth having."); *accord In re Subpeona to Non-Party Lindsey O. Graham*, Case No. 1:22-cv-03027-LMM (N.D. Ga. Sept. 1, 2022) (holding that Senator Graham's communications with third parties were privileged to the extent they were part of his legislative fact-finding duties). Therefore, communications between state legislators and individuals inside the General Assembly (staff and other state legislators) and individuals outside the General Assembly (personnel of state agencies, constituents, and other third parties), about the proposal, formulation, and passage of legislation are legitimate legislative activities that are protected from disclosure by legislators. This bars production of the records sought in the Subpoenas, which include all communications between or among the Movants, staff, and any non-legislators, including constituents, related to the Redistricting Bills.

Such a result is consistent with the purposes of the legislative privilege. The privilege seeks to ensure legislative independence and prevent the distraction of legislators. In achieving these purposes, there is no meaningful distinction between communications among legislators and among legislators and non-legislators. *See Pulte*, 2017 WL 2361167 at *8 (noting that the purpose of the privilege is not confidentiality,

but instead ensuring that legislators are "free to make difficult decisions" without fear of being subsequently exposed by compulsory process).

       3.   Legislative Privilege Does Not Yield to Plaintiffs' Discovery Efforts in This Case.

Whether and to what extent the legislative privilege afforded to state legislators in federal civil cases is qualified is a "thorny issue." *League of Women Voters*, 340 F.R.D. at 455. Neither the Supreme Court nor the Eleventh Circuit Court of Appeals has held that legislative privilege is qualified in federal civil cases. Outside of the context of federal criminal cases, "the Supreme Court has not set forth the circumstances under which the privilege must yield to the need for a decision maker's testimony." *Id.* Nevertheless, some federal courts have held that a state legislator's privilege is qualified in redistricting litigation and have applied a balancing test borrowed from deliberative privilege case law to determine when the privilege must yield to a plaintiff's need for discovery.[5] *See, e.g., Rodriguez*, 280 F.Supp.2d at 97-98. This balancing test (referred to herein as the "*Rodriguez* Test") weighs five factors to determine "whether the legislative privilege must give way to Plaintiffs' need for the evidence they seek."

---

[5] Movants contend that the legislative privilege afforded state lawmakers is absolute in civil cases and that civil cases holding that the privilege is qualified are wrongly decided; however, because Movants have offered to waive the privilege, within specified boundaries, to testify in this case, the question of whether the privilege is absolute or qualified in civil actions is not before the Court on this motion.

*League of Women Voters*, 340 F.R.D. at 456. The *Rodriguez* factors are: (1) the relevance of the evidence sought; (2) whether other evidence is available; (3) whether the litigation is sufficiently serious; (4) the role of the government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable. *Rodriguez*, 280 F.Supp.2d at 100-101.

Neither the Eleventh Circuit Court of Appeals nor any federal district court in Georgia has endorsed the *Rodriguez* Test as a means of weighing federal interests against the importance of the legislative privilege; however, some district courts in Florida and Alabama have applied the test. *See League of Women Voters*, 340 F.R.D. 446; *Ala. Educ. Ass'n v. Bentley*, 2013 U.S. Dist. LEXIS 531(N.D. Ala.); and *Greater Birmingham Ministries v. Merrill, 2017 U.S. Dist. LEXIS 233149* (M.D. Ala.). The *Rodriquez* Test, adapted as it is from a privilege afforded employees of the executive branch, is ill-suited to weighing the public interest in legislative privilege. *See League of Women Voters*, 340 F.R.D. at 457. Nevertheless, Movants anticipate that Plaintiffs will argue that the Court should apply the *Rodriguez* Test to determine that Movants' legislative privilege gives way to their evidentiary needs entirely in this case. The Court does not need to engage in *Rodriguez* balancing to adopt Movants' Proposal, but, as demonstrated below, even if the Court does undertake *Rodriguez* balancing, Plaintiffs would not be entitled to more discovery than Movants' have already offered them.

### a. Relevance

Regarding the first factor of the *Rodriguez* Test – relevance - courts consider the "degree to which the evidence sought is relevant to the issues in the litigation at hand." *Benisek v. Lamon*, 241 F.Supp.3d 566, 576 (D. Md. 2017).  In the underlying case before this Court, Plaintiffs seek to prove that the maps violate the Voting Rights of 1965 in that they are discriminatory and were adopted with discriminatory intent. In order to prove their case, Plaintiffs seek to compel Movants to provide evidence from which Plaintiffs seek to prove the subjective motivations of the members of the General Assembly.  In considering the relevance of such evidence, the Supreme Court has noted that "no case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971); accord *Greater Birmingham Ministries v. Secretary of State for the State of Ala.*, 992 F.3d 1299 (11th Cir. 2021) (expressing "skepticism that the discriminatory intent could be ascertained from the statements of one legislator . . ."). In *Palmer*, the plaintiffs urged that an action by state officials violated the Equal Protection Clause, citing an intent on behalf of the officials to further segregation. *Id.* In support, the plaintiffs contended that other Equal Protection cases decided by the Court held that motive or purpose behind a law is relevant to the law's constitutionality. *Id.* The Court rejected this contention, finding that "the focus of those cases was on the actual effect

of the enactments, not upon the motivation which led the States to behave as they did." *Id.* at 225.

