**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP; GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC.; GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> STATE OF GEORGIA; BRIAN KEMP, in his official capacity as the Governor of the State of Georgia; BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia, <br><br> *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    Civil Case No. 21-cv-<br>05338-SCJ-SDG-ELB |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................1

ARGUMENT ..................................................................................4

I. *MILLIGAN* INSTRUCTS THAT THE COURT SHOULD
DENY DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON THE *GINGLES* PRECONDITIONS. ..................4

    A. *Milligan* Counsels That Defendants' Motion for
Summary Judgment on *Gingles* 1 Should Be Denied. ..............7

        1) Milligan *reinforces that Dr. Duchin's illustrative
maps are "reasonably configured."*...............................8

        2) *In light of* Milligan, *Defendants' racial
gerrymander defense is foreclosed.*..............................12

        3) *If the Court reaches the issue of whether Dr.
Duchin's illustrative maps are impermissible
racial gerrymanders, the* Milligan *plurality
decision instructs that Dr. Duchin's maps are not
racial gerrymanders.* ......................................................14

    B. *Milligan* Undermines Defendants' Argument That
Plaintiffs Must Prove Causation to Satisfy *Gingles* 2 and
*Gingles* 3. ..................................................................................18

II. *MILLIGAN* REFLECTS THE APPLICATION OF
*ARLINGTON HEIGHTS* TO DISCRIMINATORY INTENT
CLAIMS IN REDISTRICTING CASES...........................................20

CONCLUSION ..............................................................................21

**INTRODUCTION**

In *Allen v. Milligan*, No. 21-1086, 599 U.S. ___, 2023 WL 3872517 (June 8, 2023) ("*Milligan*"), the Supreme Court affirmed the district court's finding that Alabama impermissibly diluted the vote of Black Alabamans by maintaining the status quo and not drawing an additional majority-Black congressional district, in violation of Section 2 of the Voting Rights Act ("VRA"). Here, Georgia's enacted redistricting plans are at least as dilutive and, in the case of Georgia's congressional redistricting, even more dilutive than the redistricting plan in *Milligan*. Before redistricting, Black voters in Georgia were able to elect six candidates of their choice to Congress. After redistricting, Black voters in Georgia are able to elect only five candidates of their choice, as a result of the legislature's purposeful dismantling of Congressional District 6, a district that had recently elected a Black woman, Lucy McBath, to office. Additionally, other aspects of *Milligan* further support denial of Defendants' motion for summary judgment.

The *Milligan* Court's reaffirmation of *Thornburg v. Gingles* as providing the governing standards for vote dilution cases brought under Section 2 of the Voting Rights Act rejects arguments at the core of Defendants' motion for summary judgment, and confirms what Plaintiffs have been arguing all along:

- A *Gingles* 1 illustrative map is not intended as a remedial map, but to demonstrate that the "'minority has the *potential* to elect a representative of its own choice in some single-member district.'" *Milligan*, 2023 WL 3872517, at *9 (quoting *Growe v. Emison*, 507 U. S. 25, 40 (1993)) (emphasis added). This is contrary to Defendants' restrictive, incorrect view of the purpose of illustrative maps. Doc. 141-1, p. 19 (arguing the maps "must . . . be a remedy . . . .").

- An illustrative map satisfies *Gingles* 1 if it meets the majority-minority threshold and is reasonably configured, taking into consideration traditional districting principles such as compactness, population equality, contiguity, and respect for communities of interest and political boundaries, *Milligan*, 2023 WL 3872517, at *10-11, all of which Plaintiffs' expert, Dr. Moon Duchin, considered in drawing her illustrative maps here. *See* Doc. 171-1, ¶¶ 178-188, 243-258. Notably, Dr. Duchin also served as a mapping expert in Alabama, and her work and mapping expertise was credited by both the Supreme Court and the district court in *Milligan*. *See e.g.*, *Milligan*, 2023 WL 3872517, at *10.

- Because the majority of the Court in *Milligan* agrees both that *Gingles* remains precedent and that *Gingles* necessarily requires the

consideration of race in implementing Section 2's protections, it was able to render its decision without deciding whether compliance with *Gingles* 1 was a racial gerrymander. *Id*. at *10-11. This Court is bound to follow suit, and Defendants' argument that Plaintiffs' illustrative maps are impermissible racial gerrymanders is thus foreclosed.

