## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **GEORGIA STATE CONFERENCE OF THE NAACP,** *et al.,* <br>     **Plaintiffs,** <br>           **v.** <br> **STATE OF GEORGIA,** *et al.,* <br>     **Defendants.** | **Civil Action No.** <br> **1:21-cv-05338-ELB-SCJ-SDG** |
| **COMMON CAUSE,** *et al.,* <br>     **Plaintiffs,** <br>           **v.** <br> **BRAD RAFFENSPERGER,** <br>     **Defendant.** | **Civil Action No.** <br> **1:22-cv-00090-ELB-SCJ-SDG** <br><br> **THREE-JUDGE COURT** |

Before BRANCH, Circuit Judge, JONES and GRIMBERG, District Judges.

PER CURIAM except as to Section III.B.:

## <u>OPINION AND ORDER</u>

After careful consideration of the parties' briefing, and with the benefit of oral argument, Defendants' motions for summary judgment are **DENIED** for the reasons stated below.

## TABLE OF CONTENTS

I.      Factual Background ..................................................................... 5

        A.      The Parties and Claims ................................................... 5

                1.      The *Georgia NAACP* Case ................................... 5

                2.      The *Common Cause* Case ..................................... 6

        B.      Georgia's Redistricting Process .................................... 7

        C.      The Enacted Maps .......................................................... 10

II.     Legal Standard ............................................................................ 11

III.    Analysis ........................................................................................ 12

        A.      Standing .......................................................................... 13

                1.      Associational Standing ......................................... 14

                        i.      The NAACP, Common Cause, and the
                                League .......................................................... 15

                        ii.     GALEO and GCPA ..................................... 17

        B.      Abrogation of Sovereign Immunity ............................ 18

        C.      Racial Gerrymandering Claims .................................... 23

                1.      The Parties' Arguments ......................................... 25

                2.      Congressional Districts ......................................... 27

                        i.      CD-02 and CD-08 ....................................... 28

                        ii.     CD-03 ............................................................ 29

                        iii.    CD-04 and CD-10 ....................................... 30

                        iv.     CD-06, CD-13, and CD-14 ......................... 31

                3.      State Senate Districts ............................................. 34

        *i.*     SD-01, SD-02, and SD-04 ...................................................... 35

        *ii.*    SD-17 ..................................................................................... 36

        *iii.*   SD-26 ..................................................................................... 36

        *iv.*   SD-48 ..................................................................................... 37

        *v.*     SD-56 ..................................................................................... 38

     4.    State House Districts 44, 48, 49, 52, and 104 .............................. 39

  D.    Discriminatory Purpose Claim............................................................ 40

  E.    Vote Dilution Claim ............................................................................ 42

     1.    The *Gingles* Prerequisites................................................................ 44

        *i.*     First *Gingles* Prerequisite ...................................................... 44

           *a.*    Coalitions................................................................. 45

           *b.*    Traditional Districting Principles ........................ 49

        *ii.*    Second and Third *Gingles* Prerequisites.......................... 51

     2.    Proportionality ................................................................................. 56

IV.   Conclusion ................................................................................................ 57

BRANCH, Circuit Judge, concurring in part and dissenting in part:..................... 58

Plaintiffs in these two related cases allege that redistricting legislation enacted in the wake of the 2020 Census infringes on the rights of many of Georgia's black and latino voters. In *Georgia State Conference of the NAACP v. Georgia* (the *Georgia NAACP* case), Plaintiffs assert statutory and constitutional claims related to certain districts drawn for the Georgia Senate and House, and the U.S. House of Representatives. In *Common Cause v. Raffensperger* (the *Common Cause* case), Plaintiffs bring a constitutional challenge to three of Georgia's congressional districts. Because both sets of Plaintiffs assert constitutional claims, a three-judge panel was convened pursuant to 28 U.S.C. § 2284(a). Doc. No. [8].[1] Pursuant to Federal Rule of Civil Procedure 42, we consolidated the cases for all purposes, electing to exercise ancillary jurisdiction over the *Georgia NAACP* Plaintiffs' statutory claim. Doc. No. [40].

On March 27, 2023, Defendants in both cases moved for summary judgment. Doc. No. [141]. *Common Cause* Doc. No. [92]. As explained below, Defendants' motions are denied. These cases will proceed to trial.

---

[1]   Unless otherwise noted, record citations in this Order are to the *Georgia NAACP* docket. All page citations are to the CM/ECF numbering.

## I.     Factual Background

### A.     The Parties and Claims

#### 1.     The *Georgia NAACP* Case

Plaintiffs are the Georgia State Conference of the NAACP (NAACP); the Georgia Coalition for the People's Agenda, Inc. (GCPA); and GALEO Latino Community Development Fund, Inc. (GALEO). Doc. No. [59], ¶¶ 33–59. Defendants are the State of Georgia; Brian Kemp, in his official capacity as the Governor of Georgia; and Brad Raffensperger, in his official capacity as the Georgia Secretary of State. *Id.* ¶¶ 60–62. Plaintiffs assert causes of action for racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments (Count I); vote dilution under Section 2 of the Voting Rights Act of 1965 (the VRA) (Count II); and discriminatory purpose in violation of the Fourteenth Amendment and Section 2 (Count III). *Id.* ¶¶ 313–44. These claims challenge the redistricting plans for the Georgia Senate,[2] the Georgia House,[3] and Congress (collectively, the

---

[2]    In the Amended Complaint, Plaintiffs challenged SD-01, SD-02, SD-04, SD-05, SD-06, SD-07, SD-10, SD-14, SD-16, SD-17, SD-18, SD-22, SD-23, SD-25, SD-26, SD-28, SD-30, SD-31, SD-32, SD-33, SD-34, SD-35, SD-37, SD-38, SD-43, SD-44, SD-48, and SD-56. Doc. No. [59], ¶¶ 184–237.

[3]    While it is not entirely clear from their amended pleading, Plaintiffs appeared to challenge: HD-25, HD-29, HD-30, HD-31, HD-47, HD-48, HD-49, HD-50, HD-51, HD-52, HD-53, HD-54, HD-61, HD-64, HD-65, HD-69, HD-72, HD-74, HD-75, HD-76, HD-77, HD-78, HD-79, HD-91, HD-92, HD-93, HD-95, HD-100, HD-103, HD-104, HD-111, HD-113, HD-114, HD-115, HD-116, HD-117, HD-

*(continued on next page)*

2021 Maps).[4] Plaintiffs have now refined their claims to challenge Senate Districts 1, 2, 4, 17, 26, 48, and 56;[5] House Districts 44, 48, 49, 52, and 104; and Congressional Districts 2, 3, 4, 6, 8, 10, 13, and 14. Doc. No. [152], at 17.

### 2.    The *Common Cause* Case

Plaintiffs are Common Cause; the League of Women Voters of Georgia (the League); and Dr. Cheryl Graves, Dr. Ursula Thomas, Jasmine Bowles, Dr. H. Benjamin Williams, and Brianne Perkins. *Common Cause* Doc. No. [32], ¶¶ 12–26. Defendant is Brad Raffensperger, in his official capacity as Secretary of State. *Id.* ¶ 27.[6] These Plaintiffs assert a single cause of action for racial gerrymandering in

---

118, HD-128, HD-133, HD-136, HD-137, HD-138, HD-142, HD-143, HD-145, HD-147, HD-151, HD-152, HD-153, HD-154, HD-161, HD-162, HD-163, HD-164, HD-165, and HD-166. *Id.* ¶¶ 238–312.

[4]    In the Amended Complaint, Plaintiffs challenged CD-03, CD-04, CD-06, CD-07, CD-09, CD-10, CD-11, CD-13, and CD-14. *Id.* ¶¶ 142–183.

[5]    In their brief opposing summary judgment, Plaintiffs indicated that they were challenging Senate District 59 (not 56). Doc. No. [152], at 17. This appears to have been a typo: During oral argument, counsel for Plaintiffs identified the challenged district as Senate District 56. Doc. No. [176], at 53–54. And the NAACP provided evidence that it has members who reside in SD-56 but did not identify a resident of SD-59. Doc. No. [152-15], ¶ 11. For purposes of this Order, then, we presume the *Georgia NAACP* Plaintiffs are challenging SD-56.

[6]    The original Complaint also named as Defendants John Kennedy and Bonnie Rich, sued in their official capacities as Chair of the Georgia Senate Committee on Reapportionment and Redistricting and as Chair of the Georgia House Committee on Legislative and Congressional Reapportionment, respectively. *Common Cause* Doc. No. [1], ¶ 26. They were not included as Defendants in the Amended Complaint. *See generally id.* Doc. No. [32].

violation of the Fourteenth Amendment. *Id.* ¶¶ 119–23. They challenge Georgia Congressional Districts (CD) 6, 13, and 14 adopted as part of the 2021 Maps (together with the districts challenged by the *Georgia NAACP* Plaintiffs, the Challenged Districts), contending that the Georgia General Assembly subordinated traditional districting principles to racial considerations. *Id.* ¶ 1. In this regard, the sole cause of action in *Common Cause* is entirely encompassed by the racial gerrymandering claim in the *Georgia NAACP* case.

**B.    Georgia's Redistricting Process**

The 2021 redistricting process is the first Census-related redistricting in Georgia since the United States Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), after which Georgia was no longer subject to the VRA's preclearance requirement. *See, e.g.*, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1237 (N.D. Ga. 2022) ("As a result [of *Shelby County*], the State of Georgia is no longer a covered jurisdiction. The current round of redistricting is the first to be done as a result of a Decennial Census after the *Shelby County* ruling. Thus, this is the first time in over fifty years in which Georgia has redistricted following the Decennial Census without having to seek preclearance.").

The State of Georgia has historically conducted redistricting in special legislative sessions. Doc. No. [152-1], ¶ 3. *Common Cause* Doc. No. [102], ¶ 3.[7] The Georgia Senate and House committees on redistricting adopted guidelines governing the process for drawing the 2021 Maps. Doc. [152-1], ¶ 11. *Common Cause* Doc. No. [102], ¶ 11; *id.* Doc. No. [107], ¶ 7. Those guidelines included complying with constitutional requirements for equal protection and with the VRA (including "a recognition of racially polarized voting"); recognizing the importance of jurisdictional boundaries; prioritizing communities of interest; consideration of the districts' compactness; and requiring contiguity. *Common Cause* Doc. No. [107], ¶ 7.

The Georgia General Assembly held town hall meetings before publishing the 2021 Maps. Doc. No. [152-1], ¶ 1. *Common Cause* Doc. No. [102], ¶ 1; *id.* Doc. No. [107], ¶ 4. The legislators listened to public comments but did not answer questions during those meetings. Doc. No. [152-1], ¶ 2. *Common Cause* Doc. No.

