IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,<br><br>Defendant. | Case No.<br>1:21-cv-5337-SCJ |
| COAKLEY PENDERGRASS *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, *et al.*,<br><br>Defendants. | Case No.<br>1:21-cv-5339-SCJ |
| ANNIE LOIS GRANT *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, *et al.*,<br><br>Defendants. | Case No.<br>1:22-cv-122-SCJ |

GEORGIA STATE CONFERENCE OF
THE NAACP, *et al.*,

        Plaintiffs,

        v.

STATE OF GEORGIA, *et al.*,

        Defendants.

Case No.
1:21-cv-5338-ELB-SCJ-SDG
Three-Judge Court

**BRIEF OF THE UNITED STATES ON THE CONSTITUTIONALITY OF
SECTION 2 OF THE VOTING RIGHTS ACT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT ..................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ..............................................2

STATUTORY BACKGROUND.............................................................5

ARGUMENT ...........................................................................................6

I.    The Canon of Constitutional Avoidance Is Not a Vehicle to Challenge Congress's Authority to Enact Section 2 of the Voting Rights Act. ............7

II.   Supreme Court Precedent Forecloses Defendants' Constitutional Arguments. ...............................................................................11

    A.    The Fifteenth Amendment Permits Race-Based Redistricting as a Remedy for Section 2 Violations...........................................12

    B.    There Are No Constitutional Concerns That Require Revisiting the *Gingles* Preconditions. .........................................................18

CONCLUSION ....................................................................................23

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Milligan*, 599 U.S. 1 (2023)................................................................. passim

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger* (*Alpha Phi Alpha I*), No. 1:21-cv-5337, 2023 WL 5674599 (N.D. Ga. July 17, 2023) ...................... 4, 15, 19, 21

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger* (*Alpha Phi Alpha II*), No. 1:21-cv-05337, 2023 WL 7037537 (N.D. Ga. Oct. 26, 2023) ............................. passim

*B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138 (2015). ........................10

*Clark v. Martinez*, 543 U.S. 371 (2005) ......................................................... 8, 10, 11

*Ga. State Conf. of the NAACP v. Georgia*, No. 1:21-cv-5338, 2023 WL 7093025 (N.D. Ga. Oct. 26, 2023)................................................................. passim

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ..........................................................8

*Johnson v. Hamrick*, 196 F.3d 1216 (11th Cir. 1999) ..............................................14

*Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984) .........................13

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ......................................... 1, 16, 17, 18

*Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218 (11th Cir. 2000) (en banc)................................................................................................ 10, 22

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ..............................................18

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)....................................................................................18

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .................................................. 1, 5, 6, 9

*United States v. Apel*, 571 U.S. 359 (2014) ..................................................... 10, 11

*United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546 (11th Cir. 1984)..... 14, 23

## Statutes

28 U.S.C. § 2284 ............................................................................................2

28 U.S.C. § 2403 ............................................................................................2

52 U.S.C. § 10301 .............................................................................. passim

## Rules

Federal Rule of Civil Procedure 5.1(a) ......................................................3

## Other Authorities

Ellen D. Katz et al., *The Evolution of Section 2: Numbers and Trends*, Fig. 7

(2022), https://perma.cc/MH6P-XMZR ............................................22

Heather K. Gerken, *A Third Way for the Voting Rights Act*, 106 Colum. L. Rev.

708 (2006) ..........................................................................................17

## PRELIMINARY STATEMENT

The United States intervened in these actions to defend the constitutionality of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  Section 2 is a "permanent, nationwide ban on racial discrimination in voting."  *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013).  The Supreme Court has repeatedly upheld the Section 2 prohibition on any state-imposed "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," 52 U.S.C. § 10301(a), as an appropriate exercise of Congress's remedial powers under the Fourteenth and Fifteenth Amendments. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 41 (2023).  Courts can apply Section 2 to redistricting claims consistent with the Fourteenth and Fifteenth Amendments, under the well-settled and recently reaffirmed test set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986).

