# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BRAD RAFFENSPERGER,<br><br>*Defendant*. | CIVIL ACTION<br><br>FILE NO. 1:21-CV-05337-SCJ |
| COAKLEY PENDERGRASS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BRAD RAFFENSPERGER, *et al.*,<br><br>*Defendants*. | CIVIL ACTION<br><br>FILE NO. 1:21-CV-05339-SCJ |
| ANNIE LOIS GRANT, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BRAD RAFFENSPERGER, *et al.*,<br><br>*Defendants*. | CIVIL ACTION<br><br>FILE NO. 1:22-CV-00122-SCJ |

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>STATE OF GEORGIA, *et al.*,<br><br>*Defendants*. | CIVIL ACTION<br><br>FILE NO. 1:21-CV-5338-ELB-SCJ-SDG |

# RESPONSE TO UNITED STATES ON CONSTITUTIONALITY OF SECTION 2 OF THE VOTING RIGHTS ACT

1

# INTRODUCTION

In its brief related to the constitutionality of Section 2 of the Voting Rights Act (VRA),[1] the Department of Justice (DOJ) begins with a point of agreement with Defendants—that "Defendants do not facially challenge Section 2's constitutionality." DOJ Brief, p. 11. As Defendants have repeatedly stated in these cases, properly applying the *Gingles* preconditions and Senate Factor 2 avoids the constitutional questions raised by Justice Kavanaugh in the *Allen* case and addresses the tension between the Constitution, "which prohibits restricts consideration of race" and the VRA, which "demands consideration of race." *Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018).

The Court acknowledged in the Section 2-only cases that Georgia has made "great strides . . . to increase the political opportunities of Black voters in the 58 years since the passage of the Voting Rights Act." *Alpha Phi Alpha* Doc. 333, p. 9. Those strides demand the conclusion that Defendants' constitutional claims are valid and require this Court to carefully consider whether Section 2, as applied to Georgia's redistricting plans, is constitutional.

---

[1] The DOJ filed the same brief in all four redistricting cases raising Section 2 claims about Georgia's 2021 redistricting plans. For ease of reference, the term "DOJ Brief" refers to the brief filed at the following docket entries in each case: *Alpha Phi Alpha* Doc. 335-1, *Grant* Doc. 296-1, *Pendergrass* Doc. 296-1, *Ga. NAACP* Doc. 206-1. While a formal response may not necessarily be required given the posture of the cases, Defendants file this response to ensure the record is complete.

# ARGUMENT

## I. Defendants have consistently raised constitutional arguments in these cases.

Throughout these cases, as DOJ acknowledges, Defendants have consistently raised constitutional arguments regarding the proper scope of Section 2 of the VRA in applying that statute to the facts in Georgia. That includes motions for summary judgment (*Alpha Phi Alpha* Doc. 230-1, pp. 21, 27–29; *Grant* Doc. 190-1, pp. 24, 30–32; *Pendergrass* Doc. 175-1, pp. 20, 26–28; *Ga. NAACP* Doc. 141-1, pp. 33–35), after the *Allen v. Milligan* decision (*Alpha Phi Alpha* Doc. 263, pp. 19-21; *Grant* Doc. 228, pp. 19-21; *Pendergrass* Doc. 214, pp. 17-19; *Ga. NAACP* Doc. 178, pp. 17-19), in the pretrial orders (*Alpha Phi Alpha* Doc. 280, pp. 22–24; *Grant* Doc. 243, pp. 24–25; *Pendergrass* Doc. 231, pp. 27–29; *Ga. NAACP* Doc. 194, pp. 28–29), at opening argument in the trial of the single-judge Section 2 cases (Trial Tr. Sept. 5, 2023 at 39:22–40:20), in closing arguments in the trial of the single-judge Section 2 cases (Trial Tr. Sept. 14, 2023 at 2419:15–2421:19), and in proposed findings of fact and conclusions of law (*Alpha Phi Alpha* Doc. 317, ¶¶ 10, 763–773; *Grant* Doc. 277, ¶¶ 10, 697–707; *Pendergrass* Doc. 268, ¶¶ 10, 561–571).

While the Court in the Section 2-only cases found that Defendants "offered no argument or support" for their constitutional claims during the trial, *Alpha Phi Alpha* Doc. 333, p. 508, DOJ clearly was able to respond to a

3

number of arguments made by Defendants that were articulated in briefs and trial argument. Those arguments require this Court to consider carefully the constitutional issues raised in these cases.