In reaching this conclusion, the Court relied upon the concerns expressed in *U.S. v. O'Brien*, 391 U.S. 367 (1968). In *O'Brien*, the Court addressed an argument that a statute was unconstitutional based on an alleged Congressional intent to suppress freedom of speech. *Id.* at 382-83. The Court, while acknowledging that legislative purpose may serve as a guide in statutory interpretation, remarked that "[i]t is entirely a different matter when we are asked to void a statute, that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it." *Id.* at 384-85 ("In these cases, the purpose of the legislation was irrelevant, because the inevitable effect . . . abridged constitutional rights.").

In the case at hand, Plaintiffs seek discovery regarding the Movants' motivation when enacting the challenged maps. While those claims do require proof of discriminatory intent, the Movants' Proposal provides the Plaintiffs sufficient avenue to explore: (1) the specific sequence of events leading up to the adoption of the maps; (2) whether the general Assembly departed from its normal procedures or substantive conclusions in adopting the maps; and (3) relevant legislative history and contemporaneous statements made by legislators during the legislative process – all of which Plaintiffs contend are relevant to their claims.

Because the individual mindsets of the Movants are not competent evidence of discriminatory intent of the underlying legislation, legislative privilege should not be abrogated to allow for discovery of the subjective motivation of any of the Movants. *Palmer*, 403 U.S. at 224; *O'Brien*, 391 U.S. at 384

### b. Availability of Other Evidence

The second element of the *Rodriguez* Test—the availability of other evidence—also weighs in favor of legislative privilege. The Plaintiffs have a considerable amount of information regarding the proposal, passage, and formulation of the maps already available in the public record. For instance, sources of information include "public hearing minutes, special interest group position papers, statements made by lawmakers during debate, committee reports, press releases, [and] newspaper articles …." *Comm. for a Fair & Balanced Map v. Illinois State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508 at *8 (N.D. Ill. Oct. 12, 2011). This evidence is readily available and has been produced to Plaintiffs.   Further, Movants' Proposal will provide Plaintiffs with further evidence related to the maps and the legislative process undertaken by the General Assembly in the formulation and adoption thereof.   There are no extraordinary circumstances present to justify further intrusion into the legislative process or legislative immunity.

In *League of Women Voters*, Florida legislators sought to quash subpoenas for depositions in a case brought under the Voting Rights Act; in response, the District Court

found that the legislators' offer to produce documents tilted this factor in favor of the legislators. *League of Women Voters*, 340 F.R.D. at 457. By readily providing these documents, plaintiffs had access to "the materials and information available [to the Legislature] at the time a decision was made." *Id*. at 458. Similarly, Movant's Proposal is more than sufficient to provide Plaintiffs with sufficient evidence and information to litigate their claims.

### c. Seriousness

The third factor - the seriousness of the litigation - is neutral. Movants recognize that voting rights litigation is serious. *See League of Women Voters*, 340 F.R.D. at 457. What Plaintiffs fail to acknowledge is that legislative privilege arises from and serves the people the legislators represent. *See Tenney*, 341 U.S. at 373 ("In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense.")

It is a privilege that secures the voters' right to free and independent representation. Legislative  privilege is so foundational to our form of government that the Framers ensconced it in Article I of the Constitution, while leaving it to the states to decide the specific rules for how to conduct elections.  Setting aside the privilege is not a frivolous undertaking to be lightly considered; it is a serious intrusion into the

democratic process. Merely stating that voting rights are serious is not enough to tip the scales on this factor.

### d.  Governmental Involvement in the Litigation

The fourth factor- the role of the government in the litigation- "is inapt in the legislative privilege context." *League of Women Voters.*, 340 F.R.D. at 457. The Movants themselves have instituted this action on behalf of the government. Thus, this factor does not favor either outcome and, accordingly, helps illustrate why the *Rodriguez* Test is poorly suited as a methodology for qualifying legislative privilege.

### e.  Possibility of Chilling the Legislative Process

Considering the fifth and final element of the *Rodriguez* Test - the possibility of future timidity and the need to encourage frank discussion among legislators and those that they consult in the legislative decision-making process - overwhelmingly favors preserving the legislative privilege. "Legislators face competing demands from constituents, lobbyists, party leaders, special interest groups and others. They must be able to confer with one another without fear of public disclosure." *Comm. for a Fair and Balanced Map*, 2011 WL 4837508 at *8.  Permitting the unrestrained depositions of Movants and requiring the production of all communications related to the redistricting process will unquestionably serve to discourage members of the General Assembly from engaging in free and frank communications with other members of the General Assembly and their constituents.