- Even were the Court to reach the issue of whether Dr. Duchin's maps were impermissible racial gerrymanders, Dr. Duchin's mapping process and testimony here are virtually identical to those cited by the plurality of the Court in *Milligan* as demonstrating "race conscious," and not "race motivated," map drawing, as explained below. *See* infra Argument § I(A)(3).

- The phrase "account of race" in Section 2 simply means "with respect to race." *Milligan*, 2023 WL 3872517, at *13. This holding undermines Defendants' argument that Plaintiffs must prove race—and not politics—is the cause of minority group or white-majority political cohesion to satisfy *Gingles* 2 and *Gingles* 3. *See* Doc. 141, pp. 23-34; Doc. 163, pp. 16-20.

- Redistricting cases such as this are fact-intensive and therefore not readily conducive to disposition by way of summary judgment. The

totality of the circumstances requirement in Section 2 means that "application of the *Gingles* factors is peculiarly dependent upon the facts of each case" and requires an "intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality." *Milligan*, 2023 WL 3872517, at *9 (internal quotations and citations omitted).

- The *Arlington Heights* factors apply to proof of intentional discrimination in redistricting cases, *see id.* at *19, contrary to Defendants' argument. Doc. 141-1, pp. 37-38.

## ARGUMENT

## I. *MILLIGAN* INSTRUCTS THAT THE COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE *GINGLES* PRECONDITIONS.

In *Milligan*, the Supreme Court affirmed the *Gingles* framework that has governed Section 2 vote dilution cases "[f]or the past 40 years." *Milligan*, 2023 WL 3872517, at *9. That framework is designed to adduce whether "'a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters.'" *Id.* (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). The risk of such vote dilution "is greatest 'where minority and majority voters consistently prefer different

candidates' and where minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices." *Id*. (quoting *Gingles*, 478 U.S. at 48) (alteration in original).

As did the defendants in *Milligan*, Defendants here have asked this Court to take a "closer review" of existing Voting Rights Act precedents in assessing whether Plaintiffs satisfy the *Gingles* preconditions. *See* Doc. 141-1, p. 24. Specifically, Defendants argue that Plaintiffs' illustrative *Gingles* 1 maps are "racial gerrymanders" because they are designed to create 50%-plus minority-districts, *see* Doc. 141-1, pp. 19-21; Doc. 163, pp. 15-16, and that the phrase "on account of race" in Section 2 of the Voting Rights Act means "caused by race," so as to impose on Plaintiffs the burden to prove that their *Gingles* 2 showing of minority cohesion and *Gingles* 3 showing of white bloc voting was "caused by" race, not partisanship. *See* Doc. 141-1, pp. 24-34.

Contrary to Defendants' arguments, *Milligan* makes clear that, because *Gingles* remains the controlling precedent, the *Gingles* 1 precondition necessarily anticipates that race be considered when drawing illustrative districts, *Milligan*, 2023 WL 3872517, at *17 n. 7, and plaintiffs meet the precondition so long as the illustrative district is reasonably configured in accordance with important districting principles such as compactness, contiguity, population equality, and respect for

communities of interest and political boundaries. *Id*. at \*10-11. Thus, Defendants' racial gerrymander argument is legally irrelevant and should not be reached by this Court.[1] Similarly, the *Milligan* Court rejects injecting any concept of causation into the *Gingles* 2 and 3 analysis, expressly reaffirming that "account of race" as used in Section 2 means "with respect to race." *Id.* at \*13.

Finally, *Milligan* counsels that "application of the *Gingles* factors is peculiarly dependent upon the facts of each case" and requires an "intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality." *Id*. at \*11 (internal quotations omitted). Thus, summary judgment is a particularly unsuitable vehicle for ruling on the *Gingles* preconditions.

For example, the Court's rulings in *Milligan* were issued in the context of examination of a congressional redistricting that had made few changes to the benchmark plan, maintaining the number of seats where Black voters could elect candidates of choice. *Id*. at \*8. Here, the situation with regards to the congressional map is even starker: the legislature actually reduced the number of such

---

[1] Were the Court to reach the merits of Defendants' racial gerrymander argument, as set forth below, the plurality opinion strongly supports the conclusion that Dr. Duchin's maps were not racial gerrymanders. *Milligan*, 2023 WL 3872517, at \*15-16 (plurality opinion).

congressional seats from six to five.  *See* Doc. 142-1, p. 10.  And here, similar to her testimony that served as part of the basis for the Supreme Court's affirmance of the trial court's decision in *Milligan*, Dr. Duchin has provided detailed explanations as to how all of her illustrative maps covering each of the three statewide enacted plans easily satisfy *Gingles* 1.