---

[7]  Any objections raised by the parties in response to the other side's statements of material facts are overruled to the extent we rely on such facts. Doc. No. [152-1] is Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts. Citations to a particular paragraph are to the fact put forward by Defendants; citations to the response are to Plaintiffs' response to the fact asserted. Similarly, Doc. No. [164] is Defendants' Responses and Objections to Plaintiffs' Statement of Additional Material Facts, *Common Cause* Doc. No. [102] is Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts, and *Common Cause* Doc. No. [107] is Defendant's Responses and Objections to Plaintiffs' Statement of Additional Material Facts. Citations to these documents follow the convention described above.

[102], ¶ 2. After the 2020 Census data was released in 2021, the General Assembly began working on drawing the maps. Doc. No. [152-1], ¶ 8. *Common Cause* Doc. No. [102], ¶ 8. The timeline for consideration of the redistricting plans was similar in 2001, 2011, and 2021. Doc. No. [152-1], ¶ 4. *Common Cause* Doc. No. [102], ¶ 4.

From 2010 to 2020, the number of black voters in Georgia increased by over two percentage points. Doc. No. [152-1], ¶ 7. *Common Cause* Doc. No. [102], ¶ 7. Plaintiffs also presented evidence that the non-hispanic white population decreased during that time, even though the total population of the State increased by over a million people. *Common Cause* Doc. No. [100-25], at 9. The black and latino population currently comprises 42.75% of the total Georgia population, and over 38% of the citizen voting-age population. *Common Cause* Doc. No. [100-25], at 9. Georgia's total population is nearly evenly split between whites (50.06%) and non-whites (49.94%), including blacks, hispanics, and other people of color. Doc. No. [152-1], Response to ¶ 7. *Common Cause* Doc. No. [100-25], at 9.

Gina Wright, director of the Legislative and Congressional Reapportionment Office of the Georgia General Assembly (the LRCO), worked with a group to finalize the redistricting plans. Doc. [152-1], ¶ 12. *Common Cause* Doc. No. [107], ¶¶ 13–14. Ms. Wright met with the chairs of the redistricting committees, as well as other legislators. Doc. [152-1], ¶ 16. Ms. Wright also consulted with counsel about compliance with the VRA. Doc. [152-1], ¶ 19.

*Common Cause* Doc. No. [102], ¶ 19. Past election data and racial data were available to the committee chairs and Ms. Wright during this process. Doc. No. [152-1], ¶¶ 20, 23. *Common Cause* Doc. No. [102], ¶¶ 14, 17. Racial data was projected onto the computer screens, though the parties dispute the amount of time and extent to which this data was visible. Doc. No. [152-1], ¶ 23. *Common Cause* Doc. No. [107], ¶ 17. The map drawers had accurate data on a block-by-block level about race. Doc. No. [152-29], at 9 (Strangia Dep. 103:17–23). However, accurate information about political affiliation is only captured at the precinct level. Doc. No. [164-6], at 3–4 (Strangia Dep. 96:17 to 97:13). As a result, the LRCO used a program to estimate from that data—to "guess" at—political affiliation results at the block level. Doc. No. [152-29], at 4 (Strangia Dep. 98:3–18); Doc. No. [164-6], at 3–4 (Strangia Dep. 96:25–97:5).[8]

### C.   The Enacted Maps

The enacted Senate map maintained the same number of majority-black districts as the 2011 redistricting plan. Doc. No. [152-1], ¶ 34. The number of counties split between two or more districts (split counties) was reduced compared with the 2011 plan. *Id.* ¶ 32. *Common Cause* Doc. No. [100-25], at 23. The parties dispute whether the 2021 Maps avoided putting the residences of two

---

[8]   The *Georgia NAACP* Defendants' objections to Plaintiffs' characterization of this testimony, Doc. No. [164], ¶ 77 & Response, is overruled.

incumbent elected representatives in the same district (incumbent pairings).[9] Doc. No. [152-1], ¶ 33 & Response. *Common Cause* Doc. No. [100-25], at 25. The enacted House plan increased the number of majority-black districts and reduced the number of split counties. Doc. No. [152-1], ¶¶ 35–36. There are now five congressional districts that "perform" for black and latino voters—that is, districts in which the candidates of choice of black and latino voters are competitive and can frequently win elections outright. This is one fewer than the 2011 plan. *Id.* ¶ 30 & Response. *Common Cause* Doc. No. [100-25], at 11.

## II.   Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of

---

[9]   Such pairings would require incumbents to run against one another in the district in which they both live. *Common Cause* Doc. No. [100-25], at 25.

material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324. The evidence must be viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255. *See also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are for the finder of fact, and cannot be made by the court in evaluating summary judgment. *Anderson*, 477 U.S. at 255. *Accord Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

## III.   Analysis

In the *Georgia NAACP* case, Defendants present several arguments about why judgment in their favor is appropriate. They assert that Plaintiffs have not demonstrated that they have standing. Defendants also contend that the State of Georgia is entitled to sovereign immunity as to the Section 2 claim. They next argue that Plaintiffs failed to put forward evidence of racial predominance or intentional racial discrimination during the map-drawing process. Finally, Defendants assert that Plaintiffs cannot satisfy the three prerequisites set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986), for establishing a vote-dilution claim under Section 2. *See generally* Doc. No. [141-1]. In *Common Cause*, the Secretary argues that (1) the League and Common Cause failed to show that they have standing and

(2) Plaintiffs have not shown evidence of intentional racial discrimination. *See generally Common Cause* Doc. No. [92-1].

Because standing is challenged in both cases and is a necessary predicate to the organizational Plaintiffs' ability to proceed, we address it first. We then turn to the *Georgia NAACP* Defendants' argument that Section 2 did not abrogate Georgia's sovereign immunity. Third, we address the racial gerrymandering claims raised by both sets of Plaintiffs. Finally, we consider the discriminatory purpose and Section 2 claims asserted by the *Georgia NAACP* Plaintiffs.

## A.     Standing

Defendants in both cases argue that the entity Plaintiffs lack associational and organizational standing. Doc. No. [141-1], at 13–15; *Common Cause* Doc. No. [92-1], at 6–10.[10] However, Plaintiffs have shown that the entities have associational standing for each of the Challenged Districts in which one of their members resides. As a result, we find it unnecessary to address Defendants' organizational standing arguments at any length.[11]

---

[10]   Defendants do not challenge the standing of the individual *Common Cause* plaintiffs to pursue claims for the districts in which they live. Dr. Cheryl Graves lives in CD-06; Dr. Ursula Thomas, Jasmine Bowles, and Dr. H. Benjamin Williams live in CD-13; and Brianne Perkins lives in CD-14. *Common Cause* Doc. No. [32], ¶¶ 22–26.

[11]   Organizational standing is based on a diversion-of-resources theory: "[A]n organization has standing to sue when a defendant's illegal acts impair the

*(continued on next page)*

### 1.      Associational Standing

Article III of the Constitution limits federal courts to consideration of cases and controversies. U.S. Const. art. III, § 2. The doctrine of standing "is an essential and unchanging part" of that requirement. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The standing inquiry is threefold—the plaintiff must show (1) an injury-in-fact (2) that is traceable to the defendant's conduct and (3) that can be redressed by the court. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (citing *Lujan*, 504 U.S. at 560–61 (cleaned up)). Only injury-in-fact is at issue here.

An organization may demonstrate that it has associational standing

> to enforce the rights of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Crittenden*, 347 F. Supp. 3d at 1336 (cleaned up); *accord Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203 (11th Cir. 2018). To demonstrate an injury-in-fact under this theory, the organizational Plaintiffs "need not establish that all of

---

organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1336 (N.D. Ga. 2018) (citing *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014)). *See also Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1288–89 (N.D. Ga. 2018) ("It is well established that an organization can establish standing to sue on its own behalf where it can show the defendant's acts resulted in an impediment to the organization's mission or diversion of its resources.").

their members are in danger of suffering an injury," but must show only that at least one member faces a realistic danger of suffering an injury. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014); *accord Ga. Republican Party*, 888 F.3d at 1204 (clarifying that an organization must allege and prove "that a *specific* member will be injured" (emphasis added)).

The parties do not generally dispute that the organizational Plaintiffs in each case have at least one member of voting age who resides in each of the Challenged Districts. Rather, the fight is about the *timing* of Plaintiffs' disclosures of this information. Doc. No. [176], at 7–8, 64–65. Defendants argue that Plaintiffs cannot show associational standing because they did not identify during discovery members who reside in each of the Challenged Districts. Doc. No. [141-1], at 13–14; *Common Cause* Doc. No. [92-1], at 9–10. Defendants therefore contend that the organizations lack admissible evidence that would satisfy the injury-in-fact requirement of associational standing. Doc. No. [141-1], at 13–15; *Common Cause* Doc. No. [92-1], at 10.

### i.    The NAACP, Common Cause, and the League

In response to Defendants' motion for summary judgment, the NAACP provided evidence that it has numerous members who reside in each Challenged District. Doc. No. [152-15], ¶¶ 10–11; Doc. No. [164], ¶ 6. Similarly, both Common Cause and the League demonstrated that they have many members who reside in

each of the districts they challenge. *Common Cause* Doc. No. [107], ¶¶ 17, 19, 21–22, 24; *id.* Doc. No. [101-1], ¶¶ 20–23; *id.* Doc. No. [119], ¶ 4.[12] These Plaintiffs objected during discovery to Defendants' broad requests for the identification of the organizations' individual members, based on the associational privilege. *See generally* Doc. No. [152-3]; Doc. No. [152-13]. *Common Cause* Doc. No. [92-1], at 9–10; *id.* Doc. No. [100], at 12–13. Defendants never moved to compel.

Although Defendants now object to the admissibility of Plaintiffs' evidence, Defendants do not dispute its accuracy. Doc. No. [164], Responses to ¶¶ 6, 11, 15; Doc. No. [176], at 7–8, 64–66. *Common Cause* Doc. No. [107], Responses to ¶¶ 21–22, 24, 26–28. And Defendants have not identified any prejudice they have suffered or will suffer because of the alleged delay in production. Even if disclosure during discovery had been required by the Federal Rules, the severe sanction Defendants request—the exclusion of otherwise admissible evidence—would not be warranted. Fed. R. Civ. P. 37(c) (stating that a party is not allowed to use information it failed to disclose as required by Fed. R. Civ. P. 26(a) "on a motion, at a hearing, or at a trial, **unless the failure was substantially justified or is harmless**" (emphasis added)). The NAACP, Common Cause, and the League have

---

[12] This information was filed under seal. Common Cause and the League have historically kept their membership lists and member information confidential. *Common Cause* Doc. No. [107], ¶¶ 20, 25. *See also id.* Doc. No. [101], ¶ 14; Doc. No. [101-1], ¶ 12.

now produced undisputed evidence that they have associational standing. Under these circumstances, we will not disregard that evidence.