The United States takes no position on any factual dispute in these matters nor on any legal question other than the constitutionality and appropriate application of Section 2.  Furthermore, the United States' intervention in defense of the constitutionality of Section 2 need not disturb the single-judge Court's post-trial opinion or judgment in the *Alpha Phi Alpha* cases or the three-judge Court's summary judgment opinion and order in *Georgia NAACP*.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In these four cases, Plaintiffs challenge various aspects of Georgia's congressional and statewide redistricting maps as impermissibly diluting minority voting strength.  Three cases—*Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. filed Dec. 30, 2021), *Grant v. Raffensperger*, No. 1:22-cv-122 (N.D. Ga. filed Jan. 11, 2022), and *Pendergrass* v. *Raffensperger*, No. 1:21-cv-5339 (N.D. Ga. filed Dec. 30, 2021) (collectively the *Alpha Phi Alpha* cases)—raise claims only under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and are consolidated for litigation before a single-judge district court. The fourth case, *Georgia State Conference of the NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. filed Dec. 30, 2021), also involves claims under Section 2, as well as claims of unconstitutional racial gerrymandering and intentional vote dilution in violation of the Fourteenth and Fifteenth Amendments.  That case is before a three-judge district court convened pursuant to 28 U.S.C. § 2284(a).[1]

In both the *Alpha Phi Alpha* cases and *Georgia NAACP*, the Courts have now issued orders pursuant to 28 U.S.C. § 2403(a) certifying that the "constitutionality of Section 2 of the Voting Rights Act of 1965, 52 U.S.C.

---

[1] Another case raising only racial gerrymandering claims under the Fourteenth and Fifteenth Amendments is also before the three-judge court.  *See Common Cause v. Raffensperger*, No. 1:22-cv-90 (N.D. Ga. filed Jan. 7, 2022).  The United States has not intervened in that case, which does not raise issues related to Section 2.

§ 10301(b)[,] has been called into question" and requesting the Attorney General to submit his position on intervention within 60 days. Order, *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Oct. 4, 2023), ECF No. 319; Order, *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Oct. 4, 2023), ECF No. 181. Defendants have since filed notices of constitutional questions pursuant to Federal Rule of Civil Procedure 5.1(a). *See* Notice, *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Oct. 10, 2023), ECF No. 322; Notice, *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Oct. 10, 2023), ECF No. 184.

After certification of the constitutional challenge to the Attorney General in the *Alpha Phi Alpha* cases, but before the period for intervention elapsed, the Court issued a post-trial opinion, order, and judgment granting Plaintiffs relief in part. *See Alpha Phi Alpha Fraternity Inc. v. Raffensperger* (*Alpha Phi Alpha II*), No. 1:21-cv-05337, 2023 WL 7037537 (N.D. Ga. Oct. 26, 2023). The Court rejected Defendants' arguments that finding them liable for a Section 2 violation would trigger constitutional concerns, explaining that "Defendants offered no argument or support for this assertion through motion practice or at trial" and that the Supreme Court's recent decision in *Milligan* foreclosed a facial challenge to Section 2. *Alpha Phi Alpha II*, 2023 WL 7037537, at *142 (citing *Milligan*, 599 U.S. at 41). The Court also explained that Plaintiffs were not required to prove or disprove

3

potential causes of racially polarized voting to meet preconditions to Section 2

liability under *Gingles*, *id.* at *55, concluding that explanations for polarization

were relevant only under the totality of the circumstances inquiry, *see, e.g.*, *id.* at

*22, *65.[2]

    *Georgia NAACP* has proceeded past summary judgment.  *See Ga. State*

*Conf. of the NAACP v. Georgia*, No. 1:21-cv-5338, 2023 WL 7093025 (N.D. Ga.

Oct. 26, 2023).  Relevant here, the Court rejected Defendants' argument on

summary judgment that Plaintiffs must prove that racially polarized voting is

caused by racial animus (rather than partisanship) to meet the *Gingles*

preconditions, as well as Defendants' contention that a contrary construction of

*Gingles* "somehow runs afoul of the Constitution."  *Id.* at 19-20 & n.33.  Trial was

scheduled to begin on November 13, 2023, *see* Scheduling Order, *Ga. State Conf.*

*of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Mar. 20, 2023), ECF No. 126,

but on November 1, 2023, the Court stayed all deadlines and continued trial

pending the resolution of any appeal in the *Alpha Phi Alpha* cases, *see Ga. State*

---

[2] These conclusions were consistent with the Court's prior order denying cross-
motions for summary judgment, which rejected (among other arguments)
Defendants' contentions that Section 2 is unconstitutional if a plaintiff is not
required to prove racial causation when establishing racial bloc voting as part of
the *Gingles* preconditions and that there are temporal limitations to the longevity of
Section 2.  *See, e.g.*, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger* (*Alpha Phi
Alpha I*), No. 1:21-cv-5337, 2023 WL 5674599, at *1, *19-20 (N.D. Ga. July 17,
2023).

*Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Nov. 1, 2023), ECF No. 198.

On November 3, 2023, the United States intervened in these four cases to defend the constitutionality of Section 2.  This consolidated brief follows.

## STATUTORY BACKGROUND

Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits voting practices and procedures that discriminate on the basis of race, color, or membership in a language minority group.  "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  *Gingles*, 478 U.S. at 47.  Section 2 prohibits vote dilution, including the use of districting schemes "to minimize or cancel out the voting strength of racial [minorities in] the voting population."  *Id.* (alteration in original) (quotation mark omitted); *see also Milligan*, 599 U.S. at 40-41.

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court set out the requirements for a vote dilution claim, including three preconditions to liability.  *See Milligan*, 599 U.S. at 17-18.  "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."  *Gingles*, 478 U.S. at 50.  "Second, the

minority group must be able to show that it is politically cohesive." *Id.* at 51.

"Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Id.* (citations omitted).  If plaintiffs establish all three preconditions, consideration proceeds to a totality of the circumstances analysis. *See id.* at 36-37 (enumerating relevant factors); *see also Milligan*, 599 U.S. at 18-19 (explaining and reaffirming *Gingles* procedure).

## ARGUMENT

It is well established that Section 2 of the Voting Rights Act is a permissible exercise of Congress's Fourteenth and Fifteenth Amendment enforcement powers. In their notices identifying constitutional questions, Defendants do not facially challenge Section 2's constitutionality.  Instead, they argue that the Courts either must interpret Section 2 in ways that conflict with the Supreme Court's recent ruling in *Milligan* and find against liability as a matter of constitutional avoidance or must find Section 2 unconstitutional as applied to the facts of these cases. Defendants' arguments are neither novel nor correct.

To begin, Defendants misapply the canon of constitutional avoidance, which is not a means to relitigate a settled statutory construction.  Their arguments may be rejected on that basis alone.  And even if Defendants' arguments were properly

6

presented, they are indistinguishable from arguments rejected in *Milligan*.  There, the Supreme Court reaffirmed the constitutionality of race-based remedies for Section 2 violations and reiterated that the second and third *Gingles* preconditions do not require proof of racial causation.  Accordingly, Defendants' constitutional arguments pose no obstacle to liability or an appropriate remedy.[3]

## I.    The Canon of Constitutional Avoidance Is Not a Vehicle to Challenge Congress's Authority to Enact Section 2 of the Voting Rights Act.

Courts may resolve Section 2 vote dilution claims using the well-established *Gingles* test, a standard "repeatedly applied" by federal courts "for the last four decades."  *Milligan*, 599 U.S. at 41 (citing *Gingles*, 489 U.S. at 30).  Despite this clear and consistent standard, Defendants contend in the *Alpha Phi Alpha* cases

---

[3] Defendants have also argued in both the *Alpha Phi Alpha* cases and *Georgia NAACP* that "Section 2 of the Voting Rights Act provides no private right of action."  Answer, *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Feb. 25, 2022), ECF No. 280; Answer to Am. Compl., *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Oct. 11, 2022), ECF No. 92.  The Courts have already rejected these arguments.  *See Alpha Phi Alpha II*, 2023 WL 7037537, at *47; Order, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Jan. 28, 2022), ECF No. 65; Order, *Ga. State Conf. NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Sept. 26, 2022), ECF No. 89.  For the reasons the United States has articulated in briefing before the Eighth Circuit, the Northern District of Georgia, and other courts, private plaintiffs may enforce Section 2.  *See, e.g.*, U.S. Amicus Br., *Ark. State Conf. of NAACP v. Ark. Bd. of Apportionment*, No. 22-1395 (8th Cir. Apr. 22, 2022), https://perma.cc/5MAE-9DSR; U.S. Statement of Interest, *Chandler v. Allen*, No. 2:21-cv-1531 (N.D. Ala. Sept. 22, 2023), ECF No. 110, https://perma.cc/8SML-P2RE; U.S. Statement of Interest 5 n.3, *Ga. State Conf. of NAACP v. Raffensperger*, No. 1:21-cv-1259 (N.D. Ga. July 26, 2021), ECF No. 55, https://perma.cc/K648-GKNZ.