## II. The unique nature of the Voting Rights Act.

In its brief, DOJ fails to acknowledge a key point regarding the VRA—a proper interpretation by the courts is critical to maintaining its constitutionality given its required focus on race. Throughout prior redistricting cycles, the Supreme Court has explained that the Constitution prohibits racial gerrymandering. *Shaw v. Reno*, 509 U.S. 630, 648 (1993). This matters because "a racial gerrymander may exacerbate the very patterns of racial bloc voting that majority-minority districting is sometimes said to counteract." *Id.*

In cases DOJ does not even cite, the Supreme Court has denied claims by states that the VRA required particular race-based districting schemes, including in Georgia, based on concerns about how those readings would take the VRA beyond the Constitution. *See, e.g., Miller v. Johnson*, 515 U.S. 900, 921 (1995). While the Supreme Court has always assumed without deciding that compliance with federal antidiscrimination laws can justify race-based districts, the challenged district must be "reasonably necessary under a ***constitutional reading and application of those laws***." *Id.* (citing *Shaw*, 509 U.S. at 653-655) (emphasis added). This is because a state is "vulnerable

4

to 'competing hazards of liability'" between the Constitution and the VRA when creating redistricting plans. *Abbott*, 138 S. Ct. at 2315 (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality op.)).

Thus, an improper interpretation of Section 2 which "unnecessarily infuse race into virtually every redistricting," would "rais[e] serious constitutional questions." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 446 (2006) (*LULAC*). In other words, in the redistricting context, the proper application of statutes like the VRA is critically important, because an improper reading and application of the VRA means the statute cannot justify race-based decision-making that the VRA otherwise requires.

In other contexts, the Supreme Court determined that race-based programs must have an end point: "To manage these concerns, *Grutter* imposed one final limit on race-based admissions programs. At some point, the Court held, they must end." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2165 (2023). Thus, "the authority to conduct race-based redistricting cannot extend indefinitely into the future." *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring in part). If a Court improperly applies Section 2, it is creating problems of constitutional import because the Constitution places limits on the very race-based decisionmaking that Section 2 requires.

5

## III. Properly interpreting Section 2 avoids constitutional questions.

DOJ begins by claiming that the canon of constitutional avoidance does not apply, criticizing Defendants for being "unable to articulate an alternative construction of the Voting Rights Act that avoids the racial considerations they deem suspect." DOJ Brief, p. 14. But such an alternative construction is exactly what was at issue in *LULAC* and *Miller*—claims that certain districts are required by the VRA when they were not. If courts require the drawing of districts based on race as a result of an improper interpretation of the VRA, that would bring forth the very "constitutional questions" the Supreme Court warned of in *LULAC*. 548 U.S. at 446. Indeed, DOJ later agrees with Defendants that a *proper* application of Section 2 avoids constitutional questions. DOJ Brief, pp. 22-23.

### A. The facts in these cases raise constitutional questions.

As Defendants argued throughout all of these cases, the constitutional questions about Section 2 necessarily result from Plaintiffs' legal theories, because Plaintiffs would require the application of race-based remedies to a state with an equally open election system for purposes of Section 2. If Section 2 requires the continued application of race-based districting to Georgia under the facts before the Court—including the statewide elections of Black and Black-preferred candidates for the United States Senate, the election of a Black-preferred candidate for President, the success of Black candidates in five

6

out of 14 districts for the House of Representatives, and widespread success of Black-preferred candidates in the Georgia General Assembly—then the Court must consider whether the statute is constitutional as applied to Georgia. Answering this question is not just a reweighing or repackaging of the evidence. It is critical to determining what burden Section 2 actually places on the state of Georgia in enacting its redistricting plans. This is not using the avoidance canon to adjudicate "constitutional questions by other means," *United States v. Apel*, 571 U.S. 359, 372 (2014),[2] but rather to properly apply a statute that has significant tension with the requirements of the Constitution.

### B. DOJ's view of racially polarized voting is too narrow.

DOJ also overreads the conclusions in *Gingles* regarding racially polarized voting. Questions related to the scope of racially polarized voting are far less clear than DOJ claims.