Further, compelling testimony of legislators threatens the ability of legislators to privately obtain information essential to their legislative decision-making and to confer with other legislators.  Other district courts have noted, "the need to encourage frank and honest discussion among lawmakers favors nondisclosure." *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *8; *see also League of Women Voters*, 340 F.R.D. at 458. It is highly probable that legislators will refrain in the future from seeking the information they need to effectively legislate if such communications and legislative materials are subject to disclosure to litigants.  This factor weighs strongly in favor of legislative privilege.

In sum, the *Rodriguez* Test, despite its dubious applicability in the case, weighs strongly in favor of preserving the Movants' legislative privilege.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Movants have shown substantial and compelling justification for this Court to enter an order prohibiting Plaintiffs from compelling the Movants to provide evidence or testimony in response to the Subpoenas.  Nonetheless, Movants request that this Court enter a protective order which strikes a reasoned and common-sense balance between legislative privilege and the Plaintiffs' desire to obtain evidence in furtherance of their claims.  The Movants' Proposal strikes such balance, and Movants pray that this Court enter a Protective Order consistent therewith.

Respectfully Submitted, this 9th day of September, 2022.

    */s/ Patrick D. Jaugstetter*
Patrick D. Jaugstetter
Special Assistant Legislative Counsel
**JARRARD & DAVIS, LLP**
Georgia Bar No. 389680
*Attorney for Movants*

222 Webb Street
Cumming, Georgia 30040
(678) 455-7150 – telephone
(678) 455-7149 – facsimile
patrickj@jarrard-davis.com

    */s/ Alex Khoury*
Alex Khoury
Special Assistant Legislative Counsel
**SMITH, GAMBRELL & RUSSELL, LLP**
Georgia Bar No. 416978
*Attorney for Movants*

1105 West Peachtree Street
NE Suite 1000
Atlanta, Georgia 30309
404-815-3526 – telephone
404-685-6826 – facsimile
akhoury@sgrlaw.com

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **GEORGIA STATE CONFERENCE OF NAACP, ET AL.** | ) ) ) | |
| **PLAINTIFFS,** | ) ) | **CIVIL ACTION NO.** **1:21-CV-5338-** |
| **V.** | ) ) | **ELB-SCJ-SDG** |
| **STATE OF GEORGIA, ET AL.** | ) ) | |
| **DEFENDANTS.** | ) ) | |
| | ) | |
| **COMMON CAUSE, et al.,** | ) ) | **CIVIL ACTION FILE NO.** |
| **PLAINTIFFS,** | ) ) | **1:22-CV-00090-** **ELB-SCJ-SDG** |
| **V.** | ) ) | |
| **BRAD RAFFENSPERGER,** | ) ) | |
| **DEFENDANT.** | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, in accordance with LR 5.1(A), (N. D. Ga.), I have this date electronically filed the within and foregoing **BRIEF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER** in the above-styled action with the Clerk of Court by using the Court's CM/ECF system, which will automatically send notice of same to the following:

**Astor H. L. Heaven**
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

**Ezra David Rosenberg**
Lawyers' Committee for Civil Rights Under Law
Suite 900

1500 K. Street NW
Washington, DC 20005

**Gilda Rae Williams**
Advancement Project
1220 L Street NW
Suite 850
Washington, DC 20005

**Jacob Canter**
Crowell & Moring, LLC - SF CA
3 Embarcadero Center
26th Floor
San Francisco, CA 94111

**Jon M. Greenbaum**
Lawyers' Committee for Civil Rights Under Law
Suite 900
1500 K. Street NW
Washington, DC 20005

**Julie Marie Houk**
Lawyers' Committee for Civil Rights Under Law
Suite 900
1500 K. Street NW
Washington, DC 20005

**Keith J. Harrison**
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

**Kurt G. Kastorf**
Kastorf Law, LLC
1387 Iverson Street NE
Suite 100
Atlanta, GA 30307

**LaTonya Sims**
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.

Washington, DC 20004

**Raija Horstman**
Crwell & Moring, LLP - LA C
515 South Flower St
40th Floor
Los Angeles, CA 90071

**Shira Liu**
Crowell & Moring, LLP - I CA
3 Park Plaza
20th Floor
Irvine, CA 92614

**Toni Michelle Jackson**
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

I further certify that the within and foregoing has been prepared in accordance

with Local Rule 5.1(C) and is in a 14-point Times New Roman font.

This 9th day of September, 2022.

  _/s/ Patrick D. Jaugstetter_
Patrick D. Jaugstetter
Special Assistant Legislative Counsel
**JARRARD & DAVIS, LLP**
Georgia Bar No. 389680
*Attorney for Movants*

222 Webb Street
Cumming, Georgia 30040
(678) 455-7150 – telephone
(678) 455-7149 – facsimile
patrickj@jarrard-davis.com

_/s/ Alex Khoury_

Alex Khoury
Special Assistant Legislative Counsel
**SMITH, GAMBRELL & RUSSELL, LLP**
Georgia Bar No. 416978
_Attorney for Movants_

1105 West Peachtree Street
NE Suite 1000
Atlanta, Georgia 30309
404-815-3526 – telephone
404-685-6826 – facsimile
akhoury@sgrlaw.com