In addition to the reasons Plaintiffs have placed before this Court in their prior written submissions and at oral argument, *Milligan* further mandates denial of Defendants' motion for summary judgment.

### A. *Milligan* Counsels That Defendants' Motion for Summary Judgment on *Gingles* 1 Should Be Denied.

*Milligan* reaffirms the first *Gingles* precondition, *i.e.*, that the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district."  *Milligan*, 2023 WL 3872517, at *9 (internal quotations omitted) (alteration in original).  In their summary judgment papers, Defendants repeatedly criticize Plaintiffs' mapping expert, Dr. Duchin, for describing her *Gingles* 1 maps as "demonstration[s]" or "illustrative" maps, arguing that the maps "must be the remedy that can be imposed by the court."  Doc. 141-1, pp. 19-20; *see also* Doc. 163, p. 15.  But the Court in *Milligan* makes clear that Dr. Duchin's view of her maps comports precisely with the Court's view:  *Gingles* 1

maps are demonstrations that the "'minority has the *potential* to elect a representative of its own choice in some single-member district.'" *Milligan*, 2023 WL 3872517, at *9 (quoting *Growe v. Emison*, 507 U. S. 25, 40 (1993) (emphasis added). *See also id.* at *13 (explaining the purpose of *Gingles* 1 illustrative maps is to "show[] it is possible that the State's map has a disparate effect on account of race."). Dr. Duchin's maps easily meet this standard.

      1)    Milligan *reinforces that Dr. Duchin's illustrative maps are "reasonably configured."*

To satisfy the first *Gingles* precondition, plaintiffs must show that it is possible to draw an additional, "reasonably configured," majority-minority district. *Milligan*, 2023 WL 3872517, at *9. A district is "reasonably configured" if it "comports with traditional districting criteria, such as being contiguous and reasonably compact." *Id. Milligan's* "reasonable configuration" analysis reinforces that Plaintiffs' *Gingles* 1 maps are reasonably configured here. Dr. Duchin's expert report and testimony confirm that, in drawing her maps, she considered the primary districting principles of compactness and contiguity, highlighted by the *Milligan* Court as most relevant to the issue. Indeed, Dr. Duchin went beyond that, taking into account population equalization, communities of interest, and geographical

boundaries and political subdivision when drawing her maps. *Compare id.* at *10-11; *with* Doc. 171-1, ¶¶ 178-188, 243-258; and Doc. 142-1, pp. 20-24, 79-80.

Comparison of Dr. Duchin's maps with those in *Milligan* further corroborates that, at minimum, there is a dispute of fact as to Plaintiffs' compliance with *Gingles* 1, precluding summary judgment. In affirming the district court's finding of reasonable configuration, the Supreme Court in *Milligan* credited the district court's findings—after an extensive evidentiary hearing—that the Alabama Plaintiffs' illustrative maps were "roughly as compact as the existing plan," that the illustrative maps did not contain any "tentacles, appendages, bizarre shapes, or any other obvious irregulates," that the illustrative maps satisfied population deviation requirements, and that the illustrative maps were better or comparable on political subdivision splits. *Milligan*, 2023 WL 3872517, at *10.

Here, even before an evidentiary hearing, the record is replete that Dr. Duchin's illustrative maps are similarly reasonably configured. Doc. 171-1, ¶¶ 178-188, 243-258. Other than taking random pot shots at one or two of the several maps drawn by Dr. Duchin—without expert back-up—nowhere do Defendants even attempt to critique Dr. Duchin's maps on a district-by-district basis. *See* Doc. 141-1, pp. 19-21 (not identifying any specific illustrative district that is purportedly unreasonably configured); Doc. 163, pp. 15-16 (not identifying any specific

illustrative district that is purportedly unreasonably configured). Indeed, Defendants' own expert on the issue repeatedly conceded that he was not offering the opinion that any of Dr. Duchin's illustrative districts were unreasonably configured. *See* Doc. 164, ¶ 244. And unlike Alabama in *Milligan*, Defendants here do not—and cannot—point to any testimony (including from Defendants' own mapping expert) that any communities of interest in any of Plaintiffs' illustrative districts have been split. *Compare Milligan*, 2023 WL 3872517, at *10-11 (defendants in *Milligan* attempted to identify—unsuccessfully—specific communities of interest that allegedly were not respected); *with* Doc. 141-1, pp. 19-21, and Doc. 163, pp. 15-16.