### ii.   GALEO and GCPA

In contrast, GALEO and the GCPA do not have members in every Challenged District. Doc. No. [164], ¶¶ 11, 15. They therefore lack associational standing for those districts in which no member resides.[13] They may only seek relief based on associational standing as to those districts in which they have shown they have members. Those districts, however, are entirely encompassed within the Challenged Districts being pursued by the NAACP. There is thus no impact on the matters that must be tried in these cases or on the type of relief sought as a result of GALEO's and the GCPA's limited associational standing. As a result, we do not find it necessary to consider Defendants' admittedly novel argument that organizational standing cannot be applied in a redistricting case.[14]

---

[13]   GALEO only has members in CD-02, CD-03, CD-04, CD-06, CD-08, CD-10, CD-13, CD-14, HD-44, HD-48, HD-52, HD-104, SD-02, SD-04, SD-14, and SD-48. Doc. No. [164], ¶ 11. GCPA only has members in CD-02, CD-03, CD-04, CD-08, CD-13, SD-02, and SD-26. *Id.* ¶ 15.

[14]   Because vote dilution in a redistricting case is district specific, Defendants assert that an entity cannot show organizational standing through a diversion-of-resources theory since an entity does not reside in a particular district. Doc. No. [141-1], at 12–13; Doc. No. [176], at 4.

## B.      Abrogation of Sovereign Immunity

In addition to suing Georgia's Governor and Secretary of State in their official capacities, the *Georgia NAACP* Plaintiffs named the State itself as a Defendant.[15] Doc. No. [59], ¶ 60. Defendants argue that Counts II and III of the Complaint, which assert violations of Section 2, must be dismissed as to Georgia because the VRA does not abrogate the State's sovereign immunity. *See generally* Doc. No. [141-1], at 20–22. In support of this contention, Defendants rely on the dissenting opinion in *Alabama State Conference of the National Association for the Advancement of Colored People v. Alabama* (hereinafter *Alabama NAACP*), 949 F.3d 647, 649 (11th Cir. Feb. 3, 2020), *judgment vacated as moot*, 141 S. Ct. 2618 (2021), and a district court case from another jurisdiction, *Christian Ministerial Alliance v. Arkansas*, No. 4:19-cv-402, 2020 WL 12968240 (E.D. Ark. Feb. 21, 2020). Defendants also assert that, since this Court is sitting as a three-judge panel, it is only bound by decisions of the United States Supreme Court and need not follow Eleventh Circuit precedent. Doc. No. [141-1], at 21–22. Because there is no controlling

---

[15]  Because Georgia is not a Defendant in the *Common Cause* case, this discussion is relevant only to the summary judgment motion in *Georgia NAACP*.

Eleventh Circuit case addressing abrogation under Section 2 of the VRA, we need not address this second argument.[16]

The Eleventh Amendment to the United States Constitution prohibits, among other things, suits against a State by a citizen of that State. *See, e.g.*, *Ala. NAACP,* 949 F.3d at 649 (citing *Hans v. Louisiana*, 134 U.S. 1, 10–15 (1890)). Under the Fourteenth and Fifteenth Amendments, however, Congress can abrogate States' sovereign immunity to redress discriminatory state action when Congress unequivocally expresses the intent to do so. *Id.* at 649–50, 654–55. The majority opinion in *Alabama NAACP* held that the VRA does just that:

> By design, the VRA was intended to intrude on state sovereignty to eradicate state-sponsored racial

---

[16] It is worth noting, however, that although appeals of decisions from three-judge panels like this one go directly to the Supreme Court, three-judge panels sit as district courts. 28 U.S.C. § 1253 ("[A]ny party may appeal to the Supreme Court from an order . . . in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges."), § 2284(a) ("A district court of three judges . . . ."). "The court of three judges is not a different court from the District Court, but is the District Court composed of two additional judges sitting with the single District Judge before whom the application for injunction has been made." *Jacobs v. Tawes*, 250 F.2d 611, 614 (4th Cir. 1957) (citing 28 U.S.C. § 2284). Other three-judge panels constituted in this Circuit have concluded that they were bound by Eleventh Circuit precedent. *Ga. State Conf. of the NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1278, 1278 n.7 (N.D. Ga. 2017) (three-judge panel) (concluding that the panel was bound by Eleventh Circuit precedent; addressing the "oddity" of direct appeal to the Supreme Court from such three-judge panels); *Ala. Legis. Black Caucus v. Alabama*, 988 F. Supp. 2d 1285, 1304–05 (M.D. Ala. 2013) (three-judge panel) ("Sitting as a three-judge district court within the Eleventh Circuit, we are bound by Eleventh Circuit precedent.").

> discrimination in voting. Because the Fifteenth Amendment permits this intrusion, [the State] is not immune from suit under § 2 of the VRA. Nor is § 2 any great indignity to the State. Indeed, "it is a small thing and not a great intrusion into state autonomy to require the [S]tates to live up to their obligation to avoid discriminatory practices in the election process."

*Id.* at 655 (footnote omitted) (second alteration in original) (quoting *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1561 (11th Cir. 1984)).

The *Alabama NAACP* majority also noted that the Fifth and Sixth Circuits, and a three-judge panel in this district, have reached the same conclusion. *Id.* at 651 (citing *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017); *Mixon v. Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999); *Ga. State Conf. of NAACP*, 269 F. Supp. 3d at 1274–75). The *Alabama NAACP* dissent, in a reasoned analysis, concluded otherwise. *Id.* at 655–62 (Branch, J., dissenting). It is this dissent on which Defendants urge us to rely here.

We recognize that *Alabama NAACP* is not controlling because the judgment was ultimately vacated as moot. *Alabama v. Ala. State Conf. of the NAACP*, 141 S. Ct. 2618 (May 17, 2021). But we conclude that the majority's analysis remains persuasive. *See, e.g., Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1218 (11th Cir. 2009) ("We are free to give statements in a vacated opinion persuasive value if we think they deserve it."); *Tallahassee Branch of NAACP v. Leon*

*Cnty., Fla.*, 827 F.2d 1436, 1440 (11th Cir. 1987) (noting that court was free to consider a vacated opinion as persuasive even though not binding).

In *Kimel v. Florida Board of Regents*, the Supreme Court held that, to abrogate a State's sovereign immunity, Congress must (1) make its intention to do so "unmistakably clear in the language of the statute" and (2) act pursuant to a valid grant of constitutional authority. 528 U.S. 62, 73 (2000) (cleaned up); *accord Alabama NAACP*, 949 F.3d at 650 (citing *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001)). However, "an express abrogation clause is not required. Instead, a court may look to the entire statute, and its amendments, to determine whether Congress clearly abrogated sovereign immunity." *Alabama NAACP*, 949 F.3d at 650 (citing, *inter alia*, *Kimel*, 528 U.S. at 76 ("[O]ur cases have never required that Congress make its clear statement in a single section or in statutory provisions enacted at the same time.")).

The *Alabama NAACP* majority concluded that the first part of this test was met because the VRA explicitly permits private parties to sue to enforce its provisions, which prohibit (among other things) States and political subdivisions from imposing practices or procedures that abridge a citizen's right to vote on account of race. 949 F.3d at 651–52. Specifically, the majority stated:

> The VRA, as amended, clearly expresses an intent to allow private parties to sue the States. The language of § 2 and § 3, read together, imposes direct liability on States for discrimination in voting and explicitly

> provides remedies to private parties to address
> violations under the statute. . . . It is implausible that
> Congress designed a statute that primarily prohibits
> certain state conduct, made that statute enforceable by
> private parties, but did not intend for private parties to
> be able to sue States.

*Id.* at 652. We agree.

As to the second part of the *Kimel* test, the *Alabama NAACP* majority concluded that Congress can abrogate a State's sovereign immunity pursuant to its powers under the Fourteenth Amendment to "redress discriminatory state action." 949 F.3d at 649; *see also id.* at 654 ("While Congress may not abrogate a State's immunity when acting pursuant to its Article I powers, it may do so under its enforcement powers pursuant to § 5 of the Fourteenth Amendment. . . . [I]f § 5 of the Fourteenth Amendment permits Congress to abrogate state sovereign immunity, so too must § 2 of the Fifteenth Amendment.").

While *Alabama NAACP* is itself no longer controlling, it was not the first Eleventh Circuit case to conclude that Congress acted pursuant to a valid grant of authority under the Fourteenth and Fifteenth Amendments in adopting Section 2. In determining that Section 2 was a proper exercise of that grant of authority, the *Alabama NAACP* majority relied on *Marengo County Commission*.

There, the United States and private citizens challenged a county's at-large system of electing commissioners under the Fourteenth and Fifteenth Amendments, as well as Section 2. 731 F.2d at 1550, 1552. In considering the

Section 2 claims, the Eleventh Circuit made clear that "[t]he Civil War Amendments overrode state autonomy apparently embodied in the Tenth and Eleventh Amendments." *Id.* at 1560–61 (citations omitted). The Fourteenth and Fifteenth Amendments thus provided direct authority for Congress, in amending Section 2, to abrogate any sovereign immunity to which States might otherwise have been entitled under the Eleventh Amendment.

Since the Eleventh Circuit has concluded, in two opinions, that Section 2 is a valid expression of congressional enforcement power under the Fourteenth and Fifteenth Amendments, we deny Georgia's sovereign immunity argument.

### C.    Racial Gerrymandering Claims

The United States Supreme Court has described racial gerrymandering as "the deliberate and arbitrary distortion of district boundaries for racial purposes." *Shaw v. Reno*, 509 U.S. 630, 640 (1993) (cleaned up). Both sets of Plaintiffs assert claims for racial gerrymandering in violation of the Fourteenth Amendment.[17] Doc. No. [59], Count I. *Common Cause* Doc. No. [32], Count I.

Equal protection prevents a State from "separat[ing] its citizens into different voting districts on the basis of race." *Miller v. Johnson*, 515 U.S. 900, 911 (1995). But "[f]ederal-court review of districting legislation represents a serious

---

[17]    The *Georgia NAACP* Plaintiffs also bring this claim under the Fifteenth Amendment. Doc. No. [59], Count I.

23

intrusion on the most vital of local functions. It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'" *Id.* at 915 (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)). Accordingly, we must presume the good faith of the Georgia General Assembly unless Plaintiffs provide sufficient support for their assertion that race predominated in the legislature's adoption of the Challenged Districts. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

To make out their racial gerrymandering claims, Plaintiffs must

> show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.