that the Court should read Section 2 in whatever manner upholds Georgia's maps, so that it "need not reach the constitutional issues" implicated by finding a Section 2 violation.  Defs.' Proposed Findings of Fact & Conclusions of Law ¶ 771, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Sept. 25, 2023), ECF No. 317 (Defs.' Proposed Findings & Conclusions).  And in *Georgia NAACP*, Defendants assert that the Court must read the second and third *Gingles* preconditions to require proof that racial considerations cause racially polarized voting (*i.e.*, racial causation) to avoid a reading of Section 2 that would be unconstitutional or would raise constitutional doubts.  Defs.' Summ. J. Br. 30-32 & n.11, *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Mar. 27, 2023), ECF No. 141-1 (*Ga. NAACP* Summ. J. Br.); *see also Ga. NAACP*, 2023 WL 7093025, at *19-20 (rejecting argument).  Because neither argument properly applies the canon of constitutional avoidance, the Court properly addressed them without engaging in unnecessary constitutional analysis.  *See Ga. NAACP*, 2023 WL 7093025, at *19-20; *Alpha Phi Alpha II*, 2023 WL 7037537, at *55, *142.

The canon of constitutional avoidance is a tool for choosing between competing plausible statutory interpretations, *Clark v. Martinez*, 543 U.S. 371, 385 (2005), and "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction," *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quoting *Clark*, 543 U.S. at

385).  In the *Alpha Phi Alpha* cases, Defendants raise constitutional concerns regarding race-based remedies for Voting Rights Act violations.  Defs.' Proposed Findings & Conclusions ¶¶ 764-767.  However, Defendants also concede—as they must—that the Voting Rights Act "demands consideration of race."  *Id.* ¶ 764 (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018)).  As they are unable to articulate an alternative construction of the Voting Rights Act that avoids the racial considerations they deem suspect, Defendants' constitutional avoidance arguments in the *Alpha Phi Alpha* cases fail.

Defendants similarly fail to present a permissible alternative construction to support their arguments in *Georgia NAACP*.  Although Defendants assert that finding racial bloc voting under the second and third *Gingles* preconditions without also finding racial causation would transmute Section 2 into legislation exceeding Congress's authority under the Fourteenth and Fifteenth Amendments, *Ga. NAACP* Summ. J. Br. 31, the Supreme Court long ago rejected Defendants' proffered reading of the statute.  Eight Justices held in *Gingles* that plaintiffs need show "neither causation nor intent" to prove racially polarized voting under the preconditions.  478 U.S. at 62 (plurality opinion); *see also id.* at 100 (O'Connor, J., joined by Burger, C.J., Powell, J., and Rehnquist, J., concurring in the judgment) ("I agree that defendants cannot rebut this showing by offering evidence that the divergent racial voting patterns may be explained in part by causes other than

9

race."). The Supreme Court has trodden the same path ever since. *See, e.g.*, *Milligan*, 599 U.S. at 18; *see also* Section II.B, *infra*. Moreover, the *en banc* Eleventh Circuit and this Court have already applied these decisions to relegate causation to the totality of the circumstances stage. *See Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc); *Ga. NAACP*, 2023 WL 7093025, at *20. "[B]ecause [the Supreme] Court's cases are so clear, there is no ambiguity . . . to sidestep through constitutional avoidance." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 151 (2015).

Fundamentally, avoidance "is not a method of adjudicating constitutional questions by other means," *United States v. Apel*, 571 U.S. 359, 372 (2014), or a vehicle for defendants to render federal statutes "inoperative" in individual cases, *Clark*, 543 U.S. at 384. Nonetheless, in the *Alpha Phi Alpha* cases Defendants frame avoidance as an "affirmative defense," couching their arguments in terms of how the Court would have to interpret Section 2 to "grant the relief Plaintiffs seek." Pretrial Order 23, *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Aug. 15, 2023), ECF No. 280 (*Alpha Phi Alpha* Pretrial Order). And they warn the Court that it must not find Section 2 liability "on these facts" because doing so "would call into question the constitutionality of race-based redistricting," Defs.' Proposed Findings & Conclusions ¶ 769. Avoidance principles do not authorize courts to "'interpret' statutes" this way, "by

gerrymandering them with a list of exceptions that happen to describe a party's case." *Apel*, 571 U.S. at 372 (citation omitted).