During consideration and passage of the 1982 amendments to the Voting Rights Act, the term "racially polarized voting" was understood and not at all subject to debate. For example, the 1976 District Court decision in *Bolden v. Mobile*, which would eventually make its way to the Supreme Court and spark the call for amending Section 2, defined the term in two parts. First, the court

---

[2] While DOJ cites to *Apel* for this proposition, it involved First Amendment claims, not VRA claims, and the Court of Appeals had not ruled on the plaintiff's constitutional claims. 571 U.S. at 372-73.

stated that racial polarization occurs with "white voting for white and black for black if a white is opposed to a black, or if the race is between two white candidates and one candidate is identified with a favorable vote in the black wards, or identified with sponsoring particularized black needs." 423 F. Supp. 384, 388 (S.D. Ala. 1976). When these preconditions are observed, racial polarization is present if "a ***white backlash*** occurs which usually results in the defeat of the black candidate or the white candidate identified with the blacks." *Id*. (Emphasis added). The use of term "white backlash"—as distinct from a more innocuous requirement of mere "white bloc voting"—suggests an inquiry into the *reasons* or *causes* behind the majority bloc voting pattern.

The Fifth Circuit would later affirm the opinion containing this definition. *See Bolden v. Mobile*, 571 F.2d 238, 243 (5th Cir. 1978) (citing with approval the district court's finding that "[n]o black had achieved election to the city commission due, in part, to racially polarized voting of an acute nature."). Later, the Supreme Court did nothing to question the legitimacy of the trial court's definition of racially polarized voting. *Mobile v. Bolden*, 446 U.S. 55, 64 (1980).

The result of the Supreme Court's decision in *Bolden* led to the 1982 amendments to the VRA and the modification of Section 2 that effectively overturned the Supreme Court. *Gingles*, 478 U.S. at 35 ("[T]he amendment was largely a response to this Court's plurality opinion in *Mobile v. Bolden*, 446

8

U.S. 55 (1980)… to make clear that a violation [under Section 2] could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the "results test," applied by this Court in *White v. Regester*, 412 U.S. 755 (1973), and by other federal courts before *Bolden*…").

But despite targeting the Supreme Court's decision in *Bolden*, nothing in the amendments nor the Senate Report explaining them suggests Congress understood the definition of "racial polarization" or "racially polarized voting" as anything other than what had been firmly established by the courts up to that point (*i.e.*, the definition employed by the *Bolden* district court).

And retaining the "white backlash" component of the trial court test for racial polarization makes sense in the context of the amendments because it faithfully adheres to the Supreme Court's analysis in *Whitcomb v. Chavis*, 403 U.S. 124 (1971) which the Senate Report also relied on in its efforts to return to the pre-*Bolden* legal standard, S. Rep. at 21-24. *Whitcomb* required a finding of "invidious discrimination" that could be observed in voting patterns and the way they interact with electoral system such that "[minority] residents have less opportunity" to participate in the system than do their white counterparts. 403 U.S. at 149. If this pattern is not observed, then what appears to be the discriminatory "cancel[ing] out" of Black voting power is likely "a mere euphemism for political defeat at the polls." *Id.* at 153.

9

Contrary to DOJ's claims, defining racially polarized voting in this way does not revive the intent test Congress sought to stamp out with the 1982 amendments. Rather, it simply anchors the results test in precedent and accomplishes what Justice O'Connor accuses the *Gingles* plurality opinion of failing to do: respecting "the balance struck by Congress in amending § 2" and preserving "the results test as described by this Court in *Whitcomb* and *White*." *Gingles*, 478 U.S. at 85 (O'Connor, J. concurring).

Despite the continuing focus on racial polarization in Section 2 cases, the Report of the Committee from the Senate to the 1982 amendments mentions racial polarization just two times. One time is when it approvingly cites the factors considered by the *Bolden* District Court. *See* Senate Report, p. 24 at n. 88. And the second time is when it is detailing the substance of Senate Factor 2. *Id.*, p. 29. Neither instance suggests any departure from the meaning articulated by the *Bolden* district court. When Congress designed the amendment specifically to overturn the Supreme Court, it declined to alter or refine the definition of racial polarization utilized by the courts at the time. Thus, there is nothing to suggest a departure from the interpretive maxim that "[w]ords must be given the meaning they had when the text was adopted." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012).