*Milligan* also puts to rest Defendants' argument that their maps are slightly better on some districting metrics than Dr. Duchin's. *See* Doc. 141-1, p. 20 (purporting that Plaintiffs' illustrative maps are "inferior[]" to the enacted plan on some unspecified metrics). *Milligan* makes clear that such discrepancies are irrelevant to whether the *Plaintiffs*' illustrative maps are "reasonably configured," because courts should not engage in a "beauty contest" when comparing enacted plans to illustrative plans. *Milligan*, 2023 WL 3872517, at *11.

Further, a comparison of Georgia's enacted maps with the enacted congressional map in *Milligan* demonstrates that the maps here are at least as dilutive

in effect as the map in *Milligan*. In *Milligan,* the court found impermissible vote dilution where Alabama did not increase the number of majority-minority districts from one to two—*i.e.*, where Alabama maintained the discriminatory status quo. *See Milligan*, 2023 WL 3872517, at *8; *see also id.* at *11 (holding that states cannot justify discriminatory maps under the guise of maintaining status-quo district cores, because "[i]f that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan."). Here, the legislature went even further, reducing the number of districts in which Black voters could elect their candidates of choice in the congressional map by one (from six to five) by dismantling Congressional District 6—a district that had recently elected Lucy McBath, a Black Woman, to congress. *See* Doc. 142-1, p. 10.

Ultimately, *Milligan* underscores that the *Gingles* preconditions are subject to fact-intensive and district-specific examination, not conducive to summary judgment disposition against Plaintiffs, and certainly not in light of the detailed reports and testimony of Dr. Duchin and the virtually non-existent counter evidence upon which Defendants rely.

2) *In light of* Milligan*, Defendants' racial gerrymander defense is foreclosed.*

Defendants argue—as did Alabama in *Milligan*—that Dr. Duchin's purposeful use of a 50% + standard in drawing her illustrative maps constituted an impermissible racial gerrymander. Doc. 163, pp. 15-16 ("Dr. Duchin's plans are drawn primarily based on race and traditional principles do not defeat that fact because '[r]ace was the criterion that, in the [map-drawer's] view, could not be compromised, and race-neutral considerations came into play only after the race-based decision had been made.'") (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017); *see also* Doc. 141-1, pp. 19-20. *Milligan* forecloses consideration of that issue, because the majority of the Court was able to uphold the district court's finding of compliance with *Gingles* 1 without deciding whether such compliance constituted a racial gerrymander. *Milligan*, 2023 WL 3872517, at *10-11. Indeed, the majority of the Court ruled that *Gingles* was still binding precedent, and that consideration of a majority-minority standard was a necessary consequence of application of that precedent: "The very reason a plaintiff adduces a map at the first step of *Gingles* is precisely because of its racial composition—that is, because it creates an additional majority-minority district that

does not then exist." *Id.* at \*17 n. 7.[2]  In this regard, *Milligan* voiced a position fully consistent with existing Eleventh Circuit law.  *See Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998) ("To penalize Davis, as the district court has done, for attempting to make the very showing that *Gingles*, *Nipper*, and *SCLC* demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action.").

If it was unnecessary for the Supreme Court to reach the racial gerrymander issue in *Milligan* in order to uphold the finding of a violation of Section 2, it is unnecessary for this Court to do so here.  For purposes of this motion, summary judgment on *Gingles* 1 is foreclosed by *Milligan* so long as Plaintiffs have raised a genuine dispute of fact that it is possible to create additional, reasonably configured,

---

[2] As the plurality describes it in section III(B)(1) of the opinion, "[t]hat is the whole point of the enterprise."  *Milligan*, 2023 WL 3872517, at \*16 (plurality opinion).  Although Justice Kavanaugh does not join in section III(B)(1) of the opinion, he has no dispute with the plurality as to whether *Gingles* 1 precedent allows the drawing of a map based on considerations of race.  His joining with the majority in footnote 7 is to that effect, as is his concurrence, which, in his words, recognizes that the existing precedent construing Section 2 necessarily allows "race-based" map-drawing.  *Id.* at \*17 n. 7; *id.* at \*23 (Kavanaugh J., concurring in part).  Further, although Justice Kavanaugh raises the question if "Congress . . . could constitutionally authorize race-based redistricting under § 2 . . . indefinitely into the future," he neither believes the Court could reach the issue nor expresses any views on the issue because Alabama had not raised it.  *Id*. at \*23.  Defendants also did not raise that issue in their motion for summary judgment, and that issue is not before this Court either.

majority-minority districts. As demonstrated above and in Plaintiffs' prior submissions, that is undoubtedly the case.