*Miller,* 515 U.S. at 916. Such claims apply only to individual districts. That is, they cannot be applied to a State as an undifferentiated whole. *Ala. Legis. Black Caucus v. Alabama* (hereinafter *ALBC*), 575 U.S. 254, 262 (2015). Plaintiffs have the ultimate burden of proving that the General Assembly "subordinated *traditional race-neutral districting principles*," including "compactness, contiguity, [and] respect for political subdivisions or communities defined by actual shared interests," to racial considerations. *Id.* at 272 (quoting *Miller,* 515 U.S. at 916; *Bush v. Vera*, 517 U.S. 952, 957 (1996)).

Determining the legislature's intent is "an inherently complex endeavor" that requires us to "perform a 'sensitive inquiry into such circumstantial and direct

evidence of intent as may be available.'" *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). This is a factual question. *Id.* at 549. As such, it is particularly ill-suited to resolution at summary judgment. *Id.* at 552 (citing *Anderson*, 477 U.S. at 255).

To overcome Defendants' bid for summary judgment, then, it is sufficient for Plaintiffs to point to direct or circumstantial evidence—viewed in the light most favorable to Plaintiffs—that "race was the 'predominant factor' motivating the legislature's districting decision." *Id.* at 551 (indicating that the district court was required to accept nonmovant State's explanation for redistricting plan as true at the summary judgment stage). When "[r]easonable inferences from the undisputed facts can be drawn in favor of a racial motivation finding or in favor of a political motivation finding," entry of summary judgment is inappropriate. *Cromartie*, 526 U.S. at 552. That is precisely the situation before us.

### 1.   The Parties' Arguments

Defendants in both cases argue that Plaintiffs "adduced no evidence" that race predominated in the creation of the Challenged Districts. Doc. No. [141-1], at 15. *Common Cause* Doc. No. [92-1], at 10. Defendants contend that the evidence shows Georgia's legislators were concerned with political performance, not race. Doc. No. [141-1], at 16. *Common Cause* Doc. No. [92-1], at 11. They further claim that Plaintiffs lack (1) "conclusive circumstantial evidence" of racial

gerrymandering based on the districts' shapes and demographics and (2) "sufficient evidence" that the legislature subordinated traditional redistricting principles to race. Doc. No. [141-1], at 17–18. *Common Cause* Doc. No. [92-1], at 14–15. But evidence need not be "conclusive" to defeat summary judgment and we must consider the evidence of intent with regard to each district as a whole, not in isolation. Despite the parties' objections to the other side's undisputed facts, there is actually little disagreement about the raw information on which each side relies. Rather, what the parties dispute is the import of those facts. At this stage, however, we must draw all reasonable inferences in Plaintiffs' favor. Both sets of Plaintiffs have pointed to evidence for each Challenged District supporting their position that race was the predominant reason for the placement of large swaths of people within or without a particular district. *Miller*, 515 U.S. at 916. Thus, the question of whether race predominated is a disputed factual issue precluding summary judgment in favor of Defendants.

In support of their contention that race predominated in the drawing of the Challenged Districts, Plaintiffs rely (among other things) on the testimony and report of their expert, Dr. Moon Duchin.[18] *See generally* Doc. No. [152], at 17–21;

---

[18] Plaintiffs in both cases rely on Dr. Duchin's expert report. *Compare* Doc. No. [154-1] to [154-5] *with Common Cause* Doc. No. [100-25]. This Order refers to the version of that report filed in *Common Cause* for ease of reference.

*Common Cause* Doc. No. [100], at 23–27. Dr. Duchin's report analyzed the 2021 Maps' "conformance with traditional districting principles" and whether those maps reflected "excessively race-conscious line-drawing." *Common Cause* Doc. No. [100-25], at 5. Although Defendants quibble with that description, *see, e.g.*, Doc. No. [164], Response to ¶ 90, this is exactly what her expert report purports to do.[19]

Plaintiffs may only press their racial gerrymandering claim on a district-by-district basis. *ALBC*, 575 U.S. at 262. Accordingly, we address the evidence in the same fashion. But because Plaintiffs have presented evidence supporting their position that race predominated in the drawing of the Challenged Districts, the question of whether race predominated is a disputed factual issue, and we find it unnecessary to comprehensively discuss the other evidence in the case.

### 2.   Congressional Districts

The *Georgia NAACP* Plaintiffs challenge CD-02, CD-03, CD-04, CD-06, CD-08, CD-10, CD-13, and CD-14. Doc. No. [152], at 17; *see generally id.* at 17–20. The *Common Cause* Plaintiffs challenge only districts 6, 13, and 14. *Common Cause* Doc. No. [32], ¶ 1. The following evidence supports Plaintiffs' claims that these districts were racially gerrymandered.

---

[19]   Defendants do not challenge Dr. Duchin's qualifications. Doc. No. [164], Responses to ¶¶ 88–89.

> **i.**   **CD-02 and CD-08**[20]

According to Dr. Duchin, Bibb County was split between these two districts based on "minutely race conscious decisions." Doc. No. [164], ¶¶ 145–46. *Common Cause* Doc. No. [100-25], at 73. Defendants object to this statement, claiming that Dr. Duchin testified that the split was "also political." Doc. No. [164], Response to ¶ 146. But that objection does not refute the expert's contention that there are significant racial disparities reflected in the split of Bibb County. Such evidence supports Plaintiffs' position that race predominated in the drawing of CD-02 and CD-08. Whether politics or race ultimately predominated is a disputed factual issue. Resolving it requires assessing the merits of Dr. Duchin's conclusions, which we cannot appropriately do at summary judgment, where we must interpret the evidence in Plaintiffs' favor. Thus, the question of whether race predominated is a disputed factual issue precluding summary judgment in favor of Defendants.

---

[20]   CD-02 and CD-08 were not identified in the Amended Complaint as being among the Challenged Districts. *See generally* Doc. No. [59]. Because the parties plainly engaged in discovery concerning these districts, and Plaintiffs identified them in response to Defendants' motion for summary judgment, Doc. No. [152], at 17–18, we will permit Plaintiffs to conform their pleading to include CD-02 and CD-08, consistent with the evidence that will be presented at trial. Fed. R. Civ. P. 15(b).

##### ii.    CD-03

Dr. Duchin concluded that every county that was split and included in CD-03 was consistent with "cracking" black voters.[21] Doc. No. [164], ¶¶ 147–48. *Common Cause* Doc. No. [100-25], at 74. Defendants object that Dr. Duchin did not "analyze" the counties, but only "reported the racial statistics" and that she only found the splits "consistent" with packing and cracking voters. Doc. No. [164], Responses to ¶¶ 147–48. "Dividing the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice." *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993) (discussing packing and cracking in the context of a Section 2 claim). As such, Plaintiffs have pointed to evidence supporting their position that race was the predominant factor. Thus, the question of whether race predominated is a disputed factual issue precluding summary judgment in favor of Defendants. *Cromartie*, 526 U.S. at 552 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" (quoting *Anderson*, 477 U.S. at 255)).

---

[21] "Cracking means dividing a [block of voters] among multiple districts so that they fall short of a majority in each one. Packing means concentrating [a block of voters] in a few districts that they win by overwhelming margins." *Gill v. Whitford*, 138 S. Ct. 1916, 1924 (2018) (citation omitted).

### iii.    CD-04 and CD-10

Dr. Duchin determined that the split of Newton County between CD-04 and CD-10 was consistent with packing in CD-04 and cracking in CD-10. Doc. No. [164], ¶¶ 149–50. *Common Cause* Doc. No. [100-25], at 75. Defendants object that "consistent with" is not sufficient to rule out a political—rather than racial—purpose in drawing the districts' lines. This argument fails for the same reasons it could not succeed as to CD-03: Plaintiffs need not rule out all possible alternative explanations for the districts' line-drawing on summary judgment. Thus, Plaintiffs have pointed to evidence supporting their position that race was the predominant factor in drawing the lines for CD-04 and CD-10. Therefore, the question of whether race predominated is a disputed factual issue, precluding summary judgment in favor of Defendants.

Moreover, Dr. Duchin opined that split precincts highlight the predominance of race over partisan concerns in drawing districts. Doc. No. [164], ¶¶ 151–52.[22] For CD-04 and CD-10, Dr. Duchin concluded that several split precincts on the border provide further evidence of packing and cracking. *Id.*

---

[22] Dr. Duchin opined that, "[f]or the purposes of investigating racial gerrymandering, the splits to state precincts can be especially revealing: these are the units at which cast votes are reported, so finer divisions are usually made in view of demographics but not voting behavior—that is, these highlight the predominance of race over even partisan concerns." Doc. No. [164], ¶ 152 (quoting Duchin Dep. 186:17–23).

¶ 154. *Common Cause* Doc. No. [100-25], at 76–77. Defendants object because Dr. Duchin did not know if these precincts were split along geographic features. Doc. No. [164], ¶ 154. Defendants are free to cross-examine Dr. Duchin on this issue at trial. But, crediting Dr. Duchin's testimony, as we are required to do at this stage, this objection is not a basis for us to disregard the import of her expert opinion for summary judgment purposes.

### *iv.* **CD-06, CD-13, and CD-14**

CD-06, -13, and -14 are challenged by both sets of Plaintiffs. In her report, Dr. Duchin reached the following conclusions. Cobb County was split across four districts, with CD-13 and CD-14 receiving parts of the county in which the black and hispanic voting-age population (BHVAP) was over 60%. CD-06 received a BHVAP of only 18.5%. Doc. No. [164], ¶ 143. *Common Cause* Doc. No. [100-25], at 73. Dr. Duchin found this pattern consistent with packing and cracking. *Common Cause* Doc. No. [100-25], at 73–74. Dr. Duchin determined that the county splits in these districts "submerge[d]" a small and diverse urban community in CD-14. Doc. No. [164], ¶ 148. *Common Cause* Doc. No. [100-25], at 74.

Dr. Duchin testified that there was further evidence race predominated in the drawing of CD-14. Specifically, CD-14 was expanded into Cobb County to include two majority-black cities. Doc. No. [164], ¶¶ 107–08. Dr. Duchin opined that this "incursion" was not required by traditional redistricting principles. *Id.*

¶¶ 109, 111–13. *See also Common Cause* Doc. No. [107], ¶¶ 40–41, 54. Defendants object to much of this evidence for the same reasons articulated above. We reject these protests for the same reasons.