Finally, in the *Alpha Phi Alpha* cases Defendants suggest that the passage of time has undermined the constitutionality of Section 2. *See* Defs.' Proposed Findings & Conclusions ¶¶ 772-773 (citing *Shelby County*, 570 U.S. at 535). This argument is incompatible with the canon of constitutional avoidance as a tool of statutory interpretation. The canon "rest[s] on the reasonable presumption that Congress did not intend" a statutory reading "which raises serious constitutional doubts." *Clark*, 543 U.S. at 381. But Defendants' temporal argument necessarily concedes that Section 2, as interpreted and applied in *Gingles*, was constitutional when Congress last amended this portion of the Voting Rights Act in 1982. *See also Milligan*, 599 U.S. at 13-14. There is no basis for then assuming—as application of the avoidance canon would require—that Congress intended Section 2 to mean one thing in 1982 and something else 40 years later. *See Clark*, 543 U.S. at 382 (rejecting contention that avoidance may require statutory meaning to "change" in the presence of new constitutional concerns).

## II.    Supreme Court Precedent Forecloses Defendants' Constitutional Arguments.

In *Milligan*, the Supreme Court recently reaffirmed the constitutionality of Section 2's race-based remedies and the *Gingles* framework for resolving Section 2 claims. *See* 599 U.S. at 25-26. Defendants' as-applied constitutional defenses are

flatly inconsistent with *Milligan*.  There, the Supreme Court held that Section 2's remedial regime, including race-based remedies where appropriate, is within Congress's enforcement powers.  *See id.* at 41.  And the Supreme Court declined Alabama's invitation to alter the *Gingles* framework by adding stringent evidentiary requirements beyond the statutorily enacted "totality of the circumstances" test, *id.* at 25-26, as Defendants attempt to do here by inserting a new "racial causation" requirement.  Despite Defendants' vague invocation of "changed circumstances," their arguments are substantively indistinguishable from the arguments raised and rejected in *Milligan*, as both Courts have already recognized.

### A. The Fifteenth Amendment Permits Race-Based Redistricting as a Remedy for Section 2 Violations.

The Supreme Court was clear when it rejected Alabama's arguments in *Milligan* that Section 2 exceeds Congressional enforcement powers.  Consistent with prior cases, *Milligan* explained that Congress may "pursuant to § 2 [of the Fifteenth Amendment] outlaw voting practices that are discriminatory in effect," and that the Voting Rights Act's "'ban on electoral changes that are discriminatory in effect . . . is an appropriate method of promoting the purposes of the Fifteenth Amendment.'"  599 U.S. at 41 (quoting *City of Rome v. United States*, 446 U.S. 156, 173, 177 (1980)).  And the Supreme Court specifically upheld the use of race to remediate Section 2 violations, stating that "for the last four decades," courts

"have repeatedly applied the effects test of § 2 as interpreted in *Gingles* and, under certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate § 2." *Id.*; *see also id.* at 44 (Kavanaugh, J., concurring in part) (agreeing that "the effects test, as applied by *Gingles* to redistricting, requires in certain circumstances that courts account for the race of voters" to remedy violations). Accordingly, the majority rejected the argument that "§ 2 as interpreted in *Gingles* exceeds the remedial authority of Congress." *Id.* at 41 (majority opinion).

Nevertheless, Defendants assert in the *Alpha Phi Alpha* cases "that finding for Plaintiffs requires interpreting [Section 2] in a way that calls its constitutionality into question, because [Section 2]'s inherently race-based remedies are not justified by present conditions and are not congruent and proportional to the exercise of congressional power under the Fourteenth and Fifteenth Amendments." *Alpha Phi Alpha* Pretrial Order 22. This argument cannot withstand *Milligan*. *See* 599 U.S. at 38, 41; *id.* at 45 (Kavanaugh J., concurring in part) (stating that, "[a]s the Court explains," the argument that Section 2 exceeds Congress's Fourteenth and Fifteenth Amendment powers "is not persuasive"); *see also Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984) (affirming three-judge court decision where appellants asserted that Section 2's results test exceeded Congress's Fifteenth Amendment powers). Nor can it

13

withstand consistent Eleventh Circuit precedent rejecting challenges to Section 2's constitutionality.  *See United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1556-63 (11th Cir. 1984); *see also Johnson v. Hamrick*, 196 F.3d 1216, 1219 n.3 (11th Cir. 1999) (holding *Marengo County* foreclosed constitutional challenge to Section 2).