Moreover, the District Court in *Gingles v. Edminsten*, 590 F. Supp. 345 (E.D.N.C. 1984) (three-judge court), which would later become the seminal Supreme Court case interpreting Section 2, *Thornburg v. Gingles*, agreed with the definition of racially polarized voting established by the *Bolden* district court. In finding racial polarization, the *Gingles* trial court noted that in "none of the elections, ***primary or general***, did a black candidate receive a majority of white votes cast." 590 F. Supp. at 368 (emphasis added). Moreover, "[o]n the average, 81.7% of white voters did not vote for any black candidate in the primary elections." *Id*. And, crucially, "approximately two-thirds of [Democratic] white voters did not vote for black candidates in general elections even after the candidate had won the Democratic primary and the only choice was to vote for a Republican or no one." *Id*.

This observed behavior of white Democratic voters refusing to vote for the Black candidate (or the Black-preferred white candidate) even when the only other option was a "a Republican or no one," is precisely the "white backlash" that the *Bolden* district court identified as a critical component of racial polarization. If the polarization occurred as a result of something more benign, like partisanship, there would be no "white backlash" observed and you would see white Democratic voters would coalesce around the Black or Black-preferred Democrat in the general election.

11

For purposes of determining liability under Section 2, Defendants earlier urged this Court to adopt the definition utilized by the *Bolden* district court and well-known to Congress at the time of consideration and adoption of the 1982 amendments as a method of avoiding the constitutional problems discussed in this case. Not only must the data indicate that white voters vote cohesively in opposition to the Black-preferred candidate. But there also must be an observable "white backlash" where the statistical or anecdotal evidence indicates that white voters are casting aside partisan labels and motivations in order to oppose Black candidates or Black-preferred candidates. That is simply not present on the facts of this case and demonstrates the constitutional problems with Plaintiffs' proposed application of Section 2. Without this proper definition, partisan voting patterns and racial voting patterns will be treated the same—which runs headlong into constitutional problems with how Section 2 is interpreted.

## IV. Defendants' arguments are not foreclosed by precedent.

DOJ next claims that Defendants' constitutional claims about Section 2 are foreclosed by existing precedent. Not so.

Unlike Alabama, Defendants here do not claim that race-based redistricting is unconstitutional at all times. DOJ's claim to the contrary is clearly foreclosed by Defendants' position in the pretrial order, which it quotes. DOJ Brief, p. 18 (quoting *Alpha Phi Alpha* Pretrial Order at 22). There may be

jurisdictions where continuing conditions on the ground justify remedial districts. But Georgia in 2023 is not one of those jurisdictions. Far from being "untenable," this is the appropriate resolution of the tension the Supreme Court has consistently recognized between the requirements of the Constitution and the requirements of the VRA. *Abbott*, 138 S. Ct. at 2315.

Time and facts matter. In 1982 and in other jurisdictions, the Supreme Court has upheld the provisions of Section 2. But if courts continue to apply Section 2 in a way that requires race-based redistricting in states where there is a lack of the "intensive racial politics" Section 2 was designed to address, *Allen*, 599 U.S. at 29, where there is not a lack of equal opportunity to participate in the political process on account of race, not only are they acting beyond what the statute requires, but also beyond what the Constitution allows.

> As Defendants asked in opening argument:
>
> If Georgia's electoral system is not equally open to Black voters, what would that system look like? What would have to change?
>
> Would it look like proportionality where there is an exact representation of majority Black districts to the proportion of population? This Court has already said in its summary judgment orders that that cannot be the standard. You can't measure equal opportunity based on, as a benchmark -- proportionality as a benchmark for equal opportunity.
>
> Would it be more Democrats being elected to the Legislature or to Congress? If that's the standard, we now are into constitutional questions about what Section 2 is actually protecting and whether it's congruent or proportional to the needs of the statute.

13

Section 2 Trial Tr. Sept. 5, 2023 at 36:24–37:13; *see also Alpha Phi Alpha* Doc. 317 (Defendant's Proposed Finding of Fact and Conclusions of Law ¶¶ 1090-1094). If Section 2 continues to place the burden of race-based remedies on Georgia today, then it runs headlong into the same constitutional problems as the proposed interpretation of the VRA in *Miller*, 515 U.S. at 921.