> 3) *If the Court reaches the issue of whether Dr. Duchin's illustrative maps are impermissible racial gerrymanders, the* Milligan *plurality decision instructs that Dr. Duchin's maps are not racial gerrymanders.*

Even were the Court to address the racial gerrymander issue, the result would be the same. The plurality opinion in *Milligan* forcefully supports the conclusion that Dr. Duchin's maps were merely "race conscious" and therefore could not be considered racial gerrymanders.[3] *Milligan*, 2023 WL 3872517, at *15-16 (plurality opinion).

---

[3] The Supreme Court's analysis of plaintiffs' Section 2 claims in *Milligan* do not alter the law governing Plaintiffs' racial gerrymandering claims here. As both the GA NAACP Plaintiffs and the Common Cause Plaintiffs have briefed and expanded on in oral argument before this Court, "race may not be the predominant factor in drawing district lines unless [there is] a compelling reason." *Milligan*, 2023 WL 3872517, at *15 (internal quotations omitted). This comports with *Wisconsin Legislature v. Wisconsin Elections Commission*, noting that "if race is the predominant factor motivating the placement of voters in or out of a particular district, the State bears the burden of showing that the design of that district withstands strict scrutiny," 142 S. Ct. 1245, 1248 (2022), a burden that Defendants here have nowhere attempted to (nor could they) meet. For the reasons in both GA NAACP Plaintiffs' and Common Cause Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment, as well as those elucidated at oral argument, Defendants' motion as to Plaintiffs' racial gerrymandering claims should be denied.

Here, Dr. Duchin's map drawing process and consideration of race is very similar to the mapping process she undertook in *Milligan*. In *Milligan*, Dr. Duchin testified that she used "computer algorithms to generate large numbers of drawings" and "[u]sing some of those plans as inspiration, she then began to draw by hand . . . ." *Caster v. Merrill*, 2022 WL 264819, at *23 (N.D. Ala. Jan. 24, 2022), *aff'd sub nom. Allen v. Milligan*, No. 21-1086, 599 U.S. ___, 2023 WL 3872517 (June 8, 2023). Here, Dr. Duchin testified that she used the same process:

> And what I like to do is use what I call chain runs or algorithmic generation in an exploratory fashion before I draw maps for inclusion. So I might explore with various kinds of algorithmic alternatives and get a sense of what's possible in different parts of the state before I ultimately draw it by hand. So that's the process. The process is algorithmic exploration to get a sense of responsibilities and then ultimately hand draw[] maps.

Doc. 134, 19:3-19:14.

Dr. Duchin's unrebutted deposition testimony in this case likewise reflects that she did not let race predominate the mapping process. In *Milligan*, Dr. Duchin "testified that she focused on race **only** to the extent that was necessary to be sure that she maintained two districts with BVAPs of greater than 50% to satisfy *Gingles* I." *Caster*, 2022 WL 264819, at *24 (emphasis in original). Here, Dr. Duchin testified that:

> I think we all know in redistricting, there's a delicate balance we're trying to strike where you must be race conscious at least to hit the 50

> percent plus 1 threshold. But you try to be minimally race conscious because . . . you're required not to let race predominate over other concerns.

Doc. 134, 124:20-125:3.  This testimony is also virtually identical to that of the testimony by expert Cooper in *Milligan*, which the plurality in *Milligan* cited as support for the proposition that race did not predominate in the drawing of the maps there.  *See Milligan*, 2023 WL 3872517, at *15 (plurality opinion) (crediting testimony from a mapping expert that "when asked squarely whether race predominated in his development of the illustrative plans, Cooper responded: 'No.  It was a consideration.  This is a Section 2 lawsuit, after all.  But it did not predominate or dominate.'")  And neither Defendants in any of their papers nor Defendants' mapping expert have pointed to any districting principles that Dr. Duchin subordinated to race in any illustrative, majority-minority district (or any district in her plans).  *See* Doc. 141-1, pp. 19-21; Doc. 163, pp. 15-16; Doc. 171, ¶ 244.  *See also* Doc. 151, 27:11-28:08 (Defendants' mapping expert did not conduct any analysis of "whether race predominated in the drawing of any house, congressional, or senate districts.").