Before redistricting, CD-06 was one that "performed" for black and latino voters.[23] The redistricting process added "whiter suburban/exurban/rural areas" to the district. Doc. No. [164], ¶¶ 103–04. Ms. Wright of the LRCO testified that racial data, as well as political data, was projected onto the computer screens when map lines were being drawn for CD-06, although the parties dispute the extent to which such information was displayed. Doc. No. [152-28], at 80–81 (Wright Dep. 115:8–116:21); Doc. No. [164], ¶ 79 & Response. Dr. Duchin found significant demographic disparity across precinct splits on the border of CD-6 and CD-11 (Cobb and Cherokee counties). Doc. No. [164], ¶ 153. *Common Cause* Doc. No. [100-

---

[23] In this context, the parties' submissions sometimes use "perform" or "performing" to refer to the typical electoral outcomes of a district. *See* Doc. [142-6], at 8, 11, 51 (report of Dr. Schneer) (explaining that the report examines "the performance of the[ ] districts in terms of the ability of minority candidates to elect their candidates of choice."). *Common Cause* Doc. [100-25], at 5 (Report of Dr. Duchin, summary of findings). So, for example, Dr. Duchin's report refers to previously constituted districts "that had proved to perform for the preferences of Black and Latino voters." *Common Cause* Doc. [100-25], at 5–6, 69. Dr. Duchin defined "effective" districts as those that are "electorally aligned with the preferences of Black and Latino voters in at least three out of four primaries and at least five out of eight general elections." *Common Cause* Doc. No. [100-25], at 17. Because the parties seem to use "perform" and "effective" in slightly different ways, this Order uses whichever term the parties employed in discussing a particular district.

25], at 76. She concluded that these splits were consistent with "the overall theme that CD 6 was targeted to reduce electoral opportunity for Black and Latino voters—and for Black voters, in particular." *Common Cause* Doc. No. [100-25], at 76. *See also* Doc. No. [164], ¶ 153. *Common Cause* Doc. No. [107], ¶ 44. Defendants object to this conclusion because Dr. Duchin did not know if the split precincts were contiguous, apparently suggesting that this weakens the inference that the splits show an intent to reduce electoral opportunities for black and latino voters. Doc. No. [164], Response to ¶ 153. But Defendants do not dispute that there are significant racial disparities in the splits. This supports Plaintiffs' position that race was the predominant factor in drawing the district lines for CD-06. Thus, the question of whether race predominated is a disputed factual issue precluding summary judgment in favor of Defendants.

Further, Dr. Duchin testified that CD-06 was "nearly at ideal size" before redistricting but was subject to "major reconfiguration" in the 2021 Maps. Doc. No. [164], ¶¶ 96–97. *Common Cause* Doc. No. [107], ¶ 45. Defendants object that Dr. Duchin testified one would expect changes in boundaries to all districts given the population variations in areas surrounding CD-06. Doc. No. [164], Response to ¶ 97. They do not, however, dispute that CD-06 was substantially reconfigured. Further, Defendants concede that large proportions of black and hispanic populations were moved out of CD-06 and white suburban areas were moved into

the district. *Id.* ¶ 98. The population transferred from CD-06 to CD-04 was 37.5%

black or latino. *Id.* ¶ 100. Of the population transferred into CD-06 from CD-07,

16.1% was black or latino. *Id.* ¶ 102. Dr. Duchin opined that these racially

distinctive population swaps were evidence that race predominated over

traditional redistricting principles. *Id.* ¶ 106. Defendants object that Dr. Duchin did

not rule out a political goal, but this is a disagreement about the import of the

evidence, not a basis for us to decline to view the evidence in Plaintiffs' favor.

\* \* \* \*

In sum, Plaintiffs have pointed to evidence for each challenged

Congressional District supporting their position that race was the predominant

reason for the placement of large swaths of people within or without that district.

Thus, the question of whether race predominated is a disputed factual issue

precluding summary judgment in favor of Defendants.

### 3.    State Senate Districts

The State Senate Districts are challenged only by the *Georgia NAACP*

Plaintiffs. As with the Congressional Districts, there is evidence concerning Senate

Districts 1, 2, 4, 17, 28, 48, and 56 supporting Plaintiffs' position that race was the

predominant factor in drawing the Senate District lines. Dr. Duchin opined that

numerous counties were split in a way that created at least a 20-point disparity in

BHVAP across those splits. Doc. No. [164], ¶ 155. Thus, as with the Congressional

Districts, we conclude that the question of whether race predominated in the drawing of the State Senate Districts is a disputed factual issue, precluding summary judgment in favor of Defendants.

### *i.* **SD-01, SD-02, and SD-04**

Chatham County was split among Senate Districts 1, 2, and 4. *Id.* ¶ 158. Defendants do not dispute at this stage that, while SD-02 is an effective district for black and latino voters, SD-01 and SD-04 are not. *Id.* ¶ 159. Based on her analysis, Dr. Duchin concluded that pieces of the county "look[ed] to be clearly racially sorted" in a manner that ensured black and latino voters would only have effective influence in one Senate District—SD-02. *Id.* ¶ 160. *Common Cause* Doc. No. [100-25], at 79. Defendants object to this fact as not supported by the cited evidence. Doc. No. [164], Response to ¶ 160. But having reviewed Dr. Duchin's report, it at least purports to draw and support the conclusion of racial sorting, so we must interpret the evidence in Plaintiffs' favor at this stage. *Common Cause* Doc. No. [100-25], at 79. Defendants also argue that Dr. Duchin testified only to patterns "consistent" with packing and cracking. Doc. No. [164], Response to ¶ 160. As we have noted with regard to the Congressional Districts, such testimony supports Plaintiffs' position that race predominated in the drawing of the districts. Thus, the question of whether race predominated is a disputed factual issue precluding summary judgment in favor of Defendants.

ii.   **SD-17**

Dr. Duchin analyzed the core retention and population displacement of Senate District 17. Before redistricting, SD-17 was an effective district for black and latino voters. Doc. No. [164], ¶ 122.[24] Following redistricting, it retained only about half of its prior residents even though it was only mildly overpopulated. *Id.* ¶ 123. Of the outgoing population, about half of it was black or latino, while the incoming population was much less than 50% black and latino. *Id.* ¶¶ 124–25. SD-17 is now an ineffective district for black and latino voters. None of the districts that received the outgoing population from SD-17 thereby became effective districts for black and latino voters. *Id.* ¶¶ 126–27. Defendants do not dispute these facts. Based on these facts, Dr. Duchin opined that a desire for compactness does not explain the racially imbalanced population flows into and out of SD-17. *Id.* ¶ 128.

iii.   **SD-26**

Bibb County was split among three Senate Districts: 18, 25, and 26. *Id.* ¶ 156. Dr. Duchin concluded that these splits were accomplished in a manner that

---

[24]   Defendants object to this fact on the basis that it was not separately numbered. Doc. No. [164], Response to ¶ 122. This assertion is incorrect—the version of the document accessible through PACER has numbered paragraphs. *See, e.g.*, Doc. No. [152-2], ¶ 122. Second, to the extent certain paragraphs in Doc. No. [152-2] were improperly numbered because they contain more than one factual statement, Plaintiffs' statement of material facts was sufficiently clear for Defendants to provide responses and for us to analyze which facts are undisputed.

packed SD-26. *Id.* ¶ 157. Defendants object to the conclusion that SD-26 was packed, asserting that "Dr. Duchin testified that she saw only patterns *consistent with* a packing and cracking strategy . . . not that particular districts qualified as packed." *Id.* Response to ¶ 157 (emphasis added). But Dr. Duchin's report nonetheless supports Plaintiff's position that race was the predominant factor. Thus, the question of whether race predominated is a disputed factual issue precluding summary judgment in favor of Defendants.

### iv.    SD-48

Prior to redistricting, Senate District 48 was represented by the candidate of choice for voters of color, Michelle Au. Doc. No. [164], ¶ 115. Two-thirds of that district was moved into SD-07 during the redistricting. Of that population, over 37% were black or latino. *Id.* ¶ 116. The retained population in the resulting SD-48 was less than 20% BHVAP and, therefore, Dr. Duchin concluded that the district is now highly ineffective for those voters. *Id.* ¶¶ 117, 119. Dr. Duchin opined that these racially imbalanced population transfers could not be explained by a desire to improve compactness. *Id.* ¶ 120. She therefore concluded that these facts were evidence that race predominated over traditional redistricting principles in the drawing of SD-48. *Id.* ¶ 121. Defendants object only to this final statement, asserting that Dr. Duchin could not rule out a political goal. *Id.* Response to ¶ 121. Dr. Duchin, however, testified that "it's reasonable to conclude that race

predominates—that race-inflected decision making predominated over" traditional districting principles. Doc. No. [134], at 181:24–182:14. Thus, the question of whether race predominated in the drawing of SD-48 is a disputed factual issue precluding summary judgment in favor of Defendants.

### v.   SD-56

Defendants do not dispute any of the following facts. Dr. Duchin analyzed the core retention and population displacement for this district, which, prior to redistricting, had become a competitive district for black and latino voters. Doc. No. [164], ¶ 130.[25] The benchmark SD-56 was placed almost entirely into the newly enacted SD-14. *Id.* ¶ 131. Dr. Duchin concluded that there was a racial imbalance in the movement of voters into and out of SD-56. *Id.* ¶ 133. *Common Cause* Doc. No. [100-25], at 70. Over 35% of the voters moved out of SD-56 were black or latino, while the populations moved into SD-56 were less than 20% BHVAP. Doc. No. [164], ¶¶ 134–35. *Common Cause* Doc. No. [100-25], at 70. As a result, the enacted SD-56 is no longer competitive for black and latino voters. Doc. No. [164], ¶ 136.

\* \* \* \*

---

[25] Although Dr. Duchin does not define "competitive," we interpret the term to refer to districts that, while not necessarily "effective" or "performing," sometimes allow black and latino voters to elect their candidates of choice. *See, e.g.*, *Common Cause* Doc. No. [100-25], at 70 (noting that the "previous SD 56" "had become competitive over time (with four Republican victories and four Democratic victories across the elections" in the relevant dataset).

Once more, Plaintiffs have pointed to evidence for the challenged districts supporting their position that race was the predominant factor. Thus, the question of whether race predominated is a disputed factual issue precluding summary judgment in favor of Defendants.

### 4.    State House Districts 44, 48, 49, 52, and 104[26]

Only the *Georgia NAACP* Plaintiffs challenge these districts. Dr. Duchin analyzed core retention and population displacement for the districts in the enacted House Plan. *Id.* ¶ 138. Of the Challenged State House Districts, she determined that HD-44, HD-48, HD-49, HD-52, and HD-104 had become competitive over the prior ten years for black and latino voters. *Id.* ¶ 139. Defendants do not dispute that Dr. Duchin concluded racially imbalanced population transfers occurred in those districts. *Id.* Response ¶ 140. The population transfers rendered these districts ineffective for black and latino voters.