Indeed, Defendants' arguments are indistinguishable from Alabama's assertions in *Milligan*.  There, the State argued that "[r]equiring racial preferences in single-member districts exceeds any remedial measure the Fifteenth Amendment could authorize."  Br. for Appellants at 71, *Milligan*, 559 U.S. 1 (Nos. 21-1086 & 21-1087), 2022 WL 1276146.  And it further asserted that "[r]acial gerrymanders under the auspices of §2 compliance serve no compelling interest that can justify" a race-based remedy consistent with the Fourteenth Amendment.  *Id.* at 76.  Here, Defendants similarly argue that finding them liable would "call into question the constitutionality of race-based redistricting," Defs.' Proposed Findings & Conclusions ¶ 769—an untenable argument after *Milligan*.[4]

---

[4] In *Georgia NAACP*, Defendants relatedly argue that "interpreting Section 2 to grant preferential treatment to particular racial groups would violate the Equal Protection Clause."  *Ga. NAACP* Summ. J. Br. 31.  This Court rejected that argument.  *See Ga. NAACP*, 2023 WL 7093025, at *20 & n.33.  Alabama in *Milligan* likewise framed race-conscious remedies as racial preferences and pressed the same constitutional arguments that Defendants do here.  *See* Br. for Appellants 76, 79, *Milligan*, 599 U.S. 1 (Nos. 21-1086 & 21-1087), 2022 WL 1276146 (arguing that "allegations of past discrimination or societal discrimination

14

In the pretrial order, Defendants seemingly attempted to distinguish their arguments from Alabama's by raising as an affirmative defense the "temporal argument" that race-based redistricting to remedy a Section 2 violation is no longer constitutional. *Cf. Milligan*, 599 U.S. at 45 (Kavanaugh, J., concurring in part) (stating that Alabama did not raise this "temporal argument"). But this argument is undeveloped, unsupported, and unavailing.

The Court has already found the "temporal argument" unsubstantiated in Defendants' filings. *See Alpha Phi Alpha II*, 2023 WL 7037537, at *142; *Alpha Phi Alpha I*, 2023 WL 5674599, at *20. Nothing in their proposed pretrial order, post-trial proposed findings of fact and conclusions of law, or Rule 5.1 notice suggests any basis for concluding that changed conditions require reconsideration of the settled constitutionality of race-based remedies for Section 2 violations. Instead, Defendants' proposed findings of fact and conclusions of law reveal that Defendants' "constitutional concerns" are little more than a reformulation of their argument against factual liability. Defendants argue only that, if the Court were to apply Section 2 to them "on these facts," it must be unconstitutional. Defs.' Proposed Findings & Conclusions ¶ 769. But that merely reflects Defendants'

---

. . . are inadequate to justify race-based redistricting" and asserting that litigants may not, under the Equal Protection Clause, use Section 2 to justify "transparent gerrymandering that boosts one group's chances at the expense of another" (quotation marks omitted)). *Milligan* forecloses these arguments. *See Milligan*, 599 U.S. at 41-42; *id.* at 45 (Kavanaugh, J., concurring in part).

disagreement with plaintiffs about whether the facts here present one of "'those instances of intensive racial politics' where the 'excessive role [of race] in the electoral process . . . den[ies] minority voters equal opportunity to participate.'" *Milligan*, 599 U.S. at 30 (alterations in original) (citation omitted).  The *Gingles* preconditions and totality of the circumstances analysis are the mechanisms to determine these questions.  Given the established constitutionality of the *Gingles* framework, Defendants identify no constitutional infirmity with the liability judgment against them.

Finally, even if Defendants had meaningfully pursued the temporal argument, it would fail.  Defendants incorrectly suggest that finding Section 2 liability would present the same "constitutional concerns at issue in *Shelby County*," Defs.' Proposed Findings & Conclusions ¶ 773.  But *Shelby County* turned on two primary concerns: (1) that preclearance imposed extraordinary burdens on states by requiring advance permission from the federal government "to implement laws that they would otherwise have the right to enact and execute on their own," *Shelby County*, 570 U.S. at 544; and (2) that "Congress—*if it is to divide the States*—must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions."  *Id.* at 553 (emphasis added).

Neither of those concerns is present here.  Section 2 does not require preclearance and applies only after imposition or application of a "standard,

16

practice, or procedure." 52 U.S.C. § 10301(a). As the Supreme Court observed in *Shelby County*, there are "important differences between [post-enactment lawsuit] proceedings and preclearance proceedings." 570 U.S. at 545. And Section 2 cannot impinge on the "equal sovereignty" of the states, *id.* at 544, because it applies "nationwide" to all States and political subdivisions, *id.* at 537.