Thus, contrary to DOJ's claims, the temporal argument was developed during the trial because it must relate to the facts on the ground. Partisan voting patterns are simply not enough to invoke the sweeping powers of the federal judicial to order a state to adopt new, race-based districts.

While DOJ dismisses concerns about equal sovereignty issues with Section 2, DOJ Brief, pp. 21-22, its reading of Section 2 can result in requiring partisan outcomes in some states but not others based solely on partisan voting patterns. Again, this emphasizes the importance of carefully policing whether a voting pattern is racial or partisan.

DOJ cannot simply dismiss Defendants' arguments as foreclosed by precedent when the very precedent in this arena demands their consideration. Forcing states with widespread electoral success of Black and Black-preferred candidates to enact race-based redistricting schemes runs afoul of the Constitution.

## V. Causation matters, whether during the *Gingles* preconditions or at the totality of the circumstances.

DOJ then devotes the remainder of its brief to discussing the *Gingles* preconditions and racially polarized voting. Not only is DOJ's argument about racially polarized voting foreclosed by the discussion of the proper definition above, but it misses a key point—causation matters. Indeed, DOJ agrees that causation related to polarized voting patterns should be considered at the totality of the circumstances phase. DOJ Brief, p. 24.

*Where* causation is considered does not matter nearly as much as the fact that it *must* be considered. While it makes far more sense to address whether voting patterns are partisan or racial during the preconditions, which are designed to screen claims, the nature of the voting patterns requires close inspection because "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates." *Solomon v. Liberty County Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000).

Thus, if dilution is not happening on account of race, then Section 2 does not apply because "[u]nless courts 'exercise extraordinary caution' in distinguishing race-based redistricting from politics-based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." *Cooper v. Harris*, 581 U.S. 285,

15

335 (2017) (Alito, J., concurring in the judgment in part and dissenting in part) (quoting *Miller*, 515 U.S. at 916). This danger is heightened in cases like these because Plaintiffs seek not to vindicate a complete lack of political success, but rather they seek to weaponize Section 2 to achieve "more success in place of some." *Johnson v. De Grandy*, 512 U.S. 997, 1012-13 (1994). But this Court cannot "conflat[e] discrimination on the basis of party affiliation with discrimination on the basis of race." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 924 (11th Cir. 2023) (citations omitted).

Ultimately, DOJ tries to avoid the reality that "partisan motives are not the same as racial motives." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021). And federal courts are "not responsible for vindicating generalized partisan preferences." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019). Without proper consideration of causation related to voting patterns, whether during the preconditions or otherwise, a court seeking to enforce Section 2 would be acting beyond constitutional limits.

## CONCLUSION

The Voting Rights Act is a critically important statute for the protection of voters. The way to ensure it can continue to carry out its important mission is to apply it consistent with the U.S. Constitution. And it cannot be constitutionally applied to Georgia's 2021 redistricting plans given the facts on the ground in Georgia today.

Respectfully submitted this 17th day of November, 2023.

    Christopher M. Carr
    Attorney General
    Georgia Bar No. 112505
    Bryan K. Webb
    Deputy Attorney General
    Georgia Bar No. 743580
    Russell D. Willard
    Senior Assistant Attorney General
    Georgia Bar No. 760280
    **State Law Department**
    40 Capitol Square, S.W.
    Atlanta, Georgia 30334

    */s/ Bryan P. Tyson*
    Bryan P. Tyson
    Special Assistant Attorney General
    Georgia Bar No. 515411
    btyson@taylorenglish.com
    Frank B. Strickland
    Georgia Bar No. 687600
    fstrickland@taylorenglish.com
    Bryan F. Jacoutot
    Georgia Bar No. 668272
    bjacoutot@taylorenglish.com
    Diane Festin LaRoss
    Georgia Bar No. 430830
    dlaross@taylorenglish.com
    Donald P. Boyle, Jr.
    Georgia Bar No. 073519
    dboyle@taylorenglish.com
    Daniel H. Weigel
    Georgia Bar No. 956419
    dweigel@taylorenglish.com
    **Taylor English Duma LLP**
    1600 Parkwood Circle
    Suite 200
    Atlanta, GA 30339

Telephone: 678-336-7249

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Response Brief has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

<div align="right">

*/s/Bryan P. Tyson*
Bryan P. Tyson

</div>