Finally, in a slide-deck presented at oral argument, Defendants pointed to several districts in Dr. Duchin's illustrative HD Alt 1 Atlanta plan and SD

Alt 2 Atlanta plans that each contained high Black voting age population percentages. *See* Doc. 174-1, pp. 12-13. However, in accord with *Milligan*, Dr. Duchin explained that race did not guide her decision in drawing these districts, and noted that:

> [T]his area, we're looking at the Atlanta region, has a lot as we saw in the dot densities before. It's – it's quite a segregated area. There are areas with very high concentration. And so if I'm only looking at race in order to meet that 50 percent threshold, then it is likely that I'll tend to see some districts with extremely high black voting age population. So, again, if I'm not exclusively trying to bring that down but only trying to draw minimally race conscious alternatives that meet the threshold requirement, then it's not surprising to see high concentration. . .
>
> [W]hat I mean to say is that based on the size of the Senate district and the regions which are very heavily black I found that I was creating some district with very high black percentage just as a matter of human geography but that even though that was happening it did not impede my ability to draw additional majority districts. So that the *Gingles* threshold standard is quite easily met in this part of the state.

Doc. 134, 125:04-126:07.

Accordingly, even were the Court to reach this issue, the *Milligan* plurality opinion forecloses Defendants' claim of racial predominance. At a minimum, there is a question of fact on the issue precluding summary judgment. However, we emphasize that the Court need not and should not reach this issue, as it is foreclosed by *Milligan*.

**B.** *Milligan* **Undermines Defendants' Argument That Plaintiffs Must Prove Causation to Satisfy** *Gingles* **2 and** *Gingles* **3.**

The second and third *Gingles* preconditions require, respectively, a showing that the minority group is politically cohesive and that the white majority votes sufficiently as a bloc to usually defeat the minority's preferred candidate. *Milligan*, 2023 WL 3872517, at *9. Defendants' sole argument as to these preconditions in their summary judgment motion is to urge the Court to read in a causation requirement, primarily on the basis that "on account of race" as used in the Voting Rights Act means "because of race" or "caused by" race. *See* Doc. 14, pp. 23-34; Doc. 163, pp. 16-20. Defendants would have the Court require Plaintiffs to prove that it is race, not partisanship, that is causing the polarized voting patterns. *Id.* But the *Milligan* decision forecloses this argument.

First, the Court explains that it is "patently clear that Congress has used the words 'on account of race or color'" in Section 2 to mean "'with respect to' race or color . . . ." *Milligan*, 2023 WL 3872517, at *13 (quoting *Gingles*, 478 U. S. at 71, n. 34 (plurality opinion)). Thus, vote dilution occurs "when minority voters face—unlike their majority peers—bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the state, that renders a minority vote unequal to a non-minority vote." *Id.* There is no support, therefore, for

Defendants' reading into Section 2's "on account of race" language an element of causation, and there is certainly no basis for this Court to accept Defendants' argument that Plaintiffs must disprove that partisanship causes undisputed racially polarized voting in order to satisfy *Gingles* 2 and 3.

Further, when affirming the District Court's findings that plaintiffs satisfied *Gingles* 2 and *Gingles* 3, the Supreme Court in *Milligan* does not mention causation, and instead explains that there is "no serious dispute that Black voters are politically cohesive, nor that the challenged districts' white majority votes sufficiently as a bloc to usually defeat Black voters' preferred candidate." *Id*. at *11 (internal quotations omitted). That is all that Plaintiffs need prove to meet the second and third *Gingles* preconditions.

And that is exactly what the record evidence shows here. On *Gingles* 2, Defendants do not dispute that Black (and sometimes Black and Hispanic) voters demonstrate extremely high levels of political cohesion in Georgia—as in Alabama, often upwards of 90%; Defendants also do not dispute that in the challenged districts and affected areas, the White-majority bloc regularly defeats the minority groups' preferred candidates; and as did Alabama's expert in *Milligan*, Defendants' racially polarized voting expert *concedes* racial minority group political cohesion and White-majority bloc voting, and does not dispute Plaintiffs' expert's finding that white-

majority bloc voting regularly defeats the minority group's preferred candidate. *Compare id.*; *with* Doc. 171, ¶¶ 259-372, and Doc. 163 at 18 (admitting "Black Georgians vote with dramatic regularity for Democrats and that white voters vote with somewhat less—though still substantial—regularity for Republicans."), and Doc. 150, 86:16-25 (Defendants' expert conceding that he neither contests Plaintiffs' RPV expert's methodology nor his results), 118:1-119:25 (Defendants' expert admitting black political cohesion is often upwards of 98%), 121:8-20 (Defendants' expert admitting that "blacks and whites vote for different parties" in Georgia). *Milligan* reinforces that this case should go to trial on *Gingles* 2 and *Gingles* 3.