---

[26] HD-44 was not identified in the Amended Complaint as one of the Challenged Districts. *See generally* Doc. No. [59]. However, the parties engaged in discovery about this district and Plaintiffs identified it in response to Defendants' motion for summary judgment. Doc. No. [152], at 20. In the Consolidated Pretrial Order, Plaintiffs must include all districts that they intend to challenge at trial consistent with the representations made at the hearing on the Motion for Summary Judgment. Doc. No. [176], at 53–54. *Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1089 (11th Cir. 2016) ("A pretrial order supersedes the pleadings.").

*Id.* ¶ 141. Dr. Duchin opined that the changes were not explained by traditional districting principles. *Id.* ¶ 142. *Common Cause* Doc. No. [100-25], at 71–72.

Defendants object because Dr. Duchin did not state that the districts were drawn "primarily based on race." Doc. No. [164], Response ¶ 142. But Plaintiffs were not required to present conclusive, direct evidence of intentional racial discrimination to survive summary judgment. As with the Congressional and State Senate Districts, Plaintiffs have presented evidence supporting their position that racial considerations predominated in the drawing of the lines for these House Districts. Therefore, whether race predominated is a disputed factual issue precluding summary judgment in favor of Defendants.

### D.    Discriminatory Purpose Claim

The *Georgia NAACP* Plaintiffs assert a claim for discriminatory purpose under the Fourteenth Amendment and Section 2 of the VRA. Doc. No. [59], Count III. Specifically, they contend that the 2021 Maps were adopted—"at least in part"—for the purpose of disadvantaging voters of color. Doc. No. [59], ¶ 339. The parties disagree about how we should evaluate this claim. Defendants contend that Plaintiffs must satisfy the standard set forth in *Miller v. Johnson*, 515 U.S. at 916, which is applicable to Plaintiffs' racial gerrymandering claims. That is, Plaintiffs must show, either through circumstantial or direct evidence, that race was the predominant factor in drawing the legislative lines. Doc. No. [141-1], at

40–42. In contrast, Plaintiffs assert that the standard for evaluating discriminatory purpose claims is set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. at 265–66, that "a discriminatory purpose [was] a motivating factor in the decision." Doc. No. [152], at 37–39. Ultimately, this debate boils down to whether race was the "predominate" factor in drawing district lines or merely a "motivating" factor.

Since we have concluded that the *Georgia NAACP* Plaintiffs presented sufficient evidence under the *Miller* standard to proceed on their racial gerrymandering claims, this question is somewhat academic at this stage. The same evidence is relevant to establish that the Challenged Districts were drawn with the predominant purpose of disadvantaging black and latino voters. As discussed above, Plaintiffs presented evidence sufficient to prevent summary judgment on that point. And, at a minimum, the parties do not dispute that *Arlington Heights*, 429 U.S. at 266–28, is relevant to the extent that it describes evidence germane to demonstrating legislative intent. Doc. No. [141-1], at 41; Doc. No. [152], at 38–39.

We therefore conclude that Defendants are not entitled to summary judgment on the *Georgia NAACP* Plaintiffs' discriminatory purpose claim (Count III).

### E.  Vote Dilution Claim

The *Georgia NAACP* Plaintiffs' second claim is for vote dilution under

Section 2 of the VRA. Doc. No. [59], ¶¶ 320–34. Subsection (a) of Section 2 provides:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

52 U.S.C. § 10301(a). Such a violation is established,

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b).

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court first

interpreted Section 2 after Congress amended the VRA in 1982.[27] Under *Gingles*,

plaintiffs must satisfy three prerequisites to show vote dilution:

> *First*, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be

---

[27] *See Allen v. Milligan,* 143 S. Ct. 1487, 1498–501 (2023), for a detailed history leading to the 1982 amendments.

responsible for minority voters' inability to elect its candidates. **Second**, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. **Third**, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, such as the minority candidate running unopposed — usually to defeat the minority's preferred candidate.

*Id.* at 50–51 (cleaned up) (emphasis added). These prerequisites also apply to single-member districts. *Voinovich*, 507 U.S. at 157–58. The Supreme Court recently reaffirmed this framework in *Allen v. Milligan*, 143 S. Ct. 1487, 1502–04 (2023).

"Finally, a plaintiff who demonstrates the three preconditions must also show, under the 'totality of the circumstances,' that the political process is not 'equally open' to minority voters." *Milligan*, 143 S. Ct. at 1503 (quoting *Gingles*, 478 U.S. at 45–46). As part of the inquiry into the totality of the circumstances, courts should consider evidence related to the factors identified in the Senate Report that accompanied the 1982 VRA amendments. *Gingles*, 478 U.S. at 44–45.[28] *Gingles* thus

---

[28] Broadly, these Senate Factors are: (1) the extent of any history of official discrimination; (2) the extent to which voting in the elections of the State is racially polarized; (3) the extent to which the State has used voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) whether members of the minority group have been denied access to any candidate slating process; (5) the extent to which members of the minority group in the State bear the effects of discrimination; (6) whether

*(continued on next page)*

requires "a flexible, fact-intensive inquiry into whether an electoral mechanism results in the dilution of minority votes[.]" *Brooks v. Miller*, 158 F.3d 1230, 1239 (11th Cir. 1998).

### 1.    The *Gingles* Prerequisites

Defendants contend that Plaintiffs failed to satisfy the *Gingles* prerequisites. *See generally* Doc. No. [141-1], at 22–37. We address each factor in turn.

### i.    First *Gingles* Prerequisite

Under the first *Gingles* prerequisite, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. *See also Wright v. Sumter Cnty. Bd. of Elecs. & Registration*, 979 F.3d 1282, 1303 (11th Cir. 2020) (citing *Gingles*, 478 U.S. at 501). It must have the *potential* to elect its representative of choice in a single-member district. *Milligan*, 143 S. Ct. at 1503 (citing *Growe v. Emison*, 507 U.S. 25, 40 (1993)); *accord Wright*, 979 F.3d at 1303. In addition to geography and compactness, in the Eleventh Circuit, "[a] district court must

---

political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the State's use of the challenged voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous. *Solomon v. Liberty Cnty.*, 899 F.2d 1012, 1015–16 (11th Cir. 1990) (Kravitch, J., concurring).

determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system." *Nipper v. Smith*, 39 F.3d 1494, 1530–31 (11th Cir. 1994) (en banc).[29]

Here, the parties dispute whether black and latino voters can be aggregated to create a sufficiently large minority group in a single-member district. They also disagree about whether Plaintiffs' illustrative districts sufficiently respected traditional districting principles.

### *a.* **Coalitions**

Defendants argue that Plaintiffs have failed to satisfy the first *Gingles* prerequisite because some of their illustrative plans rely on minority coalition districts, comprised of a majority of black and latino voters in combination. Defendants contend that Section 2 does not require the creation of such coalition districts. Doc. No. [141-1], at 24–25. Plaintiffs counter that two different minority groups can be treated as a single "minority" for creating a majority-minority district that satisfies the first *Gingles* prerequisite. Doc. No. [152], at 25 (relying on *Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990)). Whether such coalition districts can be an adequate remedy to a

---

[29]   While *Nipper* was a fractured, en banc decision, this portion of the lead opinion was joined by five of the eight judges.

Section 2 violation is something of an open question. A review of some of the relevant case law is therefore appropriate.

In *Concerned Citizens of Hardee County*, the Eleventh Circuit stated that such a coalition district could be a "single section 2 minority if they can establish that they behave in a politically cohesive manner." 906 F.2d at 526. There, however, the court noted that the plaintiffs had not shown such cohesion. *Id.* at 526–27. What is more, "[t]he class [did] not challenge the district court's finding" on the cohesiveness point, but instead pivoted on appeal to the argument that "black voters alone in Hardee County [were] entitled to relief because they (1) constitute[d] a 'functional majority' in the proposed single-member district, (2) [were] politically cohesive and (3) [voting was] racially polarized." *Id.* at 526. Indeed, the coalition-district language came in the course of explaining the *Gingles* prerequisites, not the analysis section. *See id.* at 526. In the end, the holding that day was that it was appropriate to "decline to consider the class's new theory of recovery." *Id.* at 527. Thus, the court's assertion about coalition districts was dicta. *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 762 (11th Cir. 2010) ("[w]hatever judicial opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced.").

Defendants heavily rely on *Bartlett v. Strickland*, 556 U.S. 1, 13–14 (2009), to argue that no circuit court has held that Section 2 requires the creation of coalition

districts. Doc. [141], at 24–25. At most, however, *Bartlett* simply noted that fact: the three-judge plurality made clear it was not addressing "coalition-district claims in which two minority groups form a coalition to elect the candidate of the coalition's choice."[30] *Bartlett,* 556 U.S. at 13–14. Rather, the plurality's opinion focused on whether Section 2 required the creation of crossover districts, in which members of the majority "crossover" to vote with a single minority group such that the minority group's candidate of choice can be elected. *See generally id.* at 13–20.

And, although Defendants claim that *Perry v. Perez*, 565 U.S. 388, 399 (2012) (per curiam), prohibits courts from creating minority coalition districts when drawing remedial districting plans, Doc. No. [141-1], at 25 n.9, that is an overstatement. The Court explained that the district court's approach in drawing other districts was "unclear"; it was "ambiguous" whether the district court had set out to draw a majority minority district—"some portions [of its order] suggest[ed] that the court deliberately designed such a district, other parts suggest[ed] that it drew the district solely as a response to population growth in the area." 565 U.S. at 398. The Court therefore concluded that, "[*i*]f the [district court] did set out to create a minority coalition district, rather than drawing a

---

[30]   Two justices concurred in the judgment only.

district that simply reflected population growth, it had no basis for doing so." *Id.* at 399 (emphasis added).

For immediate purposes, though, we assume without deciding that minority coalition districts cannot be used to propose a viable remedy for an alleged Section 2 violation. Defendants have not pointed to any districts for which Plaintiffs failed to propose at least one illustrative district in which the black voting age population (BVAP) is at least 50 percent. Defendants argue only that "Plaintiffs have not provided evidence that the first prong of *Gingles* is met for any districts where they are relying on a coalition of voters to establish a remedy." Doc. No. [141-1], at 25. Although Defendants did not identify any such districts, Plaintiffs concede that "a few" illustrative districts were formed using coalitions. Doc. No. [152], at 25; *see also* Doc. No. [152-1], ¶ 78 & Response.