Ultimately, as Defendants acknowledge, "no [temporal] limitation need be applied to the [Voting Rights Act], because the properly applied *Gingles* test is self-regulating," Defs.' Proposed Findings & Conclusions ¶ 768, thus ensuring its continued constitutionality. To establish a Section 2 violation, a plaintiff must satisfy both the *Gingles* preconditions and the totality-of-circumstances test, which turns on up-to-date considerations. For example, as the Supreme Court noted in *Milligan*, "as residential segregation decreases—as it has 'sharply' done since the 1970s—satisfying [the first precondition] becomes more difficult." *Milligan*, 599 U.S. at 28-29 (internal quotation marks omitted); *see also* Heather K. Gerken, *A Third Way for the Voting Rights Act*, 106 Colum. L. Rev. 708, 745 (2006) (recognizing that "[w]hen people cease to vote along racial lines," plaintiffs will be unable to satisfy the second and third preconditions). Similarly, when the effects of earlier discrimination and the use of racial appeals diminish in a jurisdiction, a plaintiff will have a harder time proving, under the totality of circumstances, that it is a place in which the "excessive role of race in the electoral process . . . denies

17

minority voters equal opportunity to participate." *Milligan*, 599 U.S. at 30 (citation and alterations omitted).

The rigorous standard for proving a Section 2 claim is well within Congress's power to "use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966); *cf. Shelby County*, 570 U.S. at 556 (invalidating separate Voting Rights Act provision only after finding that Congress's justification was "irrational" under the *Katzenbach* test); *id.* at 557 ("Our decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2."). And because that standard is inherently and by design sensitive to "changing conditions" and calibrated to the ongoing need for a race-based remedy, Section 2 provides its own "logical end point," alleviating any temporal concerns. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 221 (2023) (citation omitted); *see also Milligan*, 599 U.S. at 29 (noting decline in successful Section 2 challenges over time). This Court can accordingly apply Section 2 to Defendants and remediate any liability consistent with the Constitution.

### B.   There Are No Constitutional Concerns That Require Revisiting the *Gingles* Preconditions.

The Supreme Court's decision in *Milligan* also forecloses Defendants' argument in *Georgia NAACP* that Section 2 would exceed Congress's Fifteenth

18

Amendment authority if "plaintiffs can establish racial bloc voting" under the second and third *Gingles* preconditions "merely by showing that minorities and majorities vote differently." *Ga. NAACP* Summ. J. Br. 31.  The Court has already rejected this argument.  *See Ga. NAACP*, 2023 WL 7093025, at *19-20; *Alpha Phi Alpha II*, 2023 WL 7037537, at *55; *Alpha Phi Alpha I*, 2023 WL 5674599, at *16-19.  Causation is appropriately considered in the totality of the circumstances analysis, not as part of the *Gingles* preconditions.

In *Milligan*, Alabama similarly argued that the Section 2 framework is unconstitutional because "racial polarization 'provides no evidence about why people vote the way they do'" and does not "say[] anything about racial animus." Br. for Appellants 76-77, *Milligan*, 559 U.S. 1 (Nos. 21-1086 & 21-1087), 2022 WL 1276146 (alteration in original).[5]  The Supreme Court disagreed.  It laid out the second and third *Gingles* preconditions precisely as it had in *Gingles*: "the minority group must be able to show that it is politically cohesive," and "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 51) (alteration in original); *see also id.* at

---

[5] *But see* Defs.' Summ. J. Supp. Br. 3, *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. June 23, 2023), ECF No. 178 (*Ga. NAACP* Supp. Br.) (incorrectly asserting that "Alabama apparently did not press any issues at the Supreme Court related to the impact of race and partisanship").

26 (declining to "revise and reformulate the *Gingles* threshold inquiry") (quoting

*Bartlett v. Strickland*, 556 U.S. 1, 16 (2009)).  Nowhere did the Supreme Court

require a showing of racial causation.

To the contrary, *Milligan* reiterated the explanation in *Gingles* that the "risk"

of the sort of inequality Section 2 guards against "is greatest 'where minority and

majority voters consistently prefer different candidates' and where minority voters

are submerged in a majority voting population that 'regularly defeat[s]' their

choices."  *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 48) (alteration in

original).  That formulation does not turn on the reasons why minority voters are

cohesive and the majority opposes minority voters' choices.  The Supreme Court

then agreed with the district court that the plaintiffs had met the *Gingles*

preconditions because, "on average, Black voters supported their candidates of

choice with 92.3% of the vote while white voters supported Black-preferred

candidates with 15.4% of the vote."  *Id.* at 22 (internal quotation marks omitted).