## II.   *MILLIGAN* REFLECTS THE APPLICATION OF *ARLINGTON HEIGHTS* TO DISCRIMINATORY INTENT CLAIMS IN REDISTRICTING CASES.

Defendants argue that "the standard in *Miller*" governs the Voting Rights Act-intent cause of action, and that the Supreme Court has "never relied on *Arlington Heights* for the proper standard for evaluating intent claims in redistricting cases." *See* Doc. 141-1, pp. 37-38 (citing *Miller v. Johnson*, 515 U.S. 900, 915-16 (1995)). However, in *Milligan*, the Court strongly suggests that *Arlington Heights* sets the standard for intentional discrimination in redistricting cases, *see Milligan*, 2023 WL 3872517, at *19, as the Court has recognized for decades, *see Rogers v. Lodge*, 458 U.S. 613, 621 (1982) (citing *Arlington Heights*).

In *Milligan*, Alabama argued that plaintiffs must prove that deviations between the enacted plan and so-called "race-neutral" benchmarks could be explained only by racial discrimination. *Milligan*, 2023 WL 3872517, at *19. The Court flatly rejected this argument, reasoning that it would subject Section 2 effects claims to a higher standard than intent claims. *Id.* In support of its holding, the Court cited to *Arlington Heights*, noting that a plaintiff alleging an intent claim need not prove that the conduct was solely motivated by discriminatory intent. *Id.* The Supreme Court's citation to *Arlington Heights* in this context contradicts Defendants' proposition that the "analytically distinct" racial gerrymander standard that "race was *the* predominating factor motivating the legislature's decision", *Miller*, 515 U.S. at 911, 916 (emphasis added), is the proper standard for redistricting cases, *see* Doc. 141-1, p. 37-38.

## CONCLUSION

For all the foregoing reasons and for those set forth in Plaintiffs' previous submissions and at oral argument on Defendants' motion for summary judgment, the Court should deny Defendants' motion for summary judgment.

Dated: <u>June 23, 2023</u>

Respectfully submitted,

By:  <u>*/s/ Kurt Kastorf*</u>
**Georgia Bar No. 315315**
**KASTORF LAW LLP**
1387 Iverson St., Suite 100
Atlanta, GA 30307
(404) 900-0030
kurt@kastorflaw.com


Jon Greenbaum (*pro hac vice*)
Ezra D. Rosenberg (*pro hac vice*)
Julie M. Houk (*pro hac vice*)
David Rollins-Boyd (*pro hac vice*)
Alexander S. Davis (*pro hac vice*)
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
adavis@lawyerscommittee.org

**LAWYERS' COMMITTEE FOR**
**CIVIL RIGHTS UNDER LAW**
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Toni Michelle Jackson (*pro hac vice*)
Astor H.L. Heaven (*pro hac vice*)
Keith Harrison (*pro hac vice*)
tjackson@crowell.com
aheaven@crowell.com
kharrison@crowell.com

**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: (202) 624-2500

**LOCAL RULE 7.1(D) CERTIFICATION OF COMPLIANCE**

I certify that this pleading has been prepared with Times New Roman font,

14 point, as approved by the Court in L.R. 5.1(C), N.D. Ga.


Dated: June 23, 2023          /s/ *Kurt Kastorf*
**Georgia Bar No. 315315**
**KASTORF LAW LLP**
1387 Iverson St., Suite 100
Atlanta, GA 30307
(404) 900-0030
kurt@kastorflaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June, 2023, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system.

Dated: <u>June 23, 2023</u>   <u>/s/ *Kurt Kastorf*</u>
        **Georgia Bar No. 315315**
        **KASTORF LAW LLP**
        1387 Iverson St., Suite 100
        Atlanta, GA 30307
        (404) 900-0030
        kurt@kastorflaw.com