As we read Dr. Duchin's expert report, she has drawn alternative plans in which the number of majority-black districts exceeds that in the enacted plans. *See, e.g.*, Doc. No. [164], ¶¶ 189–92, 196 & *Common Cause* Doc. No. [100-25], at 26 (four majority-Black Congressional Districts drawn by Dr. Duchin compared to two in the enacted plans); Doc. No. [164], ¶¶ 201–03, 205–18[31] & *Common Cause* Doc. No.

---

[31] We overrule Defendants' objections to Paragraphs 210 through 213 that these facts are not supported by the citations provided by Plaintiffs. These paragraphs incorrectly describe the document being cited as the report of

*(continued on next page)*

[100-25], at 27–32 (showing proposed Senate Districts with more majority-black districts than enacted plans); Doc. No. [164], ¶¶ 220–41 & *Common Cause* Doc. No. [100-25], at 33–39 (showing proposed House Districts with more majority-black districts than enacted plans). Thus, even if a minority-coalition district cannot serve as a viable remedy, there is sufficient evidence at this stage that black voters can constitute a majority in the remedial districts Plaintiffs have proposed and that it is possible to draw more such districts than were included in the enacted plans.

### *b.*   Traditional Districting Principles

Defendants also assert that Plaintiffs failed to propose maps that can serve as a viable remedy because race predominated in their drawing. Doc. No. [141-1], at 22–24. According to Defendants, Dr. Duchin's illustrative maps are racial gerrymanders that do not "wrestle with traditional redistricting principles beyond the ones she can represent numerically." *Id.* at 23. Defendants did not identify what those "non-numeric" factors are. And accepting Defendants' argument would require us to interpret disputed facts in *their* favor. *See, e.g.*, Doc. No. [152-1], ¶¶ 73–74 & Responses; Doc. No. [164], ¶ 243 & Response.

---

Dr. Morgan (Defendants' expert) rather than of Dr. Duchin; the page numbers and citations to various tables in Paragraphs 210–13, however, correspond to Dr. Duchin's report. Accordingly, a simple typographical error is not a basis to disregard facts that are otherwise undisputed.

The first *Gingles* prerequisite requires some consideration of race because Section 2 plaintiffs must demonstrate that the racial minority group can constitute a majority in the proposed remedial district. *Milligan*, 143 S. Ct. at 1503; *see also id.* at 1510–12 (plurality opinion) (rejecting the defendants' argument that Section 2 prohibits a plaintiff's illustrative plan from being "based" on race); *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998) ("[O]ur precedents *require* plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." (emphasis in original)). But race cannot predominate. *Milligan*, 143 S. Ct. at 1510–12 (plurality opinion) (indicating that illustrative maps can employ "racial consciousness" but not "racial predominance").

So, while considering race when drawing her illustrative maps, Dr. Duchin's report makes clear that she "simultaneously ensur[ed] that traditional districting principles [were] highly respected." *Common Cause* Doc. No. [100-25], at 47. Dr. Duchin's maps are contiguous and relatively compact. Doc. No. [164], ¶¶ 247, 249. There is evidence that her maps respected political subdivisions, such as counties, cities, and precincts—although Defendants dispute the extent to which Dr. Duchin considered precincts. *Id.* ¶¶ 253–54 & Responses. The parties dispute the evidence concerning Dr. Duchin's consideration of other traditional districting principles. *See generally id.* ¶¶ 245–46, 248, 250–52, 255, 258. The role race

played in her creation of these illustrative maps is thus highly disputed. At this stage, we will not conclude as a matter of law that they were improper racial gerrymanders.

Whether Dr. Duchin's maps are viable remedies depends both on resolution of these disputed facts, her credibility, and the totality of the circumstances. None of that is properly considered in ruling on Defendants' summary judgment motion. *Anderson*, 477 U.S. at 255; *Graham*, 193 F.3d at 1282.

### ii.   Second and Third *Gingles* Prerequisites

The second *Gingles* prerequisite requires the minority group to "show that it is politically cohesive." 478 U.S. at 50. The purpose is to "show[ ] that a representative of [the minority group's] choice would in fact be elected." *Milligan*, 143 S. Ct. at 1503. The third *Gingles* prerequisite requires Plaintiffs to show that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed— usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (citations omitted).[32]

> [T]he question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices. A showing that a significant number of minority group members usually vote for the same

---

[32]   In *Gingles*, the Supreme Court treated the terms "racial bloc" and "racial polarization" as interchangeable. 478 U.S. at 53 n.21.

> candidates is one way of proving the political
> cohesiveness necessary to a vote dilution claim, and,
> consequently, establishes minority bloc voting within the
> context of § 2. And, in general, a white bloc vote that
> normally will defeat the combined strength of minority
> support plus white "crossover" votes rises to the level of
> legally significant white bloc voting.

*Id.* at 56 (citations omitted).

Here, Defendants contend that, even if a minority group votes in a cohesive manner and the majority votes as a bloc, Plaintiffs cannot meet their Section 2 burden because these factors are attributable to partisan politics, not race. Doc. No. [141-1], at 26–37. Put simply, Defendants argue that if black voters cannot elect their preferred candidates because they overwhelmingly vote for Democrats and the majority of white Georgians vote for Republicans, there is no racial bloc voting. *See, e.g.*, *id.* at 31–33. This position is not consistent with the controlling case law.

The *Gingles* plurality opinion concluded that, "[f]or purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent. ***It means simply that the race of voters correlates with the selection of a certain candidate or candidates***; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates." 478 U.S. at 62 (emphasis added). Justice O'Connor's concurrence (in which two other justices joined) agreed that defendants could not rebut statistical evidence of minority

political cohesion with evidence that "divergent racial voting patterns" could be explained "by causes other than race." *Id.* at 100.

Thus, seven justices in *Gingles* agreed that proof of the second and third prerequisites does not require showing the cause(s) of racial polarization. Five justices in *Milligan* reaffirmed the *Gingles* framework. 143 S. Ct. at 1502–03 (the second and third prerequisites are simply to "show[ ] that a representative of [the minority group's] choice would in fact be elected" and that "'the challenged districting thwarts a distinctive minority vote'" at least plausibly on account of race (quoting *Growe,* 507 U.S. at 40)). *See also Chisom v. Roemer*, 501 U.S. 380, 404 (1991) ("Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone."); *Davis*, 139 F.3d 1414 (not requiring racial bias to be the cause of racial bloc voting to meet the *Gingles* factors).

We do not view these prerequisites as requiring evidence that race is the cause of the cohesion or bloc voting. Rather, the conclusions to be drawn and weight to be afforded such evidence (or lack thereof) are part of the totality of the circumstances. *Milligan* itself suggests that the causes of polarization are not relevant to a determination about whether bloc voting along racial lines satisfies *Gingles*. 143 S. Ct. at 1503 (explaining the "purpose" that each "*Gingles* precondition serves"). *See also id.* at 1506 (on review of a preliminary injunction, declining to disturb three-judge district court's "careful factual findings" that, *inter*

*alia*, black voters were politically cohesive when they supported their candidates of choice with over 90% of the vote on average).

Defendants also argue that interpreting these prerequisites in this manner somehow runs afoul of the Constitution because the Fifteenth Amendment itself prohibits only purposeful discrimination. Doc. No. [141-1], at 33–35. This contention is foreclosed by *Gingles* and *Milligan*:

> [W]e have reiterated that § 2 turns on the presence of discriminatory effects, not discriminatory intent. And we have explained that "[i]t is patently clear that Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination." Individuals thus lack an equal opportunity to participate in the political process when a State's electoral structure operates in a manner that "minimize[s] or cancel[s] out the[ir] voting strength."

*Milligan*, 143 S. Ct. at 1507 (quoting *Gingles*, 478 U. S. at 71 n.34 & 47; other citations omitted). Contrary to Defendants' suggestion,[33] the *Gingles* prerequisites are simply that—the baseline Plaintiffs must meet to proceed with Section 2 claims. The prerequisites—as that description implies—are not alone sufficient to prove a violation.

---

[33] "If Section 2 was interpreted in a way that plaintiffs can establish racial bloc voting merely by showing that minorities and majorities vote differently, it would not fit within those constitutional bounds." Doc. No. [141-1], at 31 (Defendants' summary judgment brief).

Moreover, to the extent Defendants assert that Plaintiffs' evidence of cohesion and racial bloc voting is really only indicative of partisan polarization because Plaintiffs' expert did not review primary election results, Doc. No. [141-1], at 35–37, this is a factual dispute unsuited for resolution at summary judgment. Plaintiffs' expert, Dr. Benjamin Schneer, analyzed whether "members of a minority group of interest appear to be cohesive in their electoral support for a candidate of choice." Doc. No. [164], ¶ 260. He concluded that black and latino voters in statewide Georgia elections have "had a clear candidate of choice in each election" since 2012 and that "large majorities of these voters support[ed] the same candidate in each election and vot[ed] cohesively." *Id.* ¶¶ 261–62. Defendants' own expert did not dispute those findings, *id.* ¶ 263, and Defendants do not dispute these facts. Dr. Schneer also concluded that white voters oppose the candidates of choice of black and latino voters. *Id.* ¶¶ 303, 308.[34] He opined that studying primary elections was not "necessary or sufficient for drawing conclusions about racially polarized voting in Georgia general elections" and that it was sufficient here to "examine behavior in general elections in order to determine the extent of racially polarized voting." *Id.* ¶¶ 304–06.

---

[34] We overrule Defendants' objections to Paragraphs 303 and 308 and similar objections based on any incorrect citations obviously intended to reference Dr. Schneer's report.

Plaintiffs have thus satisfied the second and third *Gingles* prerequisites for purposes of summary judgment.

### 2. Proportionality

With regard to Plaintiffs' Section 2 challenge to the drawing of congressional districts, Defendants argue that the claim fails as a matter of law because the number of districts in the 2021 Maps in which black-preferred candidates can succeed is roughly proportional to the overall percentage of black voters in the State of Georgia. Doc. No. [141-1], at 37–40. Defendants, however, overstate the role of proportionality at this stage.

In *Johnson v. DeGrandy*, the Supreme Court expressly refused to adopt the interpretation of Section 2 that Defendants now advocate — that "as a matter of law no dilution occurs whenever the percentage of single-member districts in which minority voters form an effective majority mirrors the minority voters' percentage of the relevant population." 512 U.S. 997, 1017 (1994); *see also id.* at 1017–19.

Further, the *DeGrandy* court made clear that a Section 2 violation can occur even when proportionality exists. *Id.* at 1015 ("We would agree that where a State has split (or lumped) minority neighborhoods that would have been grouped into a single district (or spread among several) if the State had employed the same line-drawing standards in minority neighborhoods as it used elsewhere in the jurisdiction, the inconsistent treatment might be significant evidence of a § 2

violation, even in the face of proportionality."). Even assuming such proportionality here—something the parties dispute—it would be inappropriate for us to conclude as a matter of law that it bars Plaintiffs' Section 2 claim.