The Supreme Court never discussed whether the plaintiffs had shown or could

show a racial cause for Alabama's racially polarized voting when it found "no

reason to disturb the District Court's careful factual findings" or "to upset the

District Court's legal conclusions," affirming that the court "faithfully applied [the

Court's] precedents."  *Id.* at 23.  And the Supreme Court then upheld the *Gingles*

framework, as the district court had applied it, as a proper exercise of Congress's constitutional powers. *See id.* at 41.

Notably, the Supreme Court described the purpose of the third *Gingles* precondition in a manner that explains why it is constitutional without a racial causality requirement. As the Supreme Court explained, the majority bloc voting requirement does provide some evidence of discrimination: "The third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote' *at least plausibly on account of race.*" *Milligan*, 599 U.S. at 19 (alteration in original) (emphasis added) (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

This language does not—as Defendants suggest, *see Ga. NAACP* Supp. Br. 13—mean that the Supreme Court imposed a racial causation requirement, a contention already rejected in the *Alpha Phi Alpha* cases, *see Alpha Phi Alpha I*, 2023 WL 5674599, at *18 n.32. Rather, this discussion means that the very existence of racially polarized voting creates a plausible inference that race is at least one reason for minority voters' lack of success. In other words, the third precondition shows that "minority voters face—unlike their majority peers—bloc voting along racial lines." *Milligan*, 599 U.S. at 25. However, it is the "totality of circumstances" test, 52 U.S.C. § 10301(b), that ultimately determines whether the "district is not equally open" because that bloc voting, "arising against the

21

backdrop of substantial racial discrimination within the State, . . . renders a minority vote unequal to a vote by a nonminority voter." *Milligan*, 599 U.S. at 25. This comprehensive standard is sufficiently robust to permit race-conscious remedies under Congress's authority to enforce the Fourteenth and Fifteenth Amendments. *See id.* at 41; *see also* Ellen D. Katz et al., *The Evolution of Section 2: Numbers and Trends*, Fig. 7 (2022) (recognizing declining case counts and success rates), https://perma.cc/MH6P-XMZR.[6]

In any event, Defendants' arguments do not require constitutionalizing the *Gingles* preconditions, which are a judicially created gatekeeping mechanism to screen out claims that lack merit. *See Milligan*, 599 U.S. at 26. The *Gingles* preconditions do not represent Section 2's full "totality of circumstances" test, 52 U.S.C. § 10301(b). Partisan explanations for racially polarized voting can be considered at the totality-of-circumstances stage, *see, e.g.*, *Solomon*, 221 F.3d at 1225, but nothing in Section 2 or the Fifteenth Amendment requires plaintiffs to

---

[6] Defendants' alternative reading mislocates the harm Section 2 seeks to remedy. Their reading suggests the injury stems from individual voters casting votes in a racially polarized manner, which no law can remedy. Rather, Section 2 addresses the harm resulting from a jurisdiction's use of a method of election or districting plan that interacts with racially polarized voting in a manner that eliminates equality of electoral opportunity under the totality of circumstances. *See Milligan*, 599 U.S. at 25 ("A district is not equally open, in other words, when minority voters face . . . bloc voting along racial lines . . . *that renders a minority vote unequal to a vote by a nonminority voter*." (emphasis added)).

disprove partisan explanations for racially polarized voting merely to proceed past the preconditions.  *See Milligan*, 599 U.S. at 25-26, 41-42; *see also, e.g.*, *Marengo Cnty.*, 731 F.2d at 1567 ("The surest indication of race-conscious politics is a pattern of racially polarized voting.").[7]

## CONCLUSION

For the foregoing reasons, the Courts should reject Defendants' challenges to the constitutionality of Section 2 of the Voting Rights Act.

---

[7]  Although Defendants separately suggest in *Georgia NAACP* that a racial causality requirement is a necessary "temporal limitation on the reach of Section 2," *Ga. NAACP* Supp. Br. 16, *Milligan* recognized that the *Gingles* framework already provides a self-regulating mechanism.  *See* Section II.A, *supra*.

Date:  November 3, 2023

Respectfully submitted,

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

SPARKLE SOOKNANAN
Principal Deputy Assistant Attorney
General

*/s/ Aileen Bell Hughes*
AILEEN BELL HUGHES
Georgia Bar No. 375505
Assistant U.S. Attorney
Office of the United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181

*/s/ Daniel J. Freeman*
TIMOTHY F. MELLETT
DANIEL J. FREEMAN
MICHAEL E. STEWART
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2023, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Daniel J. Freeman*
DANIEL J. FREEMAN
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, DC 20530
Phone: (800) 253-3931
Fax: (202) 307-3961