## IV.   Conclusion

The *Georgia NAACP* Defendants' motion for summary judgment, Case No. 1:21-cv-5338, Doc. No. [141], is **DENIED**. The *Common Cause* Defendants' motion for summary judgment, Case No. 1:22-cv-0090, Doc. No. [92], is **DENIED**.

A bench trial of these cases is scheduled to begin on November 13, 2023. An Order setting pretrial deadlines shall issue separately.

**IT IS SO ORDERED** this _26th_ day of October, 2023.

**BRANCH, Circuit Judge, concurring in part and dissenting in part:**

I concur with all but Section III.B. of the panel's opinion. The State of Georgia argues that the claims against it under Section 2 of the Voting Rights Act (the "VRA") must be dismissed because Section 2 does not abrogate sovereign immunity.[1] As I have explained before, I agree. *See Ala. State Conf. of the NAACP v. Alabama*, 949 F.3d 647, 656 (11th Cir. 2020) (Branch, J., dissenting) (hereinafter "*Alabama NAACP*"). Accordingly, I respectfully dissent as to Section III.B.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[T]he Eleventh Amendment's ultimate guarantee is that nonconsenting states may not be sued by private individuals in federal court*." See McClendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001). "The Amendment not only bars suits against a state by citizens of another state, but also applies equally to suits against a state initiated by that state's own citizens." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) (citing

---

[1]  To be clear, the State's motion relates only to the State itself as the State, not the defendant-officials in their official capacities.

*Edelman v. Jordan*, 415 U.S. 651, 663 (1974); *Hans v. Louisiana*, 134 U.S. 1, 13–15 (1890)).

Congress may abrogate that immunity, but only if certain requirements are met. The Supreme Court's two-part abrogation test paves the path for our analysis. First, we ask "whether Congress unequivocally expressed its intent to abrogate [the states' sovereign] immunity[.]" *Kimel v. Florida Board of Regents*, 528 U.S. 62, 73 (2000). Second, if it did, we ask "whether Congress acted pursuant to a valid grant of constitutional authority." *Id.* In this case, our analysis begins and ends at the first step of the analysis. The Supreme Court has explained that "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention *unmistakably clear* in the language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (emphasis added)); *see also Cassady v. Hall*, 892 F.3d 1150, 1153 (11th Cir. 2018) ("[A] federal statute will not be read to abrogate a state's sovereign immunity unless Congress has made its intention to do so 'unmistakably clear' in the language of the statute.").

To put it simply, Section 2 does not include any language that demonstrates "unmistakably clear" congressional intent to abrogate state sovereign immunity. *Dellmuth*, 491 U.S. at 228. Section 2 provides as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided by subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301. Section 2 "clearly contains no express reference to either the Eleventh Amendment or state sovereign immunity"—and it "contains no language whatsoever" that "either explicitly or by implication . . . allows private plaintiffs to sue a State in federal court." *Alabama NAACP,* 949 F.3d at 657 (Branch, J., dissenting). The mere references to states in the prohibitions of the VRA, *see* 52 U.S.C. § 10301, cannot suffice because

> the Supreme Court rejected a similar argument in *Dellmuth*, holding that although the statute in question contained "frequent reference to the States" and it could be inferred that the States were intended to be subject to liability, "such a permissible inference" was not "the unequivocal declaration which . . . is necessary before [a court] will determine that Congress intended to exercise its powers of abrogation."

*Alabama NAACP,* 949 F.3d at 658 (Branch, J., dissenting) (quoting 491 U.S. at 232). "Because 'evidence of congressional intent must be both *unequivocal and textual*' in order to support a finding of abrogation, the absence of such language is fatal." *Id.* (quoting *Dellmuth*, 491 U.S. at 230).[2]

In *Alabama NAACP,* the Eleventh Circuit held that Section 2 of the VRA abrogates state sovereign immunity. 949 F.3d at 649. As the panel notes, I dissented from that decision. *Id.* at 655–62 (Branch, J., dissenting). However, that majority opinion has since been vacated by the Supreme Court, *Alabama v. Ala. State Conf. of the NAACP*, 141 S. Ct. 2618 (May 17, 2021) (citing *United States v. Munsingwear,*

---

[2]   I also note that other courts have reached the opposite conclusion that the majority in *Alabama NAACP* and the panel reaches here today, namely that Section 2 of the VRA did not abrogate States' (or governors') sovereign immunity pursuant to the Eleventh Amendment. *See Simpson v. Hutchinson*, No. 4:22-cv-213, 2022 WL 14068633, at *7 (E.D. Ark. Oct. 24, 2022) (three-judge panel); *Christian Ministerial Alli. v. Arkansas*, No. 4:19-cv-402, 2020 WL 12968240, at *4–6 (E.D. Ark. Feb. 21, 2020); *N.C. State Conf. of NAACP v. Cooper*, 397 F. Supp. 3d 786, 800 (M.D.N.C. 2019).

*Inc.*, 340 U.S. 36 (1950)), and the Eleventh Circuit has not addressed the issue again in any subsequent decision. Still, the panel chooses to rely on *Alabama NAACP* as persuasive authority. While the Eleventh Circuit has made clear that a vacated opinion is "officially gone," has "no legal effect whatever," and is "void," and thus the statements made therein have no "remaining force," *United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002), I recognize that the Eleventh Circuit has also stated that vacated opinions can be persuasive authority. *See Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1218 (11th Cir. 2009) ("We are free to give statements in a vacated opinion persuasive value if we think they deserve it."). I, however, do not find the majority opinion of *Alabama NAACP* persuasive, and I remain steadfast that Congress did not clearly abrogate state sovereign immunity in Section 2 of the VRA.

Relying on the now-vacated majority opinion in *Alabama NAACP,* the panel, and the plaintiffs, contend that the evidence of abrogation meets the "unmistakable" threshold. The majority in *Alabama NAACP* concluded that "[t]he VRA, as amended, clearly expresses an intent to allow private parties to sue the States," looking to Sections 2 and 3 "read together." *Alabama NAACP*, 949 F.3d at 652. The panel here is persuaded that, because Sections 2 and 3 "impose[] direct liability on States for discrimination in voting and explicitly provides remedies to

private parties," Congress must have "intend[ed] for private parties to be able to sue States."[3]

But the panel's analysis is flawed for the same reasons that the *Alabama NAACP* majority's was. As I said in my *Alabama NAACP* dissent: "[N]either Section 2 or Section 3 on their own, nor combined, is unmistakably clear in its language that Congress intended to abrogate States' sovereign immunity." *Alabama NAACP*, 949 F.3d at 659 (Branch, J., dissenting). The text of Section 2 does not make clear that Congress abrogated state sovereign immunity for the reasons already discussed. *See id.* at 658. Nor does the text of Section 3 make abrogation clear—at most, it speaks generally of the right of "aggrieved persons" to sue in federal court:

---

[3]  The panel also relies on *United States v. Marengo County Commission*, 731 F.2d 1546 (11th Cir. 1984), contending that it "made clear that '[t]he Civil War Amendments overrode state autonomy apparently embodied in the Tenth and Eleventh Amendments.'" For that reason, the panel says, "[t]he Fourteenth and Fifteenth Amendments . . . provided direct authority for Congress, in amending Section 2, to abrogate any sovereign immunity to which States might otherwise have been entitled under the Eleventh Amendment." *Id.* To be clear: the panel's contention on this point goes to the *second* prong of the abrogation analysis—whether Congress acted pursuant to a valid grant of constitutional authority. We need not reach that prong because the text of § 2 does not abrogate state sovereign immunity in the first place.

## (a) Authorization by court for appointment of Federal observers

Whenever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court shall authorize the appointment of Federal observers by the Director of the Office of Personnel Management in accordance with section 1973d of Title 42 to serve for such period of time and for such political subdivisions as the court shall determine is appropriate to enforce the voting guarantees of the fourteenth or fifteenth amendment (1) as part of any interlocutory order if the court determines that the appointment of such observers is necessary to enforce such voting guarantees or (2) as part of any final judgment if the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred in such State or subdivision: Provided, That the court need not authorize the appointment of observers if any incidents of denial or abridgement of the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title (1) have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future.

## (b) Suspension of use of tests and devices which deny or abridge the right to vote

If in a proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that a test or device has been used for the purpose or with the effect of denying or abridging the right of any citizen of the United States to vote on account of race or

color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title, it shall suspend the use of tests and devices in such State or political subdivisions as the court shall determine is appropriate and for such period as it deems necessary.

**(c) Retention of jurisdiction to prevent commencement of new devices to deny or abridge the right to vote**

If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such

> qualification,   prerequisite,   standard,   practice,   or
> procedure.

52 U.S.C. § 10302 (footnote indicating repeal of sections relating to examiners

omitted). Yet, as the Supreme Court has held, "[a] general authorization for suit in

federal court is not the kind of unequivocal statutory language sufficient to

abrogate the Eleventh Amendment." *Dellmuth*, 491 U.S. at 231 (1989) (quoting

*Atascadero*, 473 U.S. at 246). Even Section 3's reference to proceedings instituted "*in

any State or political subdivision*" does not make the matter unmistakable as to

"aggrieved persons," because there is a meaningful distinction between

proceedings "in" a state and proceedings "against" that State. *Alabama NAACP*,

949 F.3d at 661 (Branch, J., dissenting) (comparing the definitions of "in" and

"against"). Sections 2 and 3 do not point toward abrogation of sovereign immunity

on their own, nor do they together amount to an unmistakable abrogation of State

sovereign immunity.[4]

---

[4]   I note, as I did in my *Alabama NAACP* dissent, that the Fifth and Sixth Circuits
disagree. *See Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999); *Mixon. OCA-Greater
Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) (relying on the Sixth Circuit's
decision without further analysis). My disagreement with the analysis of those
cases stands: "[w]hile the *Mixon* court accurately quoted the statute when it
says that '[t]he language of Section 2 . . . specifically prohibits 'any State or
political subdivision' from discriminating against voters on the basis of race,'
nothing in those five words—'any State or political subdivision'—abrogates

*(continued on next page)*

In sum, the existing abrogation framework from the Supreme Court compels the conclusion that the State of Georgia is not a proper party to this action and should be dismissed. I thus respectfully dissent from Section III.B. of the panel's opinion. I join and fully concur with the remainder of the panel's opinion denying Defendants' Motions for Summary Judgment.

---

state sovereign immunity such that private individuals can sue the State in federal court." *Alabama NAACP,* 949 F.3d at 662 (Branch, J., dissenting) (citation